IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| INFORM INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | |
| vs. | ) | |
| | ) | |
| GOOGLE LLC; | ) | NO. _____ |
| GOOGLE INC.; | ) | |
| ALPHABET INC.; | ) | |
| YOUTUBE, LLC; | ) | |
| YOUTUBE, INC.; | ) | JURY TRIAL DEMANDED |
| and JOHN DOES 1-100; | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Inform, Inc. ("Inform"), by and through its attorneys, brings this action against Defendants Google LLC, Google Inc., Alphabet Inc., YouTube, LLC, YouTube, Inc., and John Does 1-100 (collectively "Defendants" or "Google"). Inform makes its allegations upon personal knowledge as to its own acts and upon information and belief as to all other matters, as well as based upon the ongoing investigation of its counsel. Plaintiff respectfully shows the Court as follows:

I.     INTRODUCTION

1.     This is an action under, *inter alia,* the Sherman Antitrust Act, the Clayton Antitrust Act, and Georgia's common law tort of tortious interference to restrain the anticompetitive conduct of Defendants, to remedy the effects of the Defendants' past unlawful conduct, to protect free market competition from continued unlawful manipulation, and to remedy harm to consumers and competitors alike.

2.     Plaintiff Inform is a digital media advertising company that for over a decade has directly competed with Google in the online advertising market, specifically online video advertising, by providing a platform of services to online publishers, content creators, and online advertisers.  While Inform had revenues in excess of $100 million for its online advertising services between 2014 and 2016, since that time Google has effectively put Inform out of business as a direct result of the illegal conduct described herein.  Google's pattern of anticompetitive practices has thwarted competition on the merits and excluded Inform and other Google competitors from the relevant markets.  The result has been to eviscerate competition in multiple markets, harm consumers, degrade consumer choice and consumer privacy, and stifle innovation.

3.     At its core, Google is in the business of online advertising, services from which it derives the vast majority of its revenues.  Users of the Google search engine do not pay a monetary fee; rather Google monetizes users' personal data to drive online advertising revenue.  In essence, Google is a broker of Internet user data for online advertising profits.

4.     For many years, Google's goal has been to monopolize the online advertising market by: (1) amassing and controlling Internet user data; (2) controlling the devices and tools with which users access the Internet; and (3) ultimately controlling the advertising content that is served and consumed by Internet users.

5.     Google, the world's largest and most accessed search engine, has an overwhelming market dominance – well over 90% – in Internet Search and other related markets.  For many years now, Defendants have possessed and still possess monopoly power in this search engine market (hereinafter the "Internet Search Market") and numerous interrelated and overlapping markets, including but not limited to the Search Advertising Market and the Ad Server Market.  Google is also dominant in the Web Browser Market and the broader Online Advertising Market.  Additionally, through its 2005 acquisition of the Android operating system ("OS"), and the resulting control over handheld Android devices, Google has established a monopoly in the worldwide market for Licensable Mobile Device Operating

3

Systems. Collectively, the markets as described above have been leveraged by Google to gain and maintain monopoly power and will be referred to herein as "Defendants' Leveraged Monopolies."

6. To maximize their advertising profits, to protect their valuable monopolies against potential competitive threats, and to extend Defendants' Leveraged Monopolies globally and across digital devices, Defendants have simultaneously engaged in a series of acquisitions and anticompetitive activities designed to thwart competition on the merits.

7. To maintain their monopolies and gain additional monopoly power, Defendants have resorted to blatant and rampant coercive and anticompetitive activities. Defendants' anticompetitive conduct includes:

- coercing consumers to use Google's products and services;

- coercing advertisers to use Google's products and services;

- illegally undermining competitive products and services;

- entering agreements tying other Google products, services and applications to the Android operating systems (OS) offered by Google and/or to the Google Ad Server;

- entering into exclusionary agreements that preclude companies from advertising, distributing, promoting, buying, or using products of competitors or potential competitors to Google's applications;

4

- entering into exclusionary agreements that restrict the right of companies to provide services or resources to competitors or potential competitors to Google's advertising services and products;

- tortiously interfering with competitors' contracts and business relationships;

- maliciously and artificially imposing restrictions on how ads can be supported and accepted for display, while exempting or whitelisting its own platforms from these rules;

- improperly influencing and infiltrating governmental agencies, including the Federal Trade Commission ("FTC") and the United States Patent and Trademark Office ("USPTO") to further Google's interests; and

- engaging in a decades-long campaign to acquire disparate tech companies and patent portfolios with the goal of leveraging its monopoly power to maintain market dominance throughout Defendants' Leveraged Monopolies.

Defendants' conduct described above shall be referred to herein as "Defendants' Competitive Restraints."

8.     Defendants have illegally leveraged their monopoly power and market dominance in interrelated markets both to maintain dominance in those markets

already monopolized by Google (*e.g.*, Internet Search Market, Search Advertising Market, Ad Server Market, and the Licensable Mobile Device Operating Systems Market), as well as to gain further dominance in related markets like the Web Browser Market and the broader Online Advertising Market.

9.     This case is not the first time Google's illegal monopolistic behavior has been challenged.   In fact, there already exists a lengthy public record detailing Google's illegal activities, including but not limited to the following:

- **June 2010**: French regulators found that Google had abused its dominant position in the Internet advertising market when it barred a location data company from using its AdWords service.

- **November 2010**: The European Commission announces an investigation into whether Google abused a dominant market position in online search by allegedly lowering or downgrading the search results of competing services and by giving preferential placement to the results of its own vertical search services in order to shut out competing services.

- **November 2010**: The Commission also announced that it will also look into allegations that Google lowered the 'Quality Score' for sponsored links of competing vertical search services – one of the factors that determine the price paid to Google by advertisers. (Comparison Shopping Investigation)

- **April 2011**: Daum Communications files antitrust complaints with the South Korean Fair Trade Commission, asserting that Google blocked them from putting their search applications on Android phones in South Korea, where Samsung and LG Android phones are manufactured.

- **June 2011**: The FTC launches an antitrust investigation against Google for abusing its monopoly power and anticompetitive practices, focused on, *inter alia*, whether Google unfairly ranks search results to favor its own businesses; whether exclusive agreements to provide search services to online publishers and other Web sites hurt competition; whether Google abused its monopoly in the search engine market to increase advertising rates for competitors and made it difficult for advertisers to compare advertising data running on rival sites such as Yahoo and Microsoft's Bing; and whether the company used control of the Android mobile operating system to pre-install Google's bundled default apps and to discourage smartphone and other mobile device manufacturers from using rivals' applications.

- **June 2011**: The FTC also looks at whether Google violated the FRAND Agreement signed by Motorola Mobility when it acquired 17,000 of the Motorola's standard essential patents SEPs (and 7,000 pending applications) that are crucial to device interoperability – by not licensing

7

the patents to rivals, willing licensees, and competitors on fair, reasonable, and non-discriminatory terms (FRAND).

- **August 2012**: The FTC announces that Google agreed to pay $22.5 million to settle the FTC's charges that Google "placed an advertising tracking cookie on the computers of Safari users who visited sites within Google's DoubleClick advertising network."

- **August 2012**: After several years of investigation, an FTC staff report recommends prosecuting Google for anticompetitive practices related to scraping, exclusive deals, and restricting advertisers' ability to run advertising campaigns on competitors' search engines.

- **July 2013**: The FTC finalizes settlement in Google Motorola Mobility case for excluding competitors on Android technology, indicating that Google violated the FRAND Agreement.

- **April 2015**: The European Commission opens a separate investigation on whether Google has entered into anti-competitive agreements or abused its monopoly in the mobile device operating system market, to pre-install Google search, Google Chrome, and a host of other Google software as default apps in mobile devices and to make it difficult for competing third-party apps and search engines to be pre-installed on mobile devices operating on Google Android.

- **July 2016**: The European Commission announces it will also investigate whether Google abused its market dominance to prevent competing advertising companies to sell ads to web sites already using Google AdSense.

- **April 2017**: In a settlement with Russia's Federal Antimonopoly Service, Google agrees to pay US $7.8 million in fines and rewrite contracts with smartphone manufacturers under a settlement over access to the Android operating system. The settlement ended a two-year legal battle after regulators — acting on a complaint filed by Yandex, Google's main competitor in Russia — found that Google apps were being given prominence over rivals on Android-based smartphones.

- **June 2017**: Google is fined with a record $2.7 billion by the European Commission for manipulating search results.

- **July 2018**: The European Commission fines Google with another record $5.1 billion in Android antitrust case for, *inter alia*, illegally tying of Google's search and browser apps; illegally making anticompetitive payments conditional on exclusive pre-installation of Google Search; and illegal obstructing of development and distribution of competing Android operating systems.

- **March 2019**: The European Commission fines Google $1.7 billion for abusive antitrust online advertising activities in imposing a number of restrictive clauses in the AdSense contracts with third-party websites which prevented Google's rivals from placing their search advertisements on these websites.

- **June 2019**: The U.S. Justice Department announces that it will launch an antitrust investigation against Google, which prompts the company to file an SEC regulatory filing stating that the DOJ has requested all documents related to Google's previous antitrust investigations and convictions here in the U.S. and elsewhere.

- **September 2019:** Google faces a host of antitrust investigations by 50 U.S. states.  Led by Texas, the state attorney generals signed onto an antitrust investigation into Google search and search advertising businesses.

10.   Defendants' illegal actions described herein are concerted attempts to maintain inextricably intertwined monopolies and to achieve dominance in other markets, not by innovation and other competition on the merits, but rather by self-serving and Google-biased manipulation of search algorithms, illegal tie-ins, exclusive dealing contracts, predatory pricing, manipulation of the patent process, tortious interference with competitors' contracts and business relationships, selective blocking of software applications, and other anticompetitive tactics that

deter innovation, exclude competition, and rob customers of their right to choose among competing alternatives.

II.    THE PARTIES

11.    Plaintiff Inform, Inc. ("Plaintiff" or "Inform") is a Delaware corporation with a principal place of business located at 3445 Peachtree Road NE, Suite 1000, Atlanta, GA, 30326.  Inform was formerly known as News Distribution Network, Inc. ("NDN").  Plaintiff is a digital media advertising company that provides a platform of services to online publishers, content creators, and online advertisers.

12.    Defendant Google Inc. incorporated in California in September 1998 and reincorporated in Delaware in August 2003.  In or around 2017, Google changed from a corporation to a limited liability company (LLC) under the umbrella of Alphabet Inc. Defendant Google LLC is a Delaware Limited Liability Company with its principal place of business at 1600 Amphitheatre Parkway in Mountain View California. Google is the world leader in general Internet search conducted on all devices and in handheld general search.  It also is the owner of the Android OS and popular and exclusive mobile and tablet applications including YouTube, Google Maps, and Gmail.  In 2018, Google's annual revenues topped $136 billion, the vast majority of which was derived from online advertising.

13.    Defendant Alphabet Inc. is a Delaware corporation with its headquarters and principal place of business at the "Googleplex" in Mountain View, California.

Defendant Alphabet is one of the top ten largest companies in the United States with more than $100 billion in annual revenue.  Alphabet, ranking 15th in the list of Fortune 500 companies, is traded on the NASDAQ under the symbol "GOOGL" and is included in the S&P 100 Index. Alphabet beat revenue expectations with $40.5 billion in the most recent quarter, Q3 2019.  For Q3 2019, advertising revenue hit a record $33.9 billion.

14.   Defendant YouTube, Inc. registered as a corporation in the State of Delaware in October 2005 and was converted into YouTube, LLC a year later. Defendant YouTube, LLC is a wholly-owned subsidiary of Google LLC.  YouTube is headquartered in San Bruno, California.

15.   Defendants and Inform are competitors in several markets, including the Online Advertising Market, and specifically in online video advertising.   As discussed below, Google provides services similar to Inform through a stable of advertising products and applications including, without limitation, Google Ads, the AdSense program, AdX, DoubleClick for Publishers (DFP) and Google Ad Manager.

III.   JURISDICTION AND VENUE

16.   This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, Section 1 and 2 of the Sherman Act, 15 U.S.C. § 1, *et seq*., and Sections 3, 4 and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15 and 26, because

Plaintiff alleges violations of federal law. The Court also has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.   Venue is proper in this district under 15 U.S.C. §§ 15, 22, and 26 and under 28 U.S.C. § 1391(b) and (c) because: (1) Google transacts business and is found within this district, (2) Inform's principal place of business is in this district; and (3) a substantial portion of the events giving rise to this claim herein occurred within this district.

## IV.   FACTUAL BACKGROUND

### A.   The Advent of Online Advertising

18.   When the Internet started to become more popular in the early 1990s, traditional print publishers established websites and began to publish their substantive content online. This created vast amounts of news and other content on the Internet and opened the door to digital or online advertising and a new means of generating advertising profits through display and video advertisements.

19.   Like other advertising medium, online advertising often includes: (1) a publisher, who integrates advertisements into its online content; (2) an advertiser, who provides the advertisements to be displayed; and (3) advertising agencies that help create and place the ads. The goal of online advertising generally is to put an advertisement in front of the best possible audience for that ad.  A view of the ad by a user is commonly referred to as an impression.

20.   During the early years of online advertising, the buying and selling of ads between an advertiser and a publisher was a direct and manual process whereby publishers sold advertising space directly to advertisers through what are known as "direct ad campaigns." However, with the speed and growing popularity of the Internet, publishers needed a more efficient and easier way to manage the various advertisers' campaigns that ran on the publisher's website – an ad server.

21.   An ad server is a piece of advertising technology (AdTech) that is used by publishers, advertisers, ad agencies, and ad networks to manage and run online advertising campaigns.  Ad servers are responsible for making the instantaneous decisions about what ads to show on a website, and then serving the ad onto that site.  Additionally, ad servers collect and report data (such as impressions and clicks) for advertisers to gain insights from and monitor the performance of their ads.  In the same way WordPress is used to manage a website's content, ad servers are used to manage and display online advertising content to the right user on a website.

22.   There are two main types of ad servers: a publisher's ad server (also called a first-party ad server) and an advertiser's ad server (or a third-party ad server). One such third-party ad server is Google's Double Click for Publishers ("DFP").

23.   First-party ad servers allow website publishers to manage the ad space or ad slots on their own website and to display direct ad campaigns sold by the publisher to the advertiser.

24.   When direct ad campaigns are not available, the first-party ad server will fill the ad space by serving ads from a third-party ad server, a supply side platform ("SSP") or an ad network.

25.   The first-party ad server will: determine which ads to display on the publisher's website based on collected user data and preferences; serve the ad to the user; and collect and report data such as impressions and clicks, which can be used to determine the cost to the advertiser.

26.   The primary function of the first-party ad server is to fill ad space on the publisher's website that is tailored to the interests of the particular user visiting the publisher's website.

27.   A first-party ad server works as follows[1]: A user visits the publisher's website and the Internet browser (*e.g.*, Google Chrome or Safari) sends a request to the publisher's web server asking for the page's content to be displayed.   The publisher's web server returns the HTML (or hypertext markup language) and it starts rendering the page's content. Simultaneously, an ad request is sent to the

---

[1] See *What is an Ad Server and How Does it Work*, Maciej Zawadzinski, https://clearcode.cc/blog/what-is-an-ad-server/.

publisher's ad server to fill the ad space or ad slot, which is a space left blank on the displayed page to be populated by advertisements that are tailored to the user's interests.   The publisher's ad server chooses an ad campaign based on the information obtained by the publisher about that user.  The publisher's ad server then sends back the JavaScript tag to the publisher's website and the relevant ad is displayed to the user.

28.   Third-party ad servers are similar but work somewhat differently. In addition to serving ads, a third-party ad server also aggregates campaign data across multiple publishers, which advertisers can then use to analyze the performance of their ad campaigns and verify reports from the publishers.

29.   A third-party ad server works as follows: A user visits the publisher's website and the Internet browser (*e.g.*, Google Chrome) sends a request to the publisher's web server asking for the page's content to be displayed.  The publisher's web server returns the HTML (or hypertext markup language) and it starts rendering the page's content. Simultaneously, an ad request is sent to the publisher's ad server to fill the ad space or ad slot, which is a space left blank on the displayed page to be populated by advertisements that are tailored to the user's interests.  The publisher's ad server chooses an ad campaign based on the information obtained by the publisher about that user.  The publisher's ad server then sends back an ad markup (or the code that is inserted into the ad slot) that contains a URL that points to the advertiser's ad

server.  The ad markup (or code) sends off a request to the advertiser's ad server for the ad markup (or code) and counts an impression. The advertiser's ad server then sends the markup to the publisher's website and an ad from the third-party ad server is displayed to the user.

30.  When a third-party ad server is used, the third-party ad server will: determine which ads to display on the publisher's website based on collected user data and preferences across publishers; serve the ad to the user; and collect and report data such as impressions and clicks, which can be used to determine the cost to the advertiser.

### B.   The Early Days of Google

31.  Google is a multinational technology company based in the United States, specializing in Internet-related services and products that include online advertising technologies, search, cloud computing, software and hardware. Google offers various services in every district in the United States and throughout the world.

32.  Google Inc. was founded in 1998 by Sergey Brin and Larry Page.  Google began as an online search firm and was established as a two-sided platform that enabled users to search the Internet.  While the first-generation of search engines simply indexed the content of web pages, Google and Google's PageRank algorithm helped define second-generation search technology, which

looked at links to and from other Web pages as a way of determining relevance.  Third-generation search engines go well beyond the link analysis and use intelligent clustering of results, natural language processing, and more human input to improve search results for users.

33.   As Google's dominance in Internet search began to grow, its product and service offerings diversified into several overlapping markets intended to leverage its increasing monopoly power.  These markets included email, document creation, mobile phones and Internet advertising.  One commentator noted:

> As the gateway to the Internet for the vast majority of users, Google has unparalleled influence over which content and services people discover, read, and use. Before Google's need for growth compelled it to look beyond horizontal search, this unfettered market power wasn't necessarily a problem. Google tended to focus its efforts on providing the best possible search results for its users, even though that usually meant steering them to other people's websites as quickly as possible. Starting around 2005, however, Google began to develop a significant conflicting interest—to steer users, not to other people's services, but to its own growing stable of competing services, in price comparison, travel search, social networking, [news], video content and so on.[2]

---

[2]  One of the earliest complainants against Google's anticompetitive behavior was from a comparison shopping service called, Foundem. In their various submissions to antitrust enforcement authorities, Foundem succinctly lays out Google's dominance and the effect of its abuse of monopoly power.  *See* http://www.searchneutrality.org/search-neutrality/the-real-search-neutrality.

C.      Google's Business Is Online Advertising.

34.   Google operated at a loss for the first two years it operated.  In 2000, Google began selling text-based advertisements associated with search keywords, turning its first profits in 2001 with a net income of approximately $7 million.  Since that time, Google's ad offerings have become considerably more sophisticated, resulting in tens of billions of dollars of annual revenue.  These services now include, *inter alia*, search campaigns, display campaigns and video campaigns, which can be implemented and viewed across multiple devices.

35.   Google's ad-based revenue model entails creating and selling ads for a specific website, service, app, or other product or service and placing them on strategic, high traffic channels based upon Google's proprietary algorithms and Google's stable of advertising offerings, including Google Ads, AdSense, AdX, DFP, Google Ad Manager and other tools.  Today, Google's ad-based revenue model generates the vast majority of Google's revenues, yielding billions in revenue each year as reflected in the following chart:



For Q3 2019, the most recent quarter, advertising revenue hit a record $33.9 billion.

D.   Google is A Broker of User Data for Online Advertising Profits.

36.   The multisided nature of Google's platform, which connects distinct but interdependent demands, offers Internet users a service purportedly "free of charge." This consumer strategy has been an advantageous commercial strategy because it attracts users, which are a critical asset to Google because it allows the platform to sell advertising space to companies that are interested in reaching those users.  In this way, Google connects users' demand for information, products, and services with advertisers' and publishers' demand for access to those users.

37.   Thus, Google does not charge a monetary fee to Internet users for its search service either by way of subscription fees or usage fees, but rather its business model is based upon generating advertising revenue with advertisers appearing in or

near the search results or on the webpages listed in the search results.    While
Google's dominant business model suggests that users receive "free" access to
services, the exchange in fact is for the commercial use of an individual's personal
data.    This user data is critical for attracting advertisers who fund Google through
billions of dollars in advertising revenue.    In essence, Google is a broker of user data
for advertising profits.

38.    Despite not charging a specific monetary fee to users in the form of
fiat currency or the like, Google receives value from every platform user in the form
of, *inter alia*, personally identifiable information, user impressions and preferences,
and insight into patterns, timing, trends, location and demographics.    Google then
stores and monetizes this data through its proprietary algorithms.[3]

---

[3] *See* Commission decision of 27 June 2017 in Case 38606 - AT.39740 Google
Search (Shopping), (the "EU Shopping Decision") at ¶158 stating:

> [E]ven though users do not pay a monetary consideration for the use
> of general search services, they contribute to the monetization of the
> service by providing data with each query. In most cases, a user
> entering a query enters into a contractual relationship with the
> operator of the general search service. For instance, Google's Terms
> of Service provide: 'By using our Services, you agree that Google can
> use such data in accordance with our privacy policies.'. . . . The data
> which users agree to allow a general search engine to store and re-use
> is of value to the provider of the general search service as it is used to
> improve the relevance of the search service and to show more relevant
> advertising."

*See also* What's The Value Of Your Data? Tech Crunch, October 13, 2015, Pauline
Glikman, Nicolas Glady ("Data has become the most important strategic asset of
pure players like Google and Facebook. And among the biggest companies in the

39.   Information generally, and personally identifiable information specifically, has become widely accepted as payment for goods and services. Users are no less paying customers simply because the medium of exchange is information and personal data rather than legal tender or banknotes.

E.   Understanding Google's Business Lines and How They Feed Into Google's Billion Dollar Advertising Business

1. Google Search

40.   Google's flagship online service is its general search engine, Google Search, which is accessible either through Google's main website (www.google.com) or through localized websites.  A search engine is a web-based tool that allows users to locate information on the Internet.  Search engines, such as Google, Yahoo, Baidu and Bing, utilize automated software applications (referred to as robots, bots, or spiders) that travel along the Web and gather information used to create a searchable index of websites.

41.   Each search engine uses different complex mathematical formulas to generate search results.  The results for a specific query are then displayed on the search engine results page (or "SERP").  These search engine algorithms take the key elements of a web page, including the page title, content, key word density,

---

world, by market capitalization, a majority see their valuation estimated as a function of their user base and the data they collect.").

number of linked web pages, and determine where to place the results on the page. For websites seeking web traffic and/or seeking to sell products and services, where they rank on the SERP are dispositive of the website's exposure, readership, sales, profits and ultimately can make or break the viability of the website and the underlying company.  Notably, each search engine's algorithm is unique so ranking at the top of one (e.g., Yahoo) does not guarantee a prominent ranking on another search engine (e.g., Google), even when results are organic.

42.   Google Search is ubiquitous, existing for static devices (personal computers and laptops), for handheld and mobile devices (smartphones and tablets), and for other smart devices, such as Google Home or devices running Android TV or Android Auto operating systems.  Additionally, Google also powers other search engines – including Ask, which is the sixth largest search engine in the world.

43.   General search engines (also called horizontal search engines), such as Google or Bing!, ostensibly compete along zero-cost bases or with non-price parameters of competition such as: the relevance of results; the speed with which results are provided; the attractiveness of the user interface; the depth of indexing of the web; and the volume of users feeding data into the network.  As user data is ingested and analyzed by the search engines to improve their performance, garnering the *most* users is critical to competing in these areas.

2. Generic Search Results

44. When a user enters a keyword or a string of keywords (a "query") in Google Search, Google's general search results pages return different categories of search results, including (1) generic search results; (2) specialized search results; and (3) online search advertisements.

45. Generic search results typically appear on the left side of Google's general search results pages in the form of blue links with short excerpts ("snippets") in order of their rank. Generic search results can link to any page on the Internet, including web pages of specialized search services that compete with Google's own specialized search services.

46. To rank generic search results in response to a query, Google uses algorithms, including an algorithm called PageRank. PageRank ostensibly measures the importance of a web page based on the interest in the page, as well as the number and quality of links to that page, the underlying assumption being that more important websites are likely to receive more links from other websites. Google applies a variety of adjustment mechanisms to the results of PageRank, which adjustments are determined by Google. Through PageRank and the adjustment mechanisms, Google determines and can manipulate the rank of a web page in generic search results on Google's general search results pages.

47.   By way of example, in response to a search query – on Google.com or on one of Google's syndicated search boxes on third party websites – Google returns search results pages with a list of generic or "algorithmic" results (typically on the left side of the screen) and, where applicable, a list of paid search advertising or "sponsored links" (typically on the top and/or right-side).   Paid ads that appear interspersed in the search results are denoted as such with a tiny box just under the title (and next to the link) that indicates "Ad."  Below is an example:



48.    This is also typically referred to as a "horizontal search," as opposed to a "vertical search."   Horizontal search results are selected on the basis of an algorithm that is applied horizontally across the entire Internet and is primarily designed to provide the most relevant pages.   Vertical search results are selected from a smaller, more specific group of sites (e.g., travel-related sites, food-related sites), often listed in a database that is separate from the index of the Internet from which horizontal search results are selected.   Vertical search engines include Expedia, Amazon, and Google's own Google Images and Google Shopping.

49.    Through this generic search process, Google has attained monopoly status in the Search Advertising Market.   Google has also been the subject of antitrust enforcement and private actions for their manipulation of vertical search results, such as the comparison shopping services, discussed below.

### 3.    AdSense, Google Ads (Formerly AdWords), DFP and AdX

50.    As users browse Google Search, use Google mobile apps, read Gmail, watch YouTube or shop online, the user sees paid advertisements populated by Google.   Google utilizes consumers' personal data to customize these ads based on the user's information, preferences and online activity.

51.    AdSense and Google Ads (formerly AdWords) are two advertising platforms offered by Google. The fundamental difference between AdSense and Google Ads is who they are designed for: Google Ads is for *advertisers* while

AdSense is for *content publishers*, or website owners.  While Google Ads is used to *buy advertising from Google*, AdSense is used to *sell advertising space to Google*. AdWords enables businesses and marketers to advertise on Google's network (search, display, etc.).  AdSense enables publishers to reserve space for the placement of Google Ads on their own website (via text, video, or images) and thereby monetize their own website content.  In this way, Google Ads and AdSense promote Google's greater advertising network: website owners put up space for Google's ads (AdSense) and businesses set budgets and create ads to display on Google's advertising network (Google Ads).

52.    Google AdX (aka Google Ad Exchange, aka DoubleClick Ad Exchange) is an ad exchange network that connects publishers, advertisers and advertising agencies.  AdX primarily focuses on providing real-time biddings, private auctions, and preferred deals.  AdX is essentially a real-time marketplace for premium advertisers and premium publishers.  AdX works with the Google Display Network (GDN), Google's ad network of publishers and suppliers.

53.    Although Google touts that AdSense as a "free" service, just as end users provide their personal information and data, website owners pay for this "free" AdSense service by providing their own websites "real estate," *i.e.*, blank spaces on their websites that Google can then populate with paid for advertising; by enabling Google to trade on their names, good and services; by driving web traffic to the

Google platform; and by essentially providing digital client lists to Google for further data mining and monetization. Additionally, Google takes a piece of the profit paid by the advertiser to the website owner.

4.    Google Ads and The Auction Bidding Market

54.    Google Ads is an online advertising program that enables businesses to promote their products and services on Google Search, YouTube, and on other third-party sites that use Google's AdSense offering.

55.    Google Ads works by displaying a provider's ad when people search online for the products and services that provider offers. Google Ads is powered by an auction bidding market. Each time an ad is eligible to appear for a search, it goes through the ad auction. The auction determines whether the ad actually shows and in which ad position it will show on the page. To gain the top spot in Google advertisements, advertisers have to outbid each other. Higher bids move up the list, while low bids may not even be displayed at all.

56.    Cost per impression (or "CPI") is the cost or expense incurred for each potential customer who views the advertisement, while cost per thousand impressions (or "CPM") refers to the cost or expense incurred for every thousand potential customers who view the advertisement. CPI, along with pay-per-click (PPC) and cost per order, are used to assess the cost-effectiveness and profitability of online advertising.

57.   When a user clicks on an AdWords result, Google receives remuneration for that click from the advertiser owning the website to which the user is directed (the "pay per click" system).  Advertisers pay Google each time a visitor clicks on an advertisement.  A click can be worth anywhere from a few cents to over $50 for highly competitive search terms.

58.   How often an ad shows, its position on the page, and how much the ad costs are all purportedly driven by two factors: the advertiser's bid and the projected quality of the ads (via a subjective "Quality Score").  However, other factors determined by Google, including acceptable and bespoke minimum bids, are also accounted for in the determining the winning bid.  In several lawsuits, Google was accused of setting competitors bids astronomically high such that bidding by these competing advertisers became impossible.

59.   While this process is held out by Google to be neutral and unbiased, Google alone controls the algorithms that generate Google Ads results, the Quality Score assigned to the search advertisements, and the minimum bids that a given advertiser can offer in the auction.  As a result, the changing or selective application of Google's auction process and/or algorithms can effectively box out competition and limit consumer choice on what it may or may not be purchased, and from whom, based upon what advertisements "win" the auction.

60.   The three most common Google Ads campaign types are:

- *Search campaigns* - usually in text form, these ads show on Google Search results pages when the user searches for a particular product or service;

- *Display campaigns* - usually in image form, these ads appear on websites or apps that consumers visit; and

- *Video campaigns* – these are digital advertisements, usually 6 or 15 second videos, that show right before or during YouTube content.

61.    Google's video campaigns can run in a number of formats, including: in-stream ads, video discovery ads, non-skippable in-stream ads, outstream ads, and bumper ads.

62.    Specifically, in-stream ads run before, during, or after other videos on YouTube or across the Google network sites, games, or apps. These ads may also run on YouTube videos that are embedded on other sites.

### 5.    DFP and DoubleClick Ad Exchange (AdX)

63.    Google has usurped a monopoly in the Ad Server Market with DFP, or DoubleClick for Publishers.  On Google's DFP, advertisers upload advertiser/ad network creative advertisements and tags (HTML codes that call other ad networks and exchanges for ads).  When there is an opportunity (or an ad call), DFP selects which ad will be served based upon the accumulated data and preferences of the individual user.    Thus,   through   the   DFP   Ad   Server   monopoly,   Google

instantaneously controls the vast majority of how, when, where and which ads are served to users on the Internet. A recent Wall Street Journal article, entitled *How Google Edged Out Rivals and Built the World's Dominant Ad Machine: A Visual Guide*, lays out the inner workings of Google's multi-billion dollar advertising conglomerate.[4]

64.   Similar to Ad Sense, AdX is Google's auction-based system for premium websites to be paired with premium advertisers.  Google AdX is more exclusive and can be accessed in two ways.  First, one could obtain a Google Ad Manager account and then get Google's approval to access the AdX account.  Alternatively, AdX can be accessed by working with a Google Certified Publishing Partner, through which a publisher can obtain a subsidiary AdX account.  In both cases, only large publishers approved by Google can use AdX.

65.   In June 2018, Google underwent a major rebranding of its ad platform. Google has now tied its DFP Ad Server with AdX under a single tool, Google Ad Manager, as follows:

---

[4]  *How Google Edged Out Rivals and Built the World's Dominant Ad Machine: A Visual Guide*, Wall Street Journal, November 7, 2019, https://www.wsj.com/articles/how-google-edged-out-rivals-and-built-the-worlds-dominant-ad-machine-a-visual-guide-11573142071?shareToken=stb7cf93601f9a42f1b95bff7b376ff5de&reflink=share_mobilewebshare.

## Google Rebranding Their Advertising Platform.

Google AdWords
will become
Google Ads

DoubleClick and the Google
Analytics 360 Suite
will become
Google Marketing Platform

DoubleClick for Publishers
and DoubleClick Ad Exchange
are becoming
Google Ad Manager







This express tying of services has not yet been addressed by antitrust enforcement agencies.

   6. <u>YouTube</u>

  66. YouTube is a video-sharing website that allows users to upload, view, rate, share, add to playlists, report, comment on videos, and subscribe to other users' content.  Created by three former PayPal employees in February 2005, YouTube was acquired by Google in November 2006 for $1.65 billion and now operates as a Google subsidiary.

  67. Approximately 1.3 billion people use YouTube.  Now the second most visited website in the world, YouTube gets over 30 million visitors per day, who

watch an estimated 5 billion videos each day. Three hundred hours of video are uploaded to YouTube every minute.[5]

68.     YouTube and selected content creators earn advertising revenue from Google AdSense. Like most other Google properties, YouTube earns the bulk of its revenue through advertisements.[6]  YouTube is estimated to generate between $16 billion and $25 billion in annual revenue, putting it in the top half of the Fortune 500.[7]

### 7.     Android Operating System

69.     As set forth above, Google obtains the vast majority of its revenue via advertising in connection with its flagship product, the Google Search Engine. The company understood early on that the shift from desktop PCs to mobile Internet, which started in the mid-2000s, would be a fundamental change for Google Search and would provide access to emerging and third-world markets, where mobile devices are significantly more prevalent.  To solidify Google's market dominance in the Search Advertising and Online Advertising Markets, Google developed a strategy to anticipate the effects of this shift and to make sure that users would continue to use Google Search on their mobile devices.

---

[5] https://merchdope.com/youtube-stats/.

[6] https://www.investopedia.com/articles/personal-finance/053015/how-youtube-makes-money-videos.asp.

[7] https://www.nytimes.com/2019/07/24/technology/youtube-financial-disclosure-google.html.

70.    In 2005, Google bought the original developer of the Android mobile operating system and has continued to develop Android and to acquire Android-relevant patents since that time.   Today, about 76.2% of smart mobile devices worldwide run on the Android OS.[8]   In addition to cell phones and tablets, versions of the Android OS can also be found on smart home devices, such as Google Home and TV set top boxes, and even in vehicles, with Android Auto.

71.    Now, more than half of the searches on www.google.com are from mobile devices.   Google mobile ads enable providers/merchants to reach potential customers wherever they are, as users are searching on their mobile devices for what the merchant offers.   Google has touted that 91% of people report that they look up information on their smartphone when they want to know about, find, do, or buy something, and that 51% of people have discovered a new company or product while searching on their mobile phones.

72.    Notably, Android is a licensable smart mobile operating system, meaning that third-party manufacturers of smart mobile devices can license and run Android on their devices.   As stated above, through its control over Android, Google is dominant in the worldwide market for Licensable Mobile Device Operating Systems, with a market share of more than 76.2%.   There are high barriers to entry in part due to network effects: the more popular an OS is, the more developers write

---

[8] https://gs.statcounter.com/os-market-share/mobile/worldwide.

apps for that system – which in turn attracts more users. Furthermore, significant resources are required to develop a successful licensable smart mobile operating system.

### 8.    Google Chrome

73.    Google's Chrome web browser ("**Google Chrome**") is an Internet browser released by **Google** in December 2008. Chrome includes **synchronization** with Google products and services and is designed to work with YouTube and Gmail. Google Chrome is used by over 50% of people in the US and approximately 67% worldwide.[9] Google's Android OS, discussed below, requires preinstallation of Google Chrome under certain circumstances, including, *inter alia*, as a condition of accessing certain Google apps.

## V.    GOOGLE AS A MONOPOLY

74.    As set forth below, Google has attained monopoly power in multiple markets and is marching toward total online and information dominance by leveraging its monopoly power to both maintain current monopolies and to attempt to gain monopoly power in corollary markets.

### A.    Google's Growth to Monopolistic Search Engine Market Dominance

75.    Over the course of the last two decades, Google has steadily

---

[9] https://netmarketshare.com/browser-market-share, September 2019.

and systematically grown through acquisition of corollary tech and web application companies. Since its founding in 1998, Google has acquired more than 227 companies and spending over $27 billion for its top ten acquisitions. Rather than growing organically, Google has grown through strategic acquisitions to yield products, manpower, and patent portfolios that directly and indirectly support and maintain its Internet Search and other monopolies and feeds its online advertising business revenue.

B.   Key Google Acquisitions

76.   In April 2003, Google acquired **Applied Semantics** for $102 million, another online advertising and marketing-related acquisition to establish and maintain Google's monopoly in the Search Advertising Market. This acquisition laid the groundwork for Google's creation of AdSense.

77.   In August 2005, Google acquired **Android** for $50 million, a developer of an open source mobile device operating system. Google's Android is now the most-used smartphone operating system in the world. In 2015, the Android OS was installed on more than 80% of the world's smartphones. Moreover, Android now powers tablets, televisions, car systems, video game platforms, and wearable devices. As discussed below, the smartphones and other mobile devices with the Android operating system are commonly preinstalled with various Google

applications such as Google searches, Google Play Store, YouTube, Google Maps and Gmail as default apps.

78.   In October 2006, Google acquired **YouTube** for $1.65 billion, an online video-sharing company launched in 2005 that became the fastest growing online video-sharing platform.   Indeed, there is a growing concern from lawmakers and consumers alike that the video platform has grown too big for Google to control the content shared on the platform adequately.[10]  Google acquired the company just over a year after its launch and it has now become the second largest search engine in the world — second only to Google.   YouTube now generates around $15 billion in revenue a year, virtually all of which is derived from advertising and accounts for the second largest revenue stream generated by Google next to its online advertising business.  Moreover, YouTube is steadily becoming more valuable to Google due to the growing shift of consumer viewership from television to online video.   YouTube is strategically important in strengthening and maintaining Google's monopoly in Internet Search, Handheld Internet Search, and Search Advertising, as well as growing its dominance in the broader Online Advertising Market.

---

[10]  In September 2019, Google was fined a record $170 million by the FTC and the New York Attorney General for violating the federal Children's Online Privacy Protection Act, or COPPA by illegally gathering children's data on YouTube. https://www.nytimes.com/2019/09/04/technology/google-youtube-fine-ftc.html.

79.   **DoubleClick** was launched in 1996 as an independent ad software network firm that specialize in display advertising.   In April 2007, Google announced its intention to acquire **DoubleClick**.  Following an investigation by the FTC prompted by antitrust concerns, Google acquired **DoubleClick** in March 2008 for $3.1 billion.  The DoubleClick acquisition was in fact instrumental in cementing Google's stronghold in the lucrative online advertising industry.  In addition to the DoubleClick software, Google also acquired the relationships with web publishers, advertisers and agencies, beating a host of other potential buyers like Microsoft to the acquisition.   Integrated into AdSense, DoubleClick has been enormously successful for Google, with about 80% to 90% of Google's $110 billion revenue in 2017 coming from its advertising business.   Since the acquisition by Google, DoubleClick has further expanded with DoubleClick for Publisher (DFP) and DoubleClick Ad Exchange.

80.   In 2010, shortly after acquiring Double Click, Google acquired **AdMob** for $750 million and then began acquiring buyer services, including **Invite Media** for a reported $81 million.  The combination of deals gave Google unprecedented positioning in every facet of how ads end up on websites and smartphone apps

around the world.  Though U.S. regulators approved these deals, their worst-case predictions about Google being too powerful have unfortunately come to pass.[11]

81.    In August 2011, Google acquired **Motorola Mobility** for $12.5 billion, a mobile device manufacturer, to establish and maintain and further strengthen Google's dominance in the handheld search through its Android OS.  Google acquired Motorola's smartphone patent portfolio, with more than 20,000 patents on mobile phones and wireless technologies, for $12.5 billion.  In the same year — prior to the Motorola acquisition — Google spent $4.9 million on the Mondu patent portfolio of Android-relevant technology.  Moreover, Google bought 1,029 patents related to the Android OS from IBM.  *See* MIT Technology Review, October 2011.

82.    In August 2015, Google announced its intention to create a new holding company, Defendant **Alphabet Inc**. The reorganization was completed on October 2, 2015. Since that date, Google has been a wholly-owned subsidiary of Alphabet, which has continued to be the umbrella company for the Internet interests of Google.  Alphabet was formed, according to Google founder Larry Page, to make Google "cleaner and more accountable," to improve "the transparency and oversight of what we're doing," and to allow greater control of unrelated companies.

83.    In January, Google acquired some of Fossil's smartwatch technology for

---

[11] https://www.reuters.com/article/us-tech-antitrust-google-explainer/explainer-advertising-executives-point-to-five-ways-google-stifles-business-idUSKCN1VW2L9.

$40 million. On October 28, 2019, Reuters confirmed that Alphabet is still eyeing the wearables market by making an offer for Fitbit.

84.    With these and other acquisitions, Google has gained monopoly power in the Internet Search Market, the Market for Licensable Mobile Device Operating Systems, the Search Advertising Market, and the Ad Server Market.  This power has been leveraged and used to abusively and illegally eviscerate competition across these and other markets, in which Google has marched toward dominance.

C.   Google's Monopoly in the Relevant Markets

85.    Google Search receives over 63,000 searches per second on any given day, which translates into at least 3.8 million searches per minute, 228 million searches per hour, 5.6 billion searches per day, and 2 trillion searches per year. Google's market share in the various overlapping markets is set forth below.

86.    Google has a durable monopoly in each of the following markets:

a.       The General Internet Search Market ("Internet Search Market"): Google has maintained a monopoly on search worldwide for nearly a decade, with control over 94 percent of the search engine market.  The next largest competitor is Microsoft's Bing, with a market share of about 2.5%.  Google's overwhelming monopoly in the Internet Search Market has been previously recognized.

b.     The Market for Licensable Mobile Device Operating Systems:

Google has approximately 75% market share in global mobile

operating systems[12];



---

41



World-Wide Smartphone Sales (Thousands of Units)

c. <u>The Search Advertising Market</u>: Google has approximately 80% market share in the Search Advertising Market, which is a sub-category of the Online Advertising Market (discussed below), followed by Microsoft and Yahoo with 7.2% and 2.5%, respectively. Additionally, Google's acquisition of DoubleClick set the stage for its monopoly in the realm of digital advertising;

d.    The Ad Server Market: as early as 2016, Google had

approximately 75% market share in the Ad Server Market[13];



---

[13] https://www.businessinsider.my/facebook-winds-down-atlas-ad-server-2016-11/.

87.   Additionally, Google is achieving monopoly power in the following additional markets:

a.   <u>The Web Browser Market</u>: Google has effectively achieved monopoly power in the Browser Market, with an estimated market share between 61% [May 2019] and 67% [September 2019] and growing; and



b.   <u>Online Advertising Market</u>: Google dominates the broader Online Advertising Market with about 40% market share, followed by Facebook with about 20%.

88.    There is significant interplay among these distinct markets that makes Google's monopolistic power in these markets more insidious.   In other words, Google is able to leverage its market dominance in each of these markets in order to further expand its monopolies in the other related markets to further stamp out competition.   For example, since Google controls some 94% of the Internet Search Market and 67% of the Browser Market, it can use its monopoly powers to coerce advertisers to use its search advertising services, including using its video advertising campaigns over competing video advertisers.   Similarly, Google can use its monopoly power in the Market for Licensable Mobile Device Operating Systems to help maintain its monopoly in the Internet Search Market and obtain a monopoly in the Web Browser Market by imposing anticompetitive restrictions in contracts on device manufacturers and mobile network operators who seek to acquire Google's proprietary Android apps and services.

89.    These durable markets have significant barriers to entry including, but not limited to: network effects that make platforms more valuable as they gain more users; the advantages of big data which enable platforms and companies to use the treasure trove of data they collect from users to improve the quality of their products and services; and lock-in effects that cause users to avoid switching platforms or companies so as not to lose their personal contacts, history of searches, photos, apps, and other information.

90.    The visual of Google's Search Engine Market share can be seen below:



91.    In light of the synergistic effect that Google has acquired from its antitrust activities in the Internet Search Market, the Search Advertising Market, the Licensable Mobile Device Operating System Market, and the Ad Server Market — all connected by an Internet platform that enables Google to gather and monetize massive consumer data for its targeted and location-specific advertising (which

accounts for 80% to 90% of Google's total revenue),[14] Google's conduct has resulted in real harm to competition, consumers, and innovation.   Ultimately, and frighteningly, Google will control all online content – particularly what information is presented to each individual user.  Google's own trademarked marketing solution – "Think with Google" – demonstrates Google's ultimate goal.



92.    Google's systematic assault on the free market competitive process, as detailed below, restrains trade, stymies competition, deprives customers of choice, degrades consumer privacy, degrades quality and variety of products and services offered to consumers, and stifles innovation. Google's predatory and anticompetitive practices are the very conduct that the United States antitrust laws were enacted to prevent.

---

[14] The October 28, 2019 Q3 earnings reports indicate that advertising revenue accounted for $33.9 billion, or 83.7%, of Alphabet's $40.5 billion in revenue.

## VI.   ANTITRUST LAWS

93.   Congress passed the first antitrust law, the Sherman Act, in 1890 as a "comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade."  In 1914, Congress passed two additional antitrust laws: the Federal Trade Commission Act, which created the FTC, and the Clayton Act.  With some revisions, these are the three core federal antitrust laws still in effect today.

94.   The Sherman Act is divided into two main sections: Section 1, which prohibits concerted activity of two or more entities that combine, contract, or conspire in restraint of trade; and Section 2, which addresses unilateral actions and prohibits monopolization or attempted monopolization in restraint of trade. Specifically, Section 2 of the Sherman Act establishes three offenses, commonly termed "monopolization," "attempted monopolization," and "conspiracy to monopolize."[15]

95.   At its core, Section 2 makes it illegal to acquire or maintain monopoly power through improper means. The long-standing requirement for monopolization is both (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or

---

[15] *See, e.g.*, 1 Section of Antitrust Law, Am. Bar Ass'n, Antitrust Law Developments 225, 317 (6th ed. 2007).

development as a consequence of a superior product, business acumen, or historic accident. To be found unlawful, monopoly power must be accompanied by an element of anticompetitive conduct, often described as "exclusionary" or "predatory" conduct. This includes both conduct used to acquire a monopoly unlawfully and conduct used to maintain a monopoly unlawfully.

96.    Section 2 also proscribes "attempt[s] to monopolize." Establishing attempted monopolization requires proof (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.

97.    Section 3 of the Clayton Act, 15 U.S.C. § 14, prohibits exclusionary practices, such as tying, exclusive dealing, and predatory pricing, that lessen competition.   Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits share acquisition or mergers that would lessen competition or create a monopoly.  The Clayton Act allows for monetary penalties that are three times as large as the harm caused by the illegal behavior.

VII.   <u>PLAINTIFF INFORM: HISTORY, INNOVATION, AND VALUE PROPOSITION</u>

98.    Inform, formerly known as NDN, is a digital media advertising company.  Inform provides a platform of services to online publishers, content creators, and online advertisers.

99.    Inform specializes in providing data-driven technology solutions for

the syndication and monetization of contextually relevant video content on publisher websites. Specifically, Inform manages the distribution and delivery of video from content creators into articles on newspaper, magazine, radio, and television websites. In other words, Inform enables publishers to pair corresponding video with their original text content in order to enhance the user's experience and understanding of the publisher's story. At the same time, Inform's platform provides brands with an opportunity to deliver video advertisements to the audience that is most likely to consume their products.

100. Like Google, Inform works with both publishers (*i.e.*, newspaper, magazine, radio and television sites, and website operators, like yahoo.com or msn.com) and advertisers, enabling publishers to monetize their websites by, among other things, selling space on their web pages to online advertisers.

A.   The Evolution of Inform's Online Video Advertising

101.   With the evolution of online video streaming in or around 2005, there was growing demand from publishers for video content to enhance and augment their online text content and thus a growing opportunity for brands to present video advertisements to consumers. Early on, Inform recognized that video content clips and video advertisements would become increasing valuable for online publishers, just as they had been for cable television networks. By embedding video content and video advertising into a publisher's articles, Inform could create a better user

experience and offer video advertising to help monetize website space for online publishers, the way television commercials monetized air space for cable television networks.

102. The Inform platform is the tech provider, the substantive content provider and the advertiser. For example, using the Inform platform in the context of a newspaper, magazine, radio, or television website, a typical story-level web page will likely include instream video (within the text of the article near the headline), outstream video (within the text of the article outside of the user's initial view), and right rail video (outside of the text of the article), as shown below:





103.  The video content played in these spaces are video clips, usually one to three minutes in length, that relate to the publisher's story or article.  In the context of newspaper, magazine, radio, and television websites, relevant video content is most often created by a news service, like the Associated Press.

104.  Inform established an extensive library of premium video content that could either be manually selected by the publisher to match the substantive text content or automatically selected for them by Inform's content matching technology.

105.   Each substantive video clip that plays on a web page presents an opportunity for a brand, product or service (e.g., Marriot Hotel) to present the user with a video advertisement.  The three ways that Inform enabled and supported video advertising were through: (1) a pre-roll ad; (2) a video carousel that highlighted the

trending videos for the publisher; and (3) placement of a display ad, that is a companion ad to the content posted on the site.  A pre-roll ad is a promotional video message that plays before the substantive video content.  These promotional video messages are often repurposed television ads, sometimes shortened to 10 or 15 seconds.  "Pre-roll ads" are particularly valuable because they stand between the user and substantive video content that the user is seeking to view, which virtually assures that the advertisement is viewed by the user.

106.  Brands often employ advertising agencies to develop an advertising strategy, create the advertisements themselves, and manage their advertising spending.  The advertisements themselves are commonly referred to as "the creative."  As noted, a pre-roll ad is one example of a creative.

107.  At its peak, Inform had an inventory of ad space from a network of approximately 5,000 publishers.  This aggregated digital audience allowed Inform to work with a brand (or the advertising agency representing a brand) to optimize the placement of its ads and to reach that brand's specific target demographic.

108.  Inform also provides the infrastructure, including the video player, allowing them to manage the technical delivery of the video for the content creator and the creative from the advertiser.  Inform's infrastructure also allowed it to collect third-party data regarding users.  Inform's access to third-party data dramatically

increases its ability to target specific demographics, driving a significant portion of the value of the ad to brands.

109.  Third-party data is information about the user and his or her online behavior that is not personally identifying.  First-party data, like name, address, and credit card numbers, is personally identifying.

110.  Inform's platform was extremely valuable to publishers, content creators, and advertisers.  Between 2010 and 2017, Inform garnered revenue of more than $180,000,000.  Indeed, in 2014, Yahoo.com and Inform had a signed term sheet to for Yahoo to acquire Inform for approximately $375,000,000, an acquisition that did not ultimately occur.  In each of 2014, 2015 and 2016, Inform had annual revenue of approximately $35,000,000. In 2015, Inform was ranked as the No. 1 Online News & Information Property by comScore, with 27 million unique monthly viewers and 230 million videos viewed each month.  Unfortunately, Google took notice of Inform's competitiveness and decided to take action.

    B.    <u>Inform Competes with Google</u>

111.  Google and Inform are competitors in the Online Advertising Market, and specifically in the online video advertising market.  Google provides services similar to Inform through Google Ads, which sells advertising to publishers through its ad auction, the AdSense program, which places paid for advertising onto third-

party websites.   These third-party websites are paid by Google when users click on a particular advertisement.

112.   Having already firmly established monopolies in the Internet Search Market, the Search Advertising Market, the Licensable Mobile Device Operating Systems Market, and the Ad Server Market, Defendants have leveraged these monopolies and engaged in other anticompetitive conduct in order to gain further dominance in the broader Online Advertising Market and eviscerate competition on the merits by Inform and other competitors.

113.   Defendants' monopolies in these markets are critical to the broader the Online Advertising Market because 94% of consumers use Google's search engine; 80% of consumers use Google for search advertising; 75% of consumers use Google's Android OS to search the Internet and more than 67% of users worldwide view websites and the associated video advertisements through Google's Chrome browser.  Thus, in order to compete in the Online Advertising Market, a company's services must be compatible with Google's stable of services and Google's Chrome browser.  Importantly, this has enabled Google to set arbitrary and anti-competitive rules by which video content and video advertisements are enabled, viewable and audible in ways that favor Google and Google's stable of products and services.

114.   Moreover, Google has a monopoly in the Ad Server Market with a near 75% market share.  In order to use Google's AdX service, advertisers and publishers

are required to use Google's ad server, Double Click for Publishers (DFP), which is programed to control how, when, where and to whom paid for advertisements are served. Smaller, competing ad servers have noted, "The ubiquity of Google's ad server provides virtually total control over which ads are shown and monetized for the majority of the Internet. This control of the ad server is strategically critical to Google."[16]

### C.   Google's Manipulation of the Online Advertising Market

115.   Google has illegally leveraged its monopoly power through its algorithms, its arbitrary rules for advertisers and marketers, and certain technological changes.

116.   For example, Flash is a proprietary digital video player developed by Adobe. For more than a decade, Flash was the standard for playing video on websites. As such, content and creatives were developed in Flash and online advertisers' infrastructure was based on Flash. Moreover, publishers liked using Flash on their websites because it gave them significant control and flexibility over the user experience, including how and when videos played. For example, with Flash, publishers controlled whether a video would start automatically when the web page loaded. This feature is commonly referred to as "autostart." It also gave

---

[16]  https://www.reuters.com/article/us-tech-antitrust-google-explainer/explainer-advertising-execs-point-to-five-ways-google-stifles-business-idUSKBN1WB2Q1.

publishers control over whether the video would be accompanied by audio and over the audio volume.

117.   Over the years, Google, and the developers of other web browsers, raised various concerns with Flash. However, Flash was superior in many respects and Google's primary reason for wanting to marginalize Flash was Google's lack of control over Abode's proprietary product.  With Adobe Flash enabled in the web browsers settings, the publishers (as opposed to Google) were able to control how and when the video content and advertising was delivered to the user.

118.   Google's Chrome browser initially came with Flash pre-loaded.  But in or around 2014, Google began to roll out changes to Chrome designed to maximize the destruction of any competition and force advertisers to migrate to the Google advertising network, while keeping its users fixated on Google, Google products and Google services.

119.   In September 2014, Google began offering Flash-to-HTML5 conversion tools for the Google Display Network[17] and DoubleClick Campaign Manager that would create a backup HTML5 video advertisement to run when Flash was disabled or otherwise not supported. On January 27, 2015, Google-owned YouTube

---

[17]  The Google Display Network has over 2 million sites and reaches over 90% of people on the Internet, enabling ads to appear across a large collection of Google-preferred websites, mobile apps, and video content.

announced that it would no longer be using Adobe Flash by default, but would instead be using its HTML5 video player by default in Google's Chrome and other browsers. By February 2015, Google started to automatically convert Adobe Flash ads to HTML5. Google automatically converted Flash campaigns, both existing and new, to HTML5 when the advertiser uploaded their ads through Google's AdWords, AdWords Editor, or third-party tools that work with Google's ad platform.

120. As a result, advertisers that had creatives supported by Adobe Flash were faced with the Hobson's choice of converting their content to HTML5 or, alternatively, migrating to the Google network to reach target users, the latter of which substantially added to Google's own advertising revenue. Converting to HTML5 was a lengthy and costly process, requiring the transcoding of all files and reaching out to each and every one of an advertiser's 100s or 1000s of vendors who had been issued flash tags to change and convert the affected content. At the same time, to continue to monetize their websites with advertising revenue, publishers were required to wait until advertisers had either migrated their creatives to Google products and services or had converted the advertising content to HTML5, both of which meant forgoing substantial revenues. Alternatively, the publisher themselves could suspend or sever prior relationships with advertisers and utilize Google's platform to fill their inventory with Google's HTML5-ready creatives. In this way hundreds of online advertisers and publishers withered and died, while Google and

YouTube plundered the valuable video advertisements that had supported the publishers' websites.

121.   Also, in June 2015, Google Chrome began to "intelligently pause" ads that were supported by Adobe Flash.  The feature was rolled out in Chrome's beta channel in June 2015 and implemented fully in September 2015.   Specifically, Chrome introduced features to automatically pause Flash content that wasn't "central to the webpage" while keeping central content playing without interruption.   For example, the main video that a user wanted to watch was unaffected while animations on the side, such as video advertising, were paused.   Notably, Google admitted that the feature would pause a lot of plugin content, including "many Flash ads."   At the time there was considerable concern that HTML5 was not as versatile for users as Adobe Flash.   According to one commentator:

> The Flash-pause feature can be seen as yet another move by Google designed to increase digital dominance under the guise of a user benefit. Google wants to maintain web monetization dominance . . . .
> In the past, Google dealt with threats to its dominance by forcing publishers into exclusive deals. Now, Google found a more subtle means to the same end: developing features to 'protect' users who don't understand how the web works. [18]

---

[18]   See Google's New Flash Pause Tool — Are Video Ads Crippled? https://www.linkedin.com/pulse/googles-new-flash-pause-tool-video-ads-crippled-vincent-meyer/

122.  On August 9, 2016, Google announced that "Chrome will de-emphasize Flash in favor of HTML5."   On or about August 31, 2016, Google Chrome discontinued the use of Adobe Flash in update 53 of their browser.   While the software could still be enabled through Chrome settings, Google confirmed that, effective the date of end of life for Flash, Google would completely block Flash from being able to run under the Chrome browser.  Eventually, in 2017, Google changed Chrome's default settings to disable Flash entirely.

123.  Notably, most creatives were built to run on Adobe Flash.  Because the vast majority of users never change the default settings on their web browser (and Google enjoyed dominance if not monopoly power with its Chrome browser), Google's decision effectively meant that a video (and the associated video advertisement) presented in Flash would not be seen by an overwhelming majority of consumers. Instead, users would see a screen similar to the following:





124. A vast majority of users presented with a screen similar to the above behaved as anticipated, closing and ignoring it – never seeing the video or the associated advertisement.  Google's decision to disable Flash in its Chrome default settings had the immediate effect of foreclosing a very significant portion of online advertisers from reaching users and target audiences.

125. The only place this did not occur was if advertisers or publishers migrated to Google's Display Network and uploaded their ads through AdWords, AdWords Editor, or third-party tools that worked with Google's ad platform. Since Google had quietly been preparing YouTube for the disabling of Flash, YouTube content and advertising on the YouTube site were likewise unaffected.  In order to achieve their market domination, Google even offered to convert to HTML5 for free to entice advertisers to migrate to the Google ecosystem.

126. Google's restrictions on Flash, and the way in which Google implemented them, dramatically and anticompetitively impacted competing online

advertising platforms and digital publishers and secured a larger share of the Online Advertising Market for Google.  Dozens of digital advertisers and publishers were severely impacted overnight, including many of Inform's downstream digital publishers, sending Inform's business plummeting.  Importantly, the advertising market share that had been garnered by other online advertising platforms, such as Inform, went directly to Google.  That Google was able to impact so many digital advertisers and publishers virtually overnight simply reinforced Google's dominance and made digital advertisers and publishers all the more vulnerable to Google's illegitimate and anticompetitive conduct, forcing them to kowtow to Google's arbitrary and anticompetitive rules or likewise face corporate death.  Again, the result was that dozens of previously profitable ad networks, publishers and advertisers were forced into bankruptcy or fire sales, while Google's revenue and market share markedly increased.

D.  Through Its Monopoly Power, Google Controls HTML5

127.  Another way in which Google illegally leverages its monopoly power is through its control of the functionality of HTML5, through *inter alia* the Chrome web browser.

128. The alternative to using Flash to play video content on websites is HTML5.  HTML 5 is a revision of the Hypertext Markup Language (HTML), the standard programming language for describing the content and appearance of Web

pages.  Unlike earlier versions, HTML5 supports high-level audio and video, rather than just text content, and is more easily functional on and compatible with mobile devices.

129.  Adobe Flash was a proprietary technology owned by Adobe, and Google had no control over how it functioned.  However, HTML5 is open source technology.  As such Google has used its monopoly powers to not only set the rules for how HTML5 will function, but to be the self-declared enforcer of how HTML5 operates.  When HTML5 is used to present video content, Google, through Chrome, has significantly more control over how, when, and what videos are played.  For example, Google controls whether a video will autostart and whether a video will play with the sound on or off.  Google even controls the size of the video player.

130.  Google claims to use a calculation called media engagement index ("MEI") to determine when and how ads are displayed.  The MEI measures an individual's propensity to consume media on a particular site. Google Chrome calculates a media engagement score which is highest on sites where media/video is played on a regular basis.  When Google Chrome determines that that the MEI is high enough, Google Chrome will allow media playback on autoplay.  Google Chrome only allows this on desktop devices, not on handheld or mobile devices. This enables Google to allow autoplay when it serves Google.

131.   Moreover, certain Google-owned or preferred sites such as YouTube, Amazon and Microsoft are whitelisted, and thus algorithmically exempt from the restrictive Chrome browser settings. Thus, on YouTube, the autostart feature and sound features remain unrestricted.  Effectively, video advertising on YouTube reaches the Internet user uninterrupted. This favorable treatment by Google of its own cannot be overstated – as the very purpose of advertising is to be seen and to be heard by the end user. And, advertisers and brands will necessarily pay to go where they are sure to been seen and heard by prospective customers.

132.   Effectively, through Google's stable of products and services, Google can manipulate how, when and where ads are placed; how, where and whether they are seen; how, where and whether they are heard; and how efficiently and effectively they are delivered.  Moreover, as stated these restrictive rules are altered and/or not in place for the video advertisements that run in front of Google's own YouTube videos.

E.   Google Affirmatively Interferes with Competitors.

133.  Google has touted that "Our tools and platforms make it easy for advertisers and publishers of all sizes to choose whom they want to work with in this open, interconnected ad system."  According to Google: "Ad tech is a very crowded field, and Google competes with hundreds of companies, including household names like Adobe, Amazon, AT&T, Comcast, News Corp and Verizon . . . . Publishers and

advertisers mix and match technology partners to meet their different needs, creating both competition and innovation." However, in reality, Google has directly engaged in anticompetitive, illegal and deceptive conduct to eviscerate competition and gain more market share for Google and its own stable of services.

134. Indeed, on or about April 4, 2016, the Google team contacted one of Inform's customers, sending them a screenshot to give them a "heads up" when Inform's floating video player with that client's advertisement appeared next to content that Google misleadingly characterized as objectionable. Google obtained information about Inform's customer through Inform's forced usage of the Google ad server, took this information to Inform's customer and used it in an attempt to convince Inform's customer that Google offered superior services. Google's malicious conduct caused purposeful interference with Inform, its customers and business relationships. On information and belief, this was not an isolated occurrence.

135. Given the nature and timing of Google's affirmative actions and Google's vast online power, this can hardly be assumed to be an isolated incident. Google's purposeful trolling of competitors' services and content demonstrates specific anticompetitive intent and an unethical effort to wrongly discredit Google's competitors and steal market share.

## VIII.  GOOGLE WIELDS MONOPOLY POWER IN MULTIPLE MARKETS AND HAS ABUSED THAT POWER TO IMPEDE COMPETITION.

136.   While there have been a number of prior legal actions alleging that Google wields monopoly power, many of these cases have struggled to define the relevant market; to pinpoint the improper means used by Google to maintain its monopoly power and/or to leverage the same to unlawfully gain monopoly power in other relevant markets; and to distinguish harm to competitors from the requisite harm to competition.  While the anticompetitive conduct by Google with respect to any single market in which Google wields monopoly power runs afoul of the antitrust laws, the totality of Google's illegal and anticompetitive conduct across multiple, inter-related markets demonstrates a frightening march to online and digital dominance.

### A.    Monopolistic Leveraging

137.   Monopolistic leveraging is the use of monopoly power in one market to strengthen or gain a monopoly share in another market. Leveraging may be achieved through many anticompetitive practices including but not limited to contractual and/or technological tying, bundling, exclusive dealing, and predatory or below cost pricing.  Monopoly leveraging is often used to describe the way in

which a monopolist in one market uses its power to monopolize or attempt to monopolize a second market.[19]

138.   Plaintiff alleges that monopoly leveraging by Google includes but is not limited to the following:

a.   Google has leveraged its monopoly power in the Internet Search Market, the Licensable Mobile Device Operating System Market and the Search Advertising Market to maintain monopoly power in those markets;

b.   Google has leveraged its monopoly power in the Internet Search Market, the Licensable Mobile Device Operating System Market and the Search Advertising Market in an attempt to gain monopoly power in the Web Browser Market and the broader Online Advertising Market; and

c.   Google has leveraged its monopoly power in the Ad Server Market and its dominance (and/or monopoly) in the Web Browser

---

[19] *See Eastman Kodak v. Image Technical Services, Inc*., 504 U.S. 451, 483 (1992) (holding that the use of monopoly power in a market to strengthen its monopoly share of another market is a violation of Section 2 and stating that "[t]he second element of a §2 claim is the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor" (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)).

Market in an attempt to gain monopoly power in the broader Online Advertising Market, including the video advertising market.

B.     Google's Anticompetitive Behavior

139.   Google violates the antitrust laws through a wide range of predatory and exclusionary conduct that maintains its monopolies in the Internet Search Market, the Licensable Mobile Device Operating System Market, the Search Advertising Market and the Ad Server Market by protecting and raising the barriers to entry. This illegal conduct restricts consumer choice across the spectrum of services, advertising, products and product offerings, news, information, comparison shopping, and web applications; thwarts competition by marginalizing competitors not owned or controlled by Google; and deters innovation.

1.     Google Leverages its Monopoly Power in the Internet Search, Internet Search Advertising, and Ad Server Markets and Its Dominance in the Web Browser Market to Maintain Its Monopolies and Gain a Monopoly in the Broader Online Advertising Market.

140.   In an attempt to maintain its numerous monopolies and gain monopoly power in the broader Online Advertising Market, Google has engaged in a number of anticompetitive, illegal and deceptive practices including:

a.     Bundling or illegally tying the use of Google's DoubleClick Ad Server with the real-time bids from Google's AdX marketplace;

b.     Using the Google Ad Server to control every facet of how ads end up on websites and smartphone apps (through the Android OS)

68

around the world and manipulating this control to preferentially treat Google's own stable of products and services in an effort to knock out competition;

c.      Illegally tying the purchase of ads on YouTube, the world's largest video streaming website, with Google's own ad buying tools – including Google Ads, AdSense, AdX and now Google Ad Manager – and making rival tools for placing ads in video streams less attractive to advertisers because they can only access smaller audiences;

d.      Requiring that publishers and advertisers comply with a host of arbitrary, Google-set rules in order to allow their online videos to be enabled, viewable and audible on Google's dominant Chrome browser;

e.      Making their own advertising products and services more attractive to users by changing and/or altering algorithms to exempt Google-owned and Google-preferred platforms, products and services from the onerous and arbitrary rules that enable online videos to be viewed and heard by users;

f.      Deceptively phasing out and/or disabling Adobe Flash in favor of HTML5, while simultaneously providing the antidote to online advertisers who uploaded their ads through AdWords, AdWords Editor, or third-party tools that work with Google's ad platform;

g.      Tying the Google Search and Google Chrome browser apps to the Android OS by assuring the pre-installation of these Google apps, thereby further feeding Google's preestablished rules and parameters for enabled, viewable, and audible online video advertisements and use of HTML5;

h.      Obstructing the development and distribution of competing online video ads and advertising platforms not approved by Google;

i.      Providing Google customers who use Google's AdX with a last-second opportunity to outbid competing advertisers, who are using non-Google marketplaces, a practice which is known as "last look";

j.      Illegally and blatantly tying its stable of advertising services together by "rebranding" them into the Google Ad Manger;

k.      Usuriously increasing the cost of rival online video platforms' use of Google's goods and services, unilaterally terminating contracts with rival online advertising platforms, and/or expressly or constructively refusing to deal and/or do business with competitors; and

l.      Deceptively trolling competing online video platforms and directly contacting their publishing/advertising partners to interfere with competitors' contracts and garner additional market share for Google.

141.   Moreover, with respect to Google ad offerings, Google has insisted on exclusivity by (1) requiring the website owners that use AdSense not to allow search ads from Google's competitors to pop-up on the website; (2) requiring premium placement of a minimum number of Google search ads; (3) requiring the website owners to allow a minimum number of search ads from Google to be displayed on the most prominent space on their search results pages; (4) prohibiting competing search ads from being placed above or next to Google search ads; and (5) establishing a right to authorize competing ads, by requiring the website owners to obtain Google's approval before making any changes to display competing search ads.

142.   Google Ads has also imposed obligations that have prevented sellers and advertisers from managing search advertising campaigns across Google's AdWords and non-Google advertising services.  These obligations include, but are not limited to, various restrictions in the AdWords API terms and conditions.

143.   Google has also engaged in other anticompetitive practices with respect to Google Ads by setting unreasonably high minimum bids targeted only at competing products or services in order to foreclose them from meaningful participation in the Google Ads auction system.  In doing so, Google has foreclosed participation by its competitors, illegally restrained trade, and stifled competition.

144.   Additionally, Google has taken parts of the content of competing sites and misappropriated such content by placing it in Google's own search results, to artificially and falsely inflate its own profile and bolster its own ranking in generic and specialized search results. When competitors have objected, Google threatens to remove them entirely from Google's search results.   Additionally, Google has contractually restricted small businesses from advertising on competing search platforms.

145.   Google has likewise engaged in anticompetitive conduct and self-dealing by, *inter alia*, prioritizing other Google specialized search services and affording its own products and services favorable treatment in its general search algorithms over competing vertical sites; by scraping and stealing the copyrighted content of rivals' web content (known as 'scraping') to enhance its position in the general search results; and placing undue restrictions on advertisers and their video content.

<div style="margin-left:2em;">

2.  Google Leverages Its Monopoly in Android Operating System to Maintain Its Monopoly Power and Attempt to Gain Further Monopoly Power.

</div>

146.   The Android OS promotes not only Google's search-engine, but also its other free services, such as Google Maps and Google Play.  This business strategy disguised by Google's gratuitous Android offer seeks to maintain its incontestable

online dominance on both static and mobile search-engine markets, and, with this in mind, maintains its sponsored links plus traffic-based revenues from advertising.[20]

147.   Google has thus leveraged its monopoly in the Licensable Mobile Device Operating System Market to maintain its monopoly power.   When Google develops a new version of Android, it publishes the source code online.   The openly accessible Android source code covers basic features of a smart mobile operating system, but not Google's proprietary Android apps and services.

148.   Device manufacturers that wish to obtain Google's proprietary Android apps and services are required to enter into contracts with Google, as part of which Google imposes a number of anticompetitive restrictions. Google also entered into contracts and applied some of these restrictions to certain large mobile network operators, who can also determine which apps and services are installed on devices sold to end users. Contractual restrictions that Google has imposed on device manufacturers and mobile network operators have enabled Google to use Android as a vehicle to maintain its Internet Search monopoly, while stifling competition.

149.   Regarding its Android OS, Google has engaged in a number of anticompetitive practices including:

---

[20]  Google's Anti-Competitive and Unfair Practices in Digital Leisure Markets, ANCA D. CHIRITA, http://dro.dur.ac.uk/13657/1/13657.pdf.

a.  Illegally tying Google's Search and Google Chrome browser apps to the Android OS by assuring the pre-installation of these Google apps;

b.  granting significant financial incentives to some of the largest device manufacturers (original equipment manufacturers or "OEMs") as well as mobile network operators on condition that they exclusively pre-installed Google Search across their entire portfolio of Android devices; and

c.  obstructing the development and distribution of competing Android OS not approved by Google.

150.  Google's tying of its Google Search app and Google Chrome browser to Android OS maintains its monopoly in Internet Search and Web Browser dominance.  The same reduces the ability of customers to choose among competing search apps and web browsers applications and app stores because it forces OEMS and other purchasers to license or acquire the tied combination whether they (or their customers) want the Google Chrome browser and the attendant Google apps or not. Google's tying, which it can accomplish because of its monopoly power in Internet Search and Licensable Mobile Device Operating Systems,  impairs the ability of its competitors to compete to have their browsers and apps preinstalled on the Android

operating systems and thus substantially forecloses those competitors from an important channel of distribution.

151.  Google has misused and continues to misuse its monopoly power by requiring other OEMs to agree, as a condition of acquiring a license to the Android OS, to Google's exclusionary restrictions.

152.  These restrictive agreements also maintain and enhance the importance of Google's ability to provide preferential placement of its own advertising revenue generating products and services.

153.  As a result, these restrictions further exclude competing apps from the most important channels of distribution, substantially reduce app developers incentives and abilities to innovate and differentiate their products in ways that could facilitate competition between Google apps and competing apps, and enhance Google's ability to use the near ubiquity of its Android OS monopoly to maintain dominance in both the relevant markets and gain dominance in the broader Online Advertising Market.

154.  Google's contracts have unreasonably restrained and unless enjoined will continue to unreasonably restrain competition in the market for web applications.  They artificially increase the share of the market held by Google's Android operating system and they threaten to tip the market permanently to Google

apps, not because customers have freely chosen Google products in a competitive marketplace, but because of the illegal exercise of monopoly power by Google.

IX.   ANTITRUST HARM

155.   Defendants' conduct goes far beyond aggressive competition. Defendants' anticompetitive and predatory actions intend to, and in fact do, exclude rivals and harm the competitive process.  It is willful and is not competition on the merits.

156.   Google's conduct harms consumers by depriving customers of valid competitive choice, degrading consumer privacy, degrading quality and variety of products and services offered to consumers, and stifling innovation.

157.   Google's conduct harms competition, by artificially and unlawfully reducing and foreclosing competition, foreclosing competitors from meaningfully participating in purportedly neutral and unbiased competitive processes including the ad auction and bidding processes, which are in fact skewed and rigged to favor Google and Google products and services; and surreptitiously altering algorithms and compatibilities with competing platforms without sufficient notice to allow them to alter their product to run on the Google platform.

158.   Google's conduct adversely affects competition and innovation, including by:

a. Impairing the incentive of Google's competitors and potential competitors to undertake research and development, because they know that Google will be able to limit the rewards from any resulting innovation;

b. Impairing the ability of Googles' competitors and potential competitors to obtain financing for research and development;

c. Inhibiting Google's competitors that nevertheless succeed in developing promising innovations from effectively marketing their improved products to customers;

d. Reducing the incentive and ability of advertising platforms, web application developers, and other competitors to innovate and differentiate their products in ways that will appeal to customers; and

e. Reducing competition and the spur to innovation by Google and others that only competition can provide.

159. The purpose and effect of Defendants' conduct has been, and if not restrained will be:

a. To preclude competition on the merits between competing online advertisers, publishers seeking advertising space and websites offering their "real estate" for ad placement;

77

b.  To preclude competition on the merits between Google's search and browser apps and other apps;

c.  To preclude potential competition between Google's Android OS and competing operating systems, other companies, and software apps whose use is facilitated by bundled Google products and services, which systems could otherwise choose to offer competing Internet and advertising platforms;

d.  To extend Google's numerous monopolies including Internet Search, Search Advertising, and Ad Server monopolies; and

e.  To maintain Google's Internet Search, Search Advertising, and Ad Server monopolies;

f.  To move toward and attain monopoly power in the Web Browser Market; and

g.  To move toward and attain monopoly power in the colossally lucrative broader Online Advertising Market.

160.  Google's systematic and predatory conduct across markets in which it enjoys monopoly power threatens to change the trajectory of digital and online competition permanently. As has been recognized: "because it can be so difficult for courts to restore competition once it has been lost, the true cost of exclusion to

consumer welfare — and its benefit to dominant firms — are likely to be understated."[21]

## X.   GOOGLE'S IMPROPER INFLUENCE ON GOVERNMENT

### A.   Obama Administration

161.   Beginning sometime after its domination of the search and search advertising markets, Google began to exert its influence on the U.S. government in order to maintain and increase its monopoly in those areas as well as others.  These attempts to influence politicians improperly were well-established by the time that former-President Barack Obama was running for his first term in office.   Eric Schmidt, former CEO and Executive Chairman of Google, regularly campaigned for President Obama as a candidate and even served as a member of his transition team and technology advisory council.[22] On October 20, 2008 the New York Times reported that "Google Inc. Chief Executive Eric Schmidt will hit the campaign trail this week on behalf of Democratic presidential candidate Barack Obama, signaling Mr. Schmidt's push for a greater voice in politics while giving the Obama campaign a boost from a highly desirable constituency."

---

[21]  Andrew I. Gavil,  *Exclusionary Distribution Strategies by Dominant Firms: Striking a Better Balance*, 72 Antitrust L.J. 3, 33 (2004).

[22]  https://www.wsj.com/articles/SB122446734650049199.

162.   In 2008, Google's PAC, its employees, and their employees' immediate families gave over $800,000 to Barack Obama's election campaign, making it the fifth-largest source of funds to the campaign.[23]  Google similarly offered significant technical assistance to the Obama campaign.  In turn, candidate Obama spent around $2.8 million in campaign cash on advertising with Google during this campaign, roughly 80% of the campaign's online ad spending.[24]

163.   Based on a review of the Obama Administration visitor logs following the election, Google company representatives visited the Obama White House an astonishing 427 times between 2009 and 2016.  These meetings show about 169 different Google employees meeting 182 different White House officials.  Google's top lobbyist, Johanna Shelton, visited 128 times, including multiple personal meetings with President Obama.

164.   According to an article published in the Guardian on December 18, 2015 "*Google under scrutiny over lobbying influence on Congress and White House,*" by David Smith (quoting an anonymous Washington antitrust lawyer), "Where Google stops and government starts is hard to tell. They're backers of Barack Obama and it's well known in Washington how it's done," said an antitrust

---

[23]  https://www.cbsnews.com/news/google-political-donations-where-company-execs-put-their-cash/.

[24]  https://www.forbes.com/2008/05/29/google-obama-advertising-tech-cx_pco_0529paidcontent.html.

lawyer based in Washington. "I've heard instances of Google calling the White House to say they're unhappy about appointments. They don't just buy off politicians; they buy off the ecosystem, including advocacy groups and thinktanks."

165.   In total, more than 250 people moved from Google and related firms to the federal government or vice versa during the Obama administration.  At the executive level, a total of 31 different Google executives joined the White House or different executive advisory boards.  And 22 different White House officials went on to join Google.[25]

166.   For example, Andrew McLaughlin, Google's head of global public policy, left Google in 2009 to join the White House as the deputy chief technology officer.  And Michelle Lee, the deputy general counsel at Google, left Google to become the Commissioner of the United States Patent and Trademark Office, a position she held from March 2015 until June 2017.

167.   The results of these meetings, the placement of officials within the government and the outpouring of cash and technical assistance has been rewarding for Google.  While certain elements of these activities take place within every level of government and multiple industries on a regular basis, Google's concerted efforts

---

[25] *See* Mark Swanson, August 9, 2016 "*Watchdog:  Exposing the Google Obama Administration Employee Pipeline.*"

shown here cross the line into blatant antitrust violations given the sheer magnitude of their efforts and the overall dramatic anti-competitive effects on the market.

168.   In late 2012, a senior attorney in the Federal Trade Commission, Robert Mahini, took a position as Google's senior policy counsel.  At or around the same time, Eric Schmidt, the CEO of Google, visited President Obama in the White House in late 2012.  Most importantly, Joshua Wright, a senior counsel at Wilson Sonsini – Google's long-time outside counsel – became the Commissioner of the Federal Trade Commission.

169.   By early 2013, and despite a recommendation from the staff of the Federal Trade Commission that Google's conduct had resulted and would continue to result in harm to consumers and innovation on the online search and advertising markets, Obama's Federal Trade Commission resolved an anti-competitive inquiry with a virtual slap on the wrist, avoiding an enforcement action altogether.  The settlement was purportedly to avoid "concerns that these practices could stifle competition in the markets for popular devices such as smart phones, tablets, and gaming consoles, as well as the market for online search advertising."

170.   Google's influence was likewise apparent with the appointment of Michelle Lee as the Director of the US Patent and Trademark Office ("USPTO") by President Obama.  Prior to being picked to head the USPTO in 2014, Lee was the Deputy General Counsel and Head of Patents and Patent Strategy for Google.  As

part of her appointment, she was tasked with implementing the newly founded Patent Trial and Appeal Board and Inter Partes Review procedures that were established under the American Invents Act ("AIA").  Commissioner Lee effectively made Google's desire to weaken patent protections for everyone but itself into USPTO policy.  This position is one that had been regularly espoused by attorneys dealing with Google patents in the past.[26]

171.  As Director, Michelle Lee wielded unprecedented power over the USPTO after the passage of the AIA, one of the greatest areas of power was in her ability to appoint Administrative Patent Judges ("APJs") to oversee Inter Partes Reviews that were established by the AIA.

172.  Thus, APJs are purely political positions, since it has no tenure to ensure the judge's independence.  Unlike most other judges, APJs can be appointed or removed at the whim of the Director.[27]  They likewise have their pay dictated by the director and have no conflicts checks in the cases that they hear, making them direct and efficient tools for the administration that is in power.

173.  Further, the very procedures of the IPRs themselves are designed to increase the likelihood that patents from smaller inventors will be invalidated.  Most

---

[26]  https://www.sfgate.com/business/article/Google-lawyer-Why-the-patent-system-is-broken-2324278.php.

[27]  https://www.ipwatchdog.com/2018/03/21/how-google-and-big-tech-killed-the-u-s-patent-system/.

shockingly, there is no limit on the number of times that a patent may be subjected to the IPR process.  As one of the top filers of IPRs, Google regularly avails itself of this process.  Despite the purported rule against duplicative filings, about 38% of Googles IPR filings challenge at least one claim that overlaps with another Google IPR.[28]

174.   While it seeks to prevent or invalidate the patents of others through USPTO procedures, Google also avails itself of other procedures that work to its benefit.  For example, in 2014, Google was by far the largest recipient of patents that were expedited under the USPTO's Track One program, created by the AIA, which allows companies to get their patent applications "fast-tracked" by paying extra fees, something that Google has no trouble doing.[29]

175.   A history of using its clout and market position to weaken the value of potentially competitive patents owned by others—and indeed prevent those patents from issuing in the first place—while steadily increasing and making use of its own massive portfolio has become a hallmark of Google.

176.   Another example of Google's manipulation of government policy during the Obama regime is with the Obama administration's dismissal of the

[28]   https://www.law360.com/articles/1083158.
[29]   https://www.washingtonpost.com/business/capitalbusiness/google-has-gotten-more-fast-track-patents-than-any-other-company/2014/10/26/b39334b4-594f-11e4-b812-38518ae74c67_story.html.

Registrar of Copyrights for the first time in 119 years.  This dismissal occurred shortly after she chastised Google for its attempts at abusing and weakening the U.S. Copyright system.[30]

> B.  Google's Influence on Policy to Maintain Monopoly Power

177.   Google's influence also extends beyond its direct manipulation of the government through lobbying.  It regularly takes a more indirect approach by funding "research" and opinion papers by professors and other individuals espousing its views on antitrust issues, data privacy, and patent policy, frequently without disclosing that they were tied to Google.[31]

178.   Likewise, it continues to expand its patent portfolio and reach through actions such as its massive cross-license with China's Tencent search firm,[32] a company that is second only to Google in global patent applications.[33]

179.   Google is further continuing its efforts as a co-founder of the High Tech Inventors Alliance, an innocuous-sounding organization that exists primarily to lobby for Google-backed patent policies.[34]  Similarly, its Patent Purchase Promotion

---

[30] https://www.theregister.co.uk/2016/10/24/murder_in_the_library_of_congress/.
[31] https://www.forbes.com/sites/davidpridham/2017/07/19/how-google-tries-to-buy-government/.
[32] https://www.reuters.com/article/us-china-google-tencent/google-announces-patent-agreement-with-tencent-amid-china-push-idUSKBN1F80DF.
[33] https://kr-asia.com/tencent-second-only-to-google-in-global-patent-applications.
[34] https://www.globenewswire.com/news-release/2018/05/22/1510140/0/en/High-Tech-Inventors-Alliance-Applauds-BIG-Data-for-IP-of-2018.html

program offers to buy patents from others in order to accumulate and consolidate its own portfolio.[35]

C.     Federal Trade Commission

180.    Google's influence over the Federal Trade Commission, its decisions to allow objectionable acquisitions and its cooperative and collaborative stance with Google is alarming.

181.    On December 20, 2007, after concerns raised about the anticompetitive nature of the acquisition, the FTC approved Google's purchase of DoubleClick from its owners Hellman & Friedman and JMI Equity.   In doing so, the FTC stated: "[A]fter carefully reviewing the evidence, we have concluded that Google's proposed acquisition of DoubleClick is unlikely to substantially lessen competition."

182.    Later in 2011, the FTC conducted an investigation into allegations that Google had manipulated its search algorithms to harm vertical websites and unfairly promote its own competing vertical properties, a practice commonly known as "search bias."  The FTC looked at Google's introduction of "Universal Search" – a

---

https://www.ipwatchdog.com/2017/07/16/high-tech-inventors-alliance-newest-efficient-infringer-lobby/.

[35]   https://ipcloseup.com/2015/11/17/googles-patent-buying-program-an-apparent-success-is-thinly-reported/

https://www.ipwatchdog.com/2015/04/29/google-announces-the-patent-purchase-promotion/.

product that prominently displays targeted Google properties in response to specific categories of searches, such as shopping and travel to determine whether Google used that product to reduce or eliminate a nascent competitive threat. The investigation also looked at whether Google altered its search algorithms to demote certain vertical websites (e.g., Expedia, Orbitz and Yelp) in an effort to reduce or eliminate a nascent competitive threat.

183.   In 2013, following the appointment of former Google outside counsel Joshua Wright as Obama's FTC Commissioner and despite a staff memo urging prosecution, the FTC issued two decisions effectively terminating the investigations into Google without any meaningful action against Google.   According to the Commission statement, the FTC concluded that the introduction of Universal Search, as well as additional changes made to Google's search algorithms – even those that may have had the effect of harming individual competitors – could be plausibly justified as innovations that improved Google's product and the experience of its users.   Notably, Google's Internet Search market rose from approximately 70% to now 94% of the market.  The FTC staff memo, which had vehemently urged enforcement action against Google, was later leaked, but no further action was taken.

184.   The FTC case was a "false negative" – a mistaken exoneration of conduct that has harmed and continues to harm competition and consumers.  The cost of this false negative includes not just the failure to condemn Google's anti-

competitive conduct, but also the loss to competition and consumers inflicted by emboldening, rather than deterring, continued anticompetitive conduct by Google and others. That nearly all state Attorneys General have jointly come together to investigate Google's anti-competitive and predatory conduct, below, rings loudly as a condemnation of the FTC's 2013 decisions concerning Google under the Obama Administration.

185.   In its 2013 Decisions, the FTC doubled-down on its prior erroneous decision to permit the DoubleClick acquisition.  The dual 2013 decisions of the FTC are, at best, the bolstering of its prior mistake.  At worst, the FTC has been complicit in Google's rise to dominance. Thus, this action and the expected action of the 50 Attorneys General must be permitted to go forward and challenge Google's march toward total online and information dominance.

XI.   <u>GOOGLE'S PREDATORY CONDUCT IS WELL DOCUMENTED</u>

186.   Google's monopolistic and anticompetitive behavior and activities are well documented.

A.     The European Union Commission

187.   On November 30, 2010, the EU Commission initiated antitrust proceedings against Google concerning complaints of the unfavorable treatment by Google of competing vertical search service providers in Google's unpaid and sponsored search results coupled with an alleged preferential placement of Google's own services (the "Google Search Investigation"). The Commission also opened the investigation into the alleged imposition of exclusivity obligations by Google on its advertising and distribution partners and suspected restrictions on advertisers as to the portability of campaign data to competing online advertising platforms (the "Google AdSense Investigation"). These practices were alleged to have constituted an infringement of Article 102 of the Treaty on the Functioning of the European Union and Article 54 of the EEA Agreement.

188.   The EU Commission investigated whether Google had abused a dominant market position in online search by lowering the ranking of unpaid search results of competing services which are specialized in providing users with specific online content such as price comparisons (so-called vertical search services, such as Expedia or Orbitz) and by according preferential placement to the results of its own vertical search services in order to shut out competing services. The Commission also looked into allegations that Google lowered the Quality Score, one of the factors that determine the price paid to Google by advertisers, for sponsored links of

competing vertical search services. The Commission's probe also focused on allegations that Google imposes exclusivity obligations on advertising partners, preventing them from placing certain types of competing ads on their web sites, as well as on computer and software vendors, with the aim of shutting out competing search tools. Finally, it investigated suspected restrictions on the portability of online advertising campaign data to competing online advertising platforms.

189.   On March 13, 2013, the EU Commission adopted a Preliminary Assessment addressed to Google under Article 9 of Regulation (EC) No 1/2003 ("Preliminary Assessment"). In the Preliminary Assessment, the Commission took the view that Google engages in the following business practices that may infringe Article 102 of the Treaty and Article 54 of the EEA Agreement:

- The favorable treatment, within Google's general search results pages, of links to Google's own specialized search services as compared to links to competing specialized search services;
- The copying and use by Google without consent of original content from third-party websites in its own specialized search services;
- Agreements that de jure or de facto oblige websites owned by third parties (referred to in the industry as "publishers") to obtain all or most of their online search advertisement requirements from Google; and
- Contractual restrictions on the management and transferability of online search advertising campaigns across online search advertising platforms.

190.   Notably, the EU Commission stated that: "The fact that a product or service is provided free of charge does not prevent the offering of such a service

from constituting an economic activity for the purposes of the competition rules of the Treaty. This is simply a factor to be taken into account in assessing dominance."

191.   On 15 April 2015, the European Commission initiated formal antitrust proceedings against Google with regard to its business practices related to Android (the "Google Android Investigation").

192.   On June 2017, DG COMP, the competition arm of the European Commission and Europe's principal antitrust enforcer, concluded the Google Search Investigation, finding infringement of Article 102, which prohibits the abuse of a dominant position. The Commission imposed a $2.7 billion fine in the Google Search Investigation.  The Commission also ordered Google to remedy the abuse within 90 days or face daily penalties of up to 5% of global group turnover. The June 2017 decision was followed by a $ 5.1 billion fine on the Google Android Investigation in 2018 and a $1.7 billion fine on Google AdSense Investigation in 2019.

B.   United States Department of Justice Inquiries

193.   On July 23, 2019, The Department of Justice announced that its Antitrust Division is reviewing whether and how market-leading online platforms have achieved market power and are engaging in practices that have reduced competition, stifled innovation, or otherwise harmed consumers. The Department's review is considering the widespread concerns that consumers, businesses, and

entrepreneurs have expressed about search, social media, and some retail services online. The Department's Antitrust Division is conferring with and seeking information from the public, including industry participants who have direct insight into competition in online platforms, as well as others. "Without the discipline of meaningful market-based competition, digital platforms may act in ways that are not responsive to consumer demands," said Assistant Attorney General Makan Delrahim of the Antitrust Division. "The Department's antitrust review will explore these important issues." The goal of the Department's review is to assess the competitive conditions in the online marketplace in an objective and fair-minded manner and to ensure Americans have access to free markets in which companies compete on the merits to provide services that users want. If violations of law are identified, the Department has indicated that it will proceed appropriately to seek redress.

C.    September 2019 Announcement of Investigation by State Attorneys General

194.    On September 9, 2019, Texas Attorney General Ken Paxton announced that Texas is leading 50 attorneys general in a multistate, bipartisan investigation of Google's business practices in accordance with state and federal antitrust laws. In so announcing AG Paxton acknowledged that there was evidence that Google's business practices undermined consumer choice, stifled innovation,

violated users' privacy, and put Google in control of the flow and dissemination of online information.

XII.   CLAIMS

### COUNT I -  VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### (Unreasonable Restraints on Trade)

195.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

196.   Defendants' actions, as stated above, have had and are having a substantial anticompetitive effect on interstate commerce.

197.   As described above, Defendants jointly have market power in Defendants' Leveraged Markets.

198.   Defendants are combinations within the meaning of Section 1 of the Sherman Act.

199.   Individually and in combination, Defendants' anticompetitive behavior constitutes illegal restrictions, agreements, and barriers that are intended to and do in fact prevent, restrict or interfere with competition in Defendants' Leveraged Markets in violation of the Sherman Act.

200.   Plaintiff has suffered, continues to suffer, and will suffer until the Court enters the relief requested below, an antitrust injury resulting from Defendants' illegal conduct as described herein.  The effects of Defendants' illegal conduct have resulted in significant monetary injury to Plaintiff, as well as in higher prices paid

by consumers for retail products, higher prices for advertising, and the forcing of Plaintiff and others to use Google products and services through improper tying. Plaintiff has no adequate remedy at law.

### COUNT II - VIOLATION OF SHERMAN ACT SECTION 2 – (Monopoly Maintenance)

201.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

202.   Defendants have monopoly power in Defendants' Leveraged Markets. Through the anticompetitive conduct described herein, Defendants have willfully maintained, and unless restrained by the Court, will continue to willfully maintain that power by anticompetitive, illegal, deceptive, and unreasonably exclusionary conduct.  Defendants have acted with the intent illegally to maintain their monopoly power in each of Defendants' Leveraged Markets, and their illegal conduct has enabled them to do so in violation of Section 2 of the Sherman Act.

203.   As a direct and proximate result of the acts and practices alleged above, competition and consumers will continue to be immediately and irreparably injured through the following:

   a.   Loss and degradation to competition in each of the relevant markets;

   b.   Degradation of the quality of products and services offered to the consumer;

c.   Degradation of data protection and the privacy rights of consumers; and

d.   Curtailing and stifling of innovation by would-be competitors.

204.   Defendants' illegal conduct has directly caused significant monetary damages to Plaintiff.  The precise amount of damages Plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

205.   In addition, Defendants' monopolization of the relevant markets are ongoing wrongs that cause incalculable and irreparable injury for which there is no adequate remedy at law.  Unless Defendants are enjoined by appropriate Order of this Court, the asserted harm will continue unabated.

## COUNT III - VIOLATION OF SHERMAN ACT SECTION 2 –
### (Monopoly Leveraging)

206.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

207.   Defendants have monopoly power in each of Defendants' Leveraged Markets, including but not limited to the Internet Search Market, the Search Advertising Market, the Market for Licensable Mobile Operating Systems, and the Ad Server Market.   Through the anticompetitive conduct described herein, Defendants have leveraged each of these markets in an effort to gain monopoly power and further dominance in the Web Browser Market and the broader Online Advertising Market.  Defendants have done so willfully and unless restrained by the

Court, will continue to willfully leverage that power by further anticompetitive, illegal, deceptive, and unreasonably exclusionary conduct.  Defendants have acted with the intent illegally to maintain and gain monopoly power in each of these markets, and their illegal conduct has enabled them to do so in violation of Section 2 of the Sherman Act.

208.   As a direct and proximate result of the acts and practices alleged above, competition and consumers will continue to be immediately and irreparably injured through the following:

     a.    Loss and degradation to competition in each of the relevant markets;

     b.    Degradation of the quality of products and services offered to the consumer;

     c.    Degradation of data protection and the privacy rights of consumers; and

     d.    Curtailing and stifling of innovation by would-be competitors.

209.   Defendants' illegal conduct has directly caused significant monetary damages to Plaintiff.  The precise amount of damages Plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

210.   In addition, Defendants' monopolization of the relevant markets and monopoly leveraging are ongoing wrongs that cause incalculable and irreparable

injury for which there is no adequate remedy at law.  Unless Defendants are enjoined by appropriate Order of this Court, the asserted harm will continue unabated.

## COUNT IV - VIOLATION OF SHERMAN ACT SECTION 2 –
### (Attempted Monopolization)

211.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

212.   Defendants have attempted to monopolize the Web Browser Market, and the broader Online Advertising Market, of which the Search Advertising Market (in which Google already has a monopoly) is a narrower sub-category.

213.   Defendants' anti-competitive conduct has created a dangerous probability that they will achieve monopoly power in the U.S. for the Web Browser Market and the broader Online Advertising market.

214.   Defendants have a specific intent to achieve monopoly power in the U.S. Web Browser Market and the broader Online Advertising Market.

215.   Defendants have the power to exclude competition in the U.S. Web Browser Market and the Online Advertising Market, and have used that power, including by way of their unlawful practices in restraint of trade and monopoly leveraging as described herein, in an attempt to monopolize these relevant markets.

216.   Defendants' conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary as respects its competitors in the U.S. markets for Online Advertising and Web Browsers.

217.   Defendants have combined and leveraged their own monopolies in an attempt to monopolize the Web Browser and Online Advertising Markets, with the effect being that competition is foreclosed, that innovation is stifled, and that consumer choice is gravely diminished.

218.   There is no business necessity or other pro-competitive justification for Defendants' conduct.

219.   Plaintiff has been injured, and will continue to be injured, in their businesses and property by way of Defendants' conduct, including by way of overpaying for goods and services, being shut out of meaningful and fair participation in advertising exchange, and being foreclosed from competing in the market on their merits.

## COUNT V - VIOLATION OF SHERMAN ACT SECTION 2 and CLAYTON ACT SECTION 3
### (Exclusive Dealing)

220.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

221.   As detailed above, Google has monopoly power in Defendant's Leveraged Monopolies, including the power to control prices and exclude competition.

222.   Google has willfully and intentionally entered into anti-competitive, exclusionary, and unjustified agreements with publishers, advertisers, original equipment manufacturers, and others creating high barriers to entry and unreasonably excluding competition in the attendant markets.

223.   These exclusive dealing agreements are unreasonably restrictive in terms of breath duration and market coverage.

224.   This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose; thus Google's exclusive dealing arrangements agreements are not only unduly restrictive and unreasonable in length, but also serve the anti-competitive purpose of cutting competitors off from resources they need to compete with Google.

225.   This conduct has substantially foreclosed competition in the relevant markets.

226.   These exclusionary agreements violate both Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 3 of the Clayton Act, 15 U.S.C. § 14 because these agreements constitute anti-competitive acts intended to maintain Google's monopoly in the Defendant's Leveraged Markets.

227.   As a direct and proximate result of Google's anti-competitive and monopolistic conduct, plaintiffs have been damaged in fact.

## COUNT VI - TORTIOUS INTERFERENCE

228.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

229.   Plaintiff has had customer contracts and customer relationships with various advertisers for more than a decade.  These customer contracts and customer relationships are valuable assets of Plaintiff.

230.   Without privilege, and without permission, authorization or even notice, Defendants have acted improperly and wrongfully by, *inter alia*, approaching Plaintiff's customers with the intent to divert those customers from Plaintiff to Defendants.  In so doing, Defendants have used information derived from their algorithms, which Plaintiff is forced to use to deliver advertisements, in order to make false or misleading claims to Plaintiff's customers.

231.   Defendants' actions were done with malice and with the specific intent to injure Plaintiff.   Defendants' actions have disrupted Plaintiff's customer relationships and future business with such customers.

232.    Defendants' illegal conduct has directly caused significant monetary damages to Plaintiff.  The precise amount of damages Plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

233. Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which would raise the presumption of conscious indifference to consequences.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter a final judgment against each Defendant as follows:

1. A declaratory judgment finding that Defendants' Leveraged Monopolies constitute an unreasonable restraint of trade and are illegal under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act;

2. A preliminary, and thereafter permanent, injunction as follows:

(a) prohibiting each Defendant from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out or renew any of the Google Competitive Restraints as alleged herein or any other similar restraint having a similar purpose or effect in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, *et seq*. and Section 3 of the Clayton Act, 15 U.S.C. § 14;

(b) imposing certain affirmative obligations on Google regarding aspects of its corporate governance and corporate mandate, including requiring Google to sell to, or provide interconnection with, rivals in each of the relevant markets in order to lower entry barriers;

(c)     requiring that Defendants be legally separated into independent corporations to include, but not be limited to: (1) one separate and independent corporate entity for its flagship Internet search business; (2) one separate and independent corporate entity for its Internet advertising business; (3) one separate and independent corporate entity for its Android mobile operating systems business; (4) one separate and independent corporate entity for its Ad Server business; and (5) one separate and independent corporate entity for its Web Browser business;

(d)     requiring that a corporate monitor assist in the breakup or allocation of business activities between and among the resulting entities designed to maximize competition and benefit to the consuming public *en masse*; that the monitor be empowered to advise the Court as to further divestment or reallocation of Google assets or further corporate government changes or board membership changes;

3.     An award of monetary damages, including treble damages, punitive damages, the costs of this action and reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

4.     An award of pre-judgement and post-judgement interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

5.      An award of such other relief as may be appropriate and as the Court may deem proper.

## XIV.  JURY DEMAND

Plaintiff demands a trial by jury on all issues herein.

Respectfully submitted, this 25th day of November, 2019.

HERMAN JONES LLP


*/s/ John C. Herman*
John C. Herman
  (Ga. Bar No. 348370)
Peter M. Jones
  (Ga. Bar No. 402620)
Carlton R. Jones
  (Ga. Bar No. 940540)
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia  30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501
jherman@hermanjones.com
pjones@hermanjones.com
cjones@hermanjones.com

Serina M. Vash
  (N.J. Bar No. 041142009)
153 Central Avenue #131
Westfield, New Jersey  07090
svash@hermanjones.com

Counsel for Plaintiff
INFORM INC.