# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

INFORM INC.,

     Plaintiff,

v.

GOOGLE LLC; GOOGLE INC.;
ALPHABET INC.; YOUTUBE, LLC;
YOUTUBE, INC.; and JOHN DOES
1-100,

     Defendants.

Civil Action No. 1:19-cv-05362-JPB

## PLAINTIFF INFORM'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

I.    LEGAL STANDARD FOR MOTION TO DISMISS . . . . . . . . . .    5

II.   INFORM HAS STANDING TO BRING THIS ACTION . . . . . . . .    6

    A.    Inform's Participation In The Relevant Markets . . . . . . . . . . .    6
    B.    The Sherman Act Is Comprehensive In Its Protections . . . . . .    7
    C.    Inform Has Suffered Antitrust Injury . . . . . . . . . . . . . . . . . . .    8
    D.    Inform Is A Proper Plaintiff To Pursue Action
        Against Google . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

III.  PLAINTIFF PLAUSIBLY ALLEGES A SECTION 1
    VIOLATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

    A.    Inform Alleges A Per Se Tying Violation . . . . . . . . . . . . . . .    13
    B.    Inform's Complaint Plausibly Alleges Concerted
        Action By Google And Its Former Employees . . . . . . . . . . .    15
    C.    Inform's Complaint Plausibly Alleges An Unreasonable
        Restraint On Competition In Defendants' Leveraged
        Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

IV.   GOOGLE'S MONOPOLY POWER, MONOPOLY
    LEVERAGING AND ATTEMPTED MONOPOLY
    (COUNTS II, III AND IV) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

    A.    Defendant Google Has Monopoly Power In The
        Relevant Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
    B.    Inform Has Adequately Set Forth the Relevant Markets . . . .    20
    C.    Inform Has Adequately Pled Market Power . . . . . . . . . . . . .    22
    D.    Inform Has Adequately Pled Both Per Se Violations Of
        The Antitrust Laws and Acts That Exclude Competition . . . .    26
    E.    Google's Actions Demonstrate Specific Intent To
        Monopolize . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28
    F.    Google Illegally Leverages Its Monopoly Power . . . . . . . . .    29

V.    GOOGLE VIOLATES THE SHERMAN AND CLAYTON
      ACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

      A.    Allegations Of Exclusive Dealing By Google . . . . . . . . . . . .    31
      B.    Tying By Google Regarding The Ad
            Server And Android OS . . . . . . . . . . . . . . . . . . . . . . . . . . .    33
      C.    Foreclosure Of The Relevant Markets . . . . . . . . . . . . . . . .    33

VI.   DEFENDANTS MALICIOUSLY AND TORTIOUSLY
      INTERFERED WITH INFORM (COUNT VI) . . . . . . . . . . . . . . .    34

VII.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ...............................................................16

*Andrx Pharms., Inc. v. Elan Corp., PLC*,
  421 F.3d 1227 (11th Cir. 2005) ...........................................................5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................5

*Associated Gen. Contractors of California, Inc. v. California State
  Council of Carpenters*,
  459 U.S. 519 (1983)............................................................................7, 8

*Austin v. Blue Cross and Blue Shield*,
  903 F.2d 1385 (11th Cir. 1990) .........................................................10

*Blue Shield of Virginia v. McCready*,
  457 U.S. 465 (1982)...............................................................................8

*Bolinger v. First Multiple Listing Serv., Inc.*,
  838 F. Supp. 2d 1340 (N.D. Ga. 2012)..............................................15

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962).............................................................................20

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
  429 U.S. 477 (1977).............................................................................10

*Corporacion Mexicana DeMantenimiento Integral, S. De R.L. De
  C.V. v. Pemex-Exploracion Y Produccion*,
  832 F.3d 92 (2d Cir. 2016) .................................................................21

*Covad Communications Co. v. BellSouth Corp.*,
  374 F.3d 1044 (11th Cir. 2004) ......................................................7, 30

*Diverse Power, Inc. v. City of LaGrange, Georgia*,
No. 3:17-cv-3-TCB, 2018 WL 9651475 (N.D. Ga. Feb. 21, 2018) ..................14

*Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*,
797 F.3d 1248 (11th Cir. 2015) ..........................................6, 19, 24, 26

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
504 U.S. 451 (1992)......................................................................26

*Feldman v. American Dawn, Inc.*
849 F.3d 1333 (11th Cir. 2017) ..........................................................8

*FieldTurf USA Inc., et al. v. TenCate Thiolon Middle East, LLC*,
No. 4:11-cv-50-TWT, 2011 WL 13234177 (N.D. Ga. Dec. 20,
2011) ...................................................................................34

*Griffiths v. Blue Cross & Blue Shield of Ala.*,
147 F. Supp. 2d 1203 (N.D. Ala. 2001)...................................................6

*Gulf States Reorganization Group, Inc. v. Nucor Corp.*,
466 F.3d 961 (11th Cir. 2006) ......................................................9, 10

*Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.*,
818 F.2d 1530 (11th Cir. 1987) .........................................................16

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
547 U.S. 28 (2006)......................................................................13

*Jacobs v. Tempur–Pedic Int'l, Inc.*,
626 F.3d 1327 (11th Cir. 2010) .........................................................21

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)......................................................................13

*Johnson v. Univ. Health Services, Inc.*,
161 F.3d 1334 (11th Cir. 1998) ..........................................................9

*Lorain Journal Co. v. United States*,
342 U.S. 143 (1951).....................................................................19

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992)........................................................................7

*McGahee v. Northern Propane Gas Co.*,
 858 F.2d 1487 (11th Cir. 1988) ....................................................28

*McWane, Inc. v. F.T.C.*,
 783 F.3d 814 (11th Cir. 2015) ..........................................22, 23, 31

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
 364 F.3d 1288 (11th Cir. 2004) ..............................................19, 26

*Omni Healthcare, Inc. v. Health First, Inc.*,
 No. 6:13-cv-1509-Orl-37DAB, 2015 WL 275806 (M.D. Fla. Jan.
 22, 2015) ..........................................................................9, 11, 13

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*,
 604 F.3d 1291 (11th Cir. 2010) ..............................................*passim*

*Polypore Int'l, Inc. v. F.T.C.*,
 686 F.3d 1208 (11th Cir. 2012) ..............................................20, 21

*Resnick v. AvMed, Inc.*,
 693 F.3d 1317 (11th Cir. 2012) ......................................................7

*Robles v. Humana Hosp. Cartersville*,
 785 F. Supp. 989 (N.D. Ga. 1992)................................................10

*RxStrategies, Inc. v. CVS Pharmacy, Inc.*,
 No. 8:18-cv-1087-T-30TGW, 2019 WL 7584729 (M.D. Fla.
 December 4, 2019).........................................................................24

*Schor v. Abbot Laboratories*,
 457 F.3d 608 (7th Cir. 2006) .......................................................30

*Servicetrends, Inc. v. Siemes Med Sys.*,
 870 F. Supp. 1042 (N.D. Ga. 1994)........................................23, 28

*Smith v. U.S.*,
 873 F.3d 1348 (11th Cir. 2017) ......................................................5

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)...............................................................................30

*T. Harris Young & Assocs., Inc. v. Marquette Elecs.*,
    931 F.2d 816 (11th Cir. 1991) ............................................................20

*Tic–X–Press, Inc. v. Omni Promotions Co. of Georgia*,
    815 F.2d 1407 (11th Cir.1987) ....................................................13, 14

*Times–Picayune Pub. Co. v. United States*,
    345 U.S. 594 (1953)...............................................................................28

*Todorov v. DCH Healthcare Auth.*,
    921 F.2d 1438 (11th Cir. 1991) ..........................................6, 9, 10, 11

*Tri-State Broad. Co. v. United Press Int'l, Inc.*,
    369 F.2d 268 (5th Cir. 1966) ........................................................32, 33

*Tribeca Homes, LLC v. Marathon Inv. Corp.*,
    745 S.E.2d 806 (Ga. Ct. App. 2013)..................................................35

*U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*,
    7 F.3d 986 (11th Cir. 1993) .................................................20, 23, 24

*United States v. Columbia Steel Co.*,
    334 U.S. 495 (1948)...............................................................................29

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)........................................................................19, 23

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)........................................22, 23, 24, 32

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..............................................................5, 29, 30

## Statutes

15 U.S.C.A. § 1 .........................................................................13, 15, 17

Clayton Act: (1) Section 4 ........................................................................8

Sherman Act Sections 1 and 2 ...............................................................13

Sherman Act Section 2...............................................................18, 19, 30

## Other Authorities

F.R.C.P. 12(b)(6)...................................................................................5, 16

Rule 8(a)...................................................................................................18

Rule 12 ......................................................................................................5

Wall Street Journal, February 5, 2020 ...................................................4

Like it has stomped out competition across multiple markets, Google[1] now asks this Court to stomp out this case before it reaches the merits, before any of Google's documents can be scrutinized, and before its past or present executives can be put under oath to testify.  Google tells the Court that the Complaint is a "poor attempt to manufacture a sprawling antitrust case," that it is a "shotgun pleading," and that it makes "threadbare allegations."[2]  Rife with a unique combination of arrogance and sleight of hand, Google's brief reads as if it were written for some other case attacking some other complaint, advancing boilerplate antitrust arguments completely divorced from the context of this lawsuit.

To make its arguments with a straight face, Google ignores page-after-page of detailed allegations that describe how Google has used it products and services illegally to monopolize multiple interrelated markets for years.  Google's hyperbole attempts to distract from the overwhelming evidence of its illegal conduct detailed in the Complaint and recognized as such by countless foreign countries, scholars, journalists, and competitors.

Simply put, mega-monopolist Google is in the business of collecting user

---

[1] As in the Complaint, the term "Google" refers to all Defendants and the allegations in the Complaint expressly apply to all Defendants.
[2] Dkt. No. 16-1, Defendants' Memorandum in Support of its Motion to Dismiss ("Google Br.") at 1, 2, and 7.

data and monetizing it through Internet advertisements.  With an astounding $135 billion of its $162.9 billion in annual revenues derived from Internet advertising (83%), Google's other business units largely service and feed this data collection and monetization process.  The Complaint details how Google has amassed breathtaking monopoly power by engaging in strategic acquisitions and illegal anticompetitive practices for many years, using its market dominance in several overlapping markets to drive online advertising dollars.  Specifically, Google has monopoly power[3] in the following markets:

- Search Engine Market – 94% monopoly
- Licensable Mobile Device Operating System Market – 75% monopoly
- Ad Server Market – 75% monopoly
- Online Video Platform Market –73% monopoly
- Web Browser Market – 67% monopoly
- Online Advertising Market – 49% monopoly[4]
- Search Advertising Submarket – 80% monopoly
- Online Video Advertising Submarket – 52% monopoly

The Complaint further details how Google uses its dominance in these overlapping markets (*i.e.*, "leveraging") to wipe out competition and drive its online ad sales.

This case against Google involves the largest monopoly in the history of the

---

[3]  Google does not dispute that it has monopoly power in the Search Engine Market, the Search Advertising Market, the Licensable Mobile Device Operating System Market ("LMDOS"), the Ad Server Market, and the Web Browser Market.
[4]  Based on Alphabet's 2019 Annual 10k Report filed last month, Google's monopoly in the online advertising market has now risen to 49%.

U.S. antitrust laws.  Yet, there is another reason this antitrust case is like no other:

the markets here are a heavily intertwined ecosystem, and the products and

services themselves are the means by which Google's anticompetitive conduct is

largely carried out.  Specifically, Google is not only able to use its monopoly

power to engage in traditional anticompetitive behavior like tying, but it also

physically and technologically blocks competitors from the market through its own

products and services.  For example, through its Chrome browser and Android OS

(LMDOS) monopolies, Google controls how and where billions of Internet users

see the vast majority of online ads.  Through its ad server and search advertising

platform, Google controls how advertisers and publishers can participate in that

online advertising market and connect with those users.  And through its complete

dominance of online search, it controls how, when, and even if users can access the

countless websites on which these ads are displayed.  All the while, Google feeds

its monopoly power by amassing more user data.  While this interplay warrants

careful and detailed consideration, Google seeks to prevent any scrutiny at all.

     Google pontificates that Inform cannot sue Google for antitrust violations in

some markets because Inform does not directly compete with Google across all of

the markets.[5]  Under the impossible test Google proffers for the Court, the only

entity that can challenge Google's illicit leveraging of multiple markets is one that

competes in each of the individual markets alleged—an argument that has never

been accepted by any court in the country, let alone the Eleventh Circuit.

Since Inform filed its Complaint, two important updates underscore both the

merits of Inform's claims and the necessity for this Court to enter the full scope of

the relief sought in the Complaint.  First, the Department of Justice ("DOJ")

reportedly[6] reached out to more than a dozen companies related to an investigation

into Google's actions in the Online Advertising Market and its submarkets—a

direct overlap with this case.  And, in another direct parallel to this case, U.S.

Attorney General William Barr recently implored the state Attorneys General to

"look more closely" into digital platforms for antitrust violations and into the

leveraging of "monopoly power in one market to gain an unfair advantage in

another."[7]

Google's motion to dismiss is without merit.  Google's monopolies warrant

---

[5]  It should be undisputed that Inform competes with Google in the Online
Advertising Market and the Search Advertising and Online Video Advertising
Submarkets.  That Inform does not compete in the Ad Server Market (Google Br.
at 1-2), where Inform is a customer, is beside the point.  Comp. ¶134.

[6]  Justice Department Ramps Up Google Probe, With Heavy Focus on Ad Tools,"
Wall Street Journal, February 5, 2020.

[7]  Exhibit A at 1-2, Speech of Attorney General William Barr, December 10, 2019.

deep scrutiny and, ultimately, the broad relief sought in the Complaint.

## I.    LEGAL STANDARD FOR MOTION TO DISMISS

To survive a motion to dismiss under F.R.C.P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).  "In assessing the sufficiency of a claim, we accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor." *Smith v. U.S.*, 873 F.3d 1348, 1351 (11th Cir. 2017).

Given Google's dominance in these digital markets and the kind of products and services at issue here, this case raises the fact-intensive issues of defining the relevant markets, antitrust standing, and market power, which are uniquely unsuited for dismissal at this early stage of litigation.  Justice Scalia stated: "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 411 (2004).  Indeed, "antitrust cases are 'fact-intensive,' and require appropriate market analysis, and therefore are typically inappropriate for a Rule 12 dismissal." *Andrx Pharms., Inc. v. Elan Corp.*, *PLC*, 421 F.3d 1227, 1236 (11th Cir. 2005) (internal citations omitted). "[T]he relevant market . . . is essentially a question of fact, . . . which may be

properly developed . . . through the discovery process." *Griffiths v. Blue Cross & Blue Shield of Ala.*, 147 F. Supp. 2d 1203, 1213 (N.D. Ala. 2001); *see also Duty Free Americas, Inc. v. Estee Lauder Companies, Inc*., 797 F.3d 1248, 1264 (11th Cir. 2015) ("[d]efining the relevant product market is a fact-intensive endeavor"). Moreover, the Eleventh Circuit has counseled that antitrust standing can be determined only after examining the dynamics of the markets.  *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp*., 604 F.3d 1291, 1300 (11th Cir. 2010).[8] Relying primarily on cases decided after discovery, Google invites legal error by ignoring this Circuit's law on motions to dismiss, as well as any factual analysis of the markets and Inform's standing.

## II.    INFORM HAS STANDING TO BRING THIS ACTION

### A.    Inform's Participation In The Relevant Markets

Inform's products and services run on the digital ecosystem controlled by Google.  Inform participates in each of the markets alleged, as well as being a consumer, customer, and user of Google's stable of products and services.  Inform specifically competes with Google in the Online Advertising, Search Advertising, and Online Video Advertising Markets and is a customer in the Ad Server Market.

---

[8] *See also Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1445, 1452 (11th Cir. 1991) (to analyze standing, court "must conduct an economic analysis of market").

Comp. ¶¶ 11, 15, 18, 19, 31, 40, 91, 98-111, 113, 134; *see Covad Communications Co. v. BellSouth Corp.*, 374 F.3d 1044, 1049 (11th Cir. 2004) (plaintiff as "both customer and competitor").

### B.    The Sherman Act Is Comprehensive In Its Protections

Article III standing requires (1) injury in fact that is concrete, particularized, and actual or imminent; (2) causal connection between the injury and the conduct complained of; and (3) likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).[9]  As Inform has adequately pled injury resulting from Google's conduct, which remains ongoing, Inform has standing for each of the claims set forth in the Complaint.

Google suggests that Inform has standing only in the markets in which Inform "competes with Google."  Google Br. at 4.  But that is not the law.  As the Supreme Court has recognized: "[t]he statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . .The Act is comprehensive in its terms and coverage, protecting all who are made victims of

---

[9] At the pleading stage, allegations need not be proven, rather "general factual allegations of injury resulting from the defendant[s'] conduct ... suffice to establish [Article III] standing." *Resnick v. AvMed, Inc.,* 693 F.3d 1317, 1323 (11th Cir. 2012) (quotation and citation omitted).  Moreover, "[h]arm to the antitrust plaintiff is sufficient to satisfy the Constitutional standing requirement of injury in fact." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983).

the forbidden practices by whomever they may be perpetrated." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472 (1982) (citation omitted). No rule excludes a class of market participants; rather, antitrust standing is a case-specific inquiry. *See Associated Gen.*, 459 U.S. at 536 ("[T]he infinite variety of claims . . . make it virtually impossible to announce a black-letter rule that will dictate the result in every case."). Moreover, even non-market participants have antitrust standing where the injury is "inextricably intertwined" with the injury defendant seeks to inflict on the market. *See McCready*, 457 U.S. at 484; *Feldman v. American Dawn, Inc.* 849 F.3d 1333, 1341 (11th Cir. 2017) (stating same).

C. **Inform Has Suffered Antitrust Injury**

A plaintiff must also have antitrust standing to bring an antitrust action. *Associated Gen.*, 459 U.S. at 529, 534-35, 535 n.31. This Circuit employs a two-prong test for antitrust standing under Section 4 of the Clayton Act: (1) a plaintiff must have alleged an antitrust injury, and (2) the plaintiff must be an efficient enforcer of the antitrust laws. *Palmyra*, 604 F.3d at 1299 ("[a]ntitrust injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. *The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.* It should, in short, be "the type of loss that the claimed

8

violations . . . would be likely to cause.") (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977) (emphasis added)).  As antitrust laws were enacted to protect competition, an antitrust injury must "result from interference with the freedom to compete," *Johnson v. Univ. Health Services, Inc.,* 161 F.3d 1334, 1338 (11th Cir. 1998), and further the public "goal of increased competition."[10] *Todorov,* 921 F.2d at 1450; *Palmyra,* 604 F.3d at 1299.

Inform has suffered antitrust injury,[11] expressly pleading financial harm to its business as a result of Google's anticompetitive conduct that excluded Inform and other competitors from the relevant markets.  Inform's case against Google "is about suppression of potential competition by a monopolist—the very essence of anti-competitive conduct."[12] *Gulf States*, 466 F.3d at 969 (Cudahy, Circuit Judge,

---

[10]  Plaintiff and the public need not suffer the same injury: "the two injuries can differ as long as they 'coincide*.*'" *Omni Healthcare, Inc. v. Health First, Inc.*, No. 6:13-cv-1509-Orl-37DAB, 2015 WL 275806, at *8 (M.D. Fla. Jan. 22, 2015).

[11]  Spoken like a true monopolist, Google incredibly argues that market participants, after Google unilaterally disabled their products, should have just become compatible with and used Google's products and services, arguing in effect that succumbing to the forced use of Google products and services would have been the solution to Google's anticompetitive conduct.  Google Br. at 10.

[12]  Google contends that Inform's damages are the result of its decision not to adapt to the change to HTML5 in the market.  Google Br. at 11.  First, this is a factual question to be developed in discovery.  Moreover, Google is not only factually incorrect, but wrong on the law as well.  The Eleventh Circuit has made clear that "[a]ntitrust law does not require that the defendant be the exclusive cause of the plaintiff's injury but only a 'material' one."  *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 466 F.3d 961, 965 (11th Cir. 2006).

concurring in part and, perhaps, dissenting in part).  Unlike the cases cited by

Google, this is not a case in which Google's actions have *promoted* competition,[13]

or in which Inform seeks to share in Google's ill-gotten monopoly profits,[14] or in

which Inform is a "disappointed competitor . . . forced to provide services

elsewhere."[15]  Rather, the Complaint details numerous violations of the antitrust

laws and articulates that Google's anticompetitive acts have "thwarted competition

on the merits and excluded Inform and other Google competitors from the relevant

markets."  Comp. ¶ 2; *see also* ¶¶ 10, 95, 97, 139, 155, 202, 207, 215-16, 221-22,

226.  This is precisely the type of injury the antitrust laws were enacted to prevent.

*See Gulf States*, 466 F.3d at 967 ("We conclude that the injury to the Group—its

exclusion from the relevant market—is inseparable from the alleged harm to

competition.").

### D.    Inform Is A Proper Plaintiff To Pursue Action Against Google

---

[13]  *See Brunswick Corp.*, 429 U.S. at 488 (no antitrust standing to pursue "the loss
of *windfall profits*" that might have resulted if not for defendant's *pro-competitive*
conduct); *Austin v. Blue Cross and Blue Shield,* 903 F.2d 1385, 1391 (11th Cir.
1990) (finding that "the agreements actually promote competition").

[14]  *See, e.g.*, *Todorov*, 921 F.2d at 1454 (doctor has no antitrust standing because
"[t]he antitrust laws were not enacted to permit one person to profit from the
anticompetitive behavior of another person").

[15]  *Robles v. Humana Hosp. Cartersville*, 785 F. Supp. 989, 999 (N.D. Ga. 1992)
("plaintiff['s] claims rest . . . merely on the fact that [he] is a disappointed
competitor who will now be forced to provide [obstetric] services elsewhere").

Inform is also an efficient enforcer and a proper plaintiff to bring this action.  There is no bright-line rule for determining whether a plaintiff is an efficient enforcer; rather, courts must weigh several factors, including:

> the directness or indirectness of the injury, the remoteness of the injury, whether other potential plaintiffs [are] better suited to vindicate the harm, whether the damages [are] highly speculative, the extent to which the apportionment of damages [would be] highly complex and would risk duplicative recoveries, and whether the plaintiff would be able to efficiently and effectively enforce the judgment.

*Palmyra,* 604 F.3d at 1299.  These factors are nonexclusive[16] and "often intertwined," and "no single factor will necessarily predominate over the others."  *Id.*  "[T]here is no 'customer or competitor' requirement to being an efficient enforcer," and a plaintiff can indeed be an "efficient enforcer[] of the antitrust laws in all of the [overlapping] relevant markets."  *Omni Healthcare,* 2015 WL 275806, at *9; *see also Todorov,* 921 F.2d at 1452.

That Inform is an efficient enforcer of the antitrust laws is clear on the face of the Complaint.  Inform is a participant in each market alleged either as a competitor or as a consumer, customer, or user of Google's stable of products and

---

[16]  Other factors the Court can consider in finding Inform an efficient enforcer are the secrecy and complexity with which Google purposefully operates, that fear has been identified as a reason plaintiffs so often forgo action against Google, and the FTC's failure to bring this case in the face of internal findings that Google violated antitrust laws, as set forth in the Complaint.  *See Palmyra*, 604 F.3d at 1306.

services.  Inform is a competitor in the Online Advertising, Search Advertising, and Online Video Advertising Markets – the very markets in which Google's predatory acts have enabled it to amass $135 billion in annual ad revenues – makes Inform particularly well-suited to enforce this case. [17]

Inform alleges financial harm to its business that flows directly from Google's illegal conduct, injury in fact that is neither speculative (much less "highly speculative") nor remote.[18]  Inform's damages are discrete, calculable, and directly caused by Google's anticompetitive conduct.  Moreover, while Google's conduct has certainly harmed competition (and thus other competitors, market participants, and consumers) there is no issue of apportionment of damages or duplicative recoveries.[19]  *See Palmyra* at 1306.  Additionally, Inform is also seeking a structural remedy to curb Google's rampant anticompetitive conduct.

---

[17]  In *Palmyra Park Hosp.,* the Eleventh Circuit found that Palmyra suffered an antitrust injury when Phoebe leveraged its monopoly power to force insurers to exclude Palmyra from their provider networks.  604 F.3d at 1296.  The Eleventh Circuit held that, as a result of defendant's actions, "there [was] less competition[,] ... higher prices and fewer choices for consumers," which "is precisely the type of harm that we allow plaintiffs to vindicate through the antitrust laws." *Id.* at 1303.

[18]  Google's argument that Inform's injury is indirect is unavailing.  Even where there are several steps in causal chain, plaintiff's injury is not necessarily remote. *See Palmyra*, 604 F.3d at 1304.

[19]  There are no issues here relating to duplicative recoveries or apportionment of damages as Inform seeks its own easily calculable damages.  To the extent these issues later arise, the Court is fully capable of addressing the issues at that time.

"When antitrust plaintiffs seek dissolution of an anticompetitive scheme rather than inclusion in it, their interests coincide with those of the consuming public." *Omni Healthcare,* 2015 WL 275806, at *8.  Finally, as a single plaintiff, Inform can efficiently and effectively enforce the judgement and faces "none of the logistical difficulties or diluted incentives that would, for example, hinder a class representative seeking to enforce a judgment in favor of a class." *Palmyra* at 1306.

## III.   PLAINTIFF PLAUSIBLY ALLEGES A SECTION 1 VIOLATION

### A.   Inform Alleges A Per Se Tying Violation

Google's motion to dismiss Inform's Section 1 claim must fail because it is premised entirely on the fallacious assertion that "Plaintiff does not identify any per se violation."  Google Br. at 13.  Section 1 provides, in pertinent part, that "[e]very contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C.A. § 1.  The United States Supreme Court and the Eleventh Circuit have long recognized that a tying arrangement is a per se violation under Section 1.[20]   *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 32 (1984); *Tic–X–Press, Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407,

---

[20] *Ill. Tool Works Inc. v. Indep. Ink, Inc*., 547 U.S. 28, 34-38 (2006) (noting that tying cases have been brought under "four different rules of law," including Sections 1 and 2 of the Sherman Act).

1414 (11th Cir.1987); *see also Diverse Power, Inc. v. City of LaGrange, Georgia*, No. 3:17-cv-3-TCB, 2018 WL 9651475, at *5-6 (N.D. Ga. Feb. 21, 2018).

To plead an unlawful tying arrangement, plaintiff must allege facts demonstrating that: (1) there are two separate products, a "tying" product and a "tied" product; (2) those products are in fact "tied" together—that is, the buyer was forced to buy the tied product to get the tying product; (3) the seller possesses sufficient economic power in the tying product market to coerce buyer acceptance of the tied product; and (4) involvement of a "not insubstantial" amount of interstate commerce in the market of the tied product. *Tic-X-Press, Inc*., 815 F.2d at 1414 (citing *Amey Inc. v. Gulf Abstract & Title, Inc*., 758 F.2d 1486 (11th Cir. 1985)). Inform's Complaint plausibly alleges that Google has illegally tied "its stable of advertising services, including the Double-Click Ad Server and the AdX marketplace, by selling them exclusively under the name Google Ad Manager." Comp. at ¶¶ 65, 140(a) and (j). The Complaint alleges that:

- Google's DoubleClick Ad Server and AdX marketplace are different products that, until recently, were offered by Google separately. (Comp. ¶¶ 21, 23, 28-30, 52, 63-64);
- In June 2018, Google tied the DoubleClick Ad Server and the AdX marketplace by selling them exclusively under the name Google Ad Manager. (Comp. ¶ 65); and
- Google has sufficient market power in the tied product, the DoubleClick Ad Server, to coerce a buyer into acceptance of the "tying product," the AdX marketplace. (Comp. at ¶¶ 86(d) and 114

14

(alleging Google had 75% market share in the Ad Server Market).[21]

Google's Motion asks the Court to ignore Inform's actual allegations,

presenting only a strawman argument premised on a purported rule of reason

analysis.  Because the Complaint contains sufficient allegations to plead a per se

tying violation under Section 1, Google's motion to dismiss Count I must fail.

## B.     Inform's Complaint Plausibly Alleges Concerted Action By Google And Its Former Employees.

To state a claim under Section 1, a plaintiff need only "plead sufficient facts

to plausibly show that Defendants (1) engaged in concerted action that (2)

unreasonably restrained competition." *Bolinger v. First Multiple Listing Serv.,*

*Inc.*, 838 F. Supp. 2d 1340, 1356 (N.D. Ga. 2012) (citing *Jacobs v. Tempur–Pedic*

*Int'l, Inc.*, 626 F.3d 1327, 1332–33 (11th Cir. 2010)).  The arguments in Google's

Motion miss the mark on both elements.

Inform has adequately alleged concerted action by Google and its former

executives to restrain trade.  "[A]t the motion to dismiss stage, 'Plaintiffs need not

allege the existence of collusive communications in "smoke-filled rooms" in order

to state a § 1 Sherman Act claim.'" *Bolinger*, 838 F. Supp. 2d at 1375 (citation

omitted).  The factual allegations need only be sufficient to plausibly establish "a

---

[21] Given that Google reaps over $135 billion in advertising revenues annually, it is inconceivable the interstate commerce requirement is not met.

conscious commitment to a common scheme to achieve an unlawful objective."
*Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1535
(11th Cir. 1987) (quotations omitted).  Moreover, in its pleading, "the plaintiff
need not show that its allegations suggesting an agreement are more likely than not
true or that they rule out the possibility of independent action, as would be required
at later litigation stages." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d
162, 184 (2d Cir. 2012) (citations omitted).  Rather, the "choice between two
plausible inferences that may be drawn from factual allegations is not a choice to
be made by the court on a Rule 12(b)(6) motion." *Id*. at 185.

Here, the Complaint contains sufficient facts to plausibly infer that Google
engaged in concerted action with a number of its former executives and lawyers,
including Michelle Lee, Joshua Wright, and Andrew McLaughlin (Comp. ¶¶ 161-
85) and with other Google-preferred companies that Google has whitelisted, such
as Microsoft.  Comp. ¶ 131.  For example, Inform alleges that Michelle Lee,
former Deputy General Counsel and Head of Patents and Patent Strategy at
Google, worked with Google to implement policies and procedures as the
Commissioner of the United States Patent and Trademark Office that allowed
Google to "effectively [make] Google's desire to weaken patent protections for
everyone but itself into USPTO policy."  Comp. ¶¶ 170-75.  Inform also alleges

that "following the appointment of former Google outside counsel Joshua Wright as Obama's FTC Commissioner and despite a staff memo urging prosecution, the FTC issued two decisions effectively terminating [two significant] investigations into Google without any meaningful action against Google."  Comp. ¶¶ 170-75.

Contrary to Google's assertion, Inform did not "allege that Defendants entered into agreements among themselves."  Google Br. at 13.  Accordingly, Google's motion to dismiss Inform's Section 1 claim should be denied.

## C.  Inform's Complaint Plausibly Alleges An Unreasonable Restraint On Competition In Defendants' Leveraged Markets

Google's "relevant market" argument, again a factual question, must fail because it mischaracterizes Inform's Complaint.  The Complaint clearly states[22] that "Defendants' anticompetitive behavior constitutes illegal restrictions, agreements, and barriers that are intended to and do in fact prevent, restrict or interfere with competition in Defendants' Leveraged Markets."  Comp. ¶ 199; *see infra* IV.D&F.  As shown above, the Complaint contains sufficient allegations to support a claim that Google's conduct constituted an unreasonable restraint in Defendants' Leveraged Markets, including the Online Advertising, Search

---

[22] Contrary to Google's assertion, the Complaint does not "concede[] that the purported harm occurs only 'in the market for web applications.'"  Google Br. at 14.

Advertising, and Online Video Advertising Markets. Comp. ¶¶ 157-58, 169-75,

180-85, 195.

Similarly, Google's "harm to competition" argument must fail because

multiple enforcement agencies have already found Google's behavior to harm

competition.  *See infra* note 25.  Moreover, Google simply ignores that Count I

incorporates by reference more than 90 pages of factual allegations, including

allegations that support a claim that Google's conduct harmed competition in the

Leveraged Markets, including the Online Advertising, Search Advertising, and

Online Video Advertising Markets.  *See* Comp. ¶¶ 157-58, 169-75, 180-85, 195.

Inform has pled sufficient facts to plausibly show that Google (1) engaged in

concerted action that (2) unreasonably restrained competition in Defendants'

Leveraged Markets, including the Online Advertising Market.  Rule 8(a) requires

nothing more.  Google's motion to dismiss Count I should be denied.

## IV.   GOOGLE'S MONOPOLY POWER, MONOPOLY LEVERAGING AND ATTEMPTED MONOPOLY (COUNTS II, III AND IV)

Section 2 of the Sherman Act makes it illegal to acquire or maintain

monopoly power through improper means, or attempt or conspire to do so.  15

U.S.C. § 2.[23]  "The offense of monopoly under § 2 of the Sherman Act has two

---

[23] As there is significant overlap between the pleading requirements for the Section 2 offenses, they are treated together here.

elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71 (1966); *Morris Commc'ns Corp. v. PGA Tour, Inc*., 364 F.3d 1288, 1293–94 (11th Cir. 2004). "The first element, monopoly power, is the power to control prices in or to exclude competition from the relevant market." *Id.* at 1294. "The second element requires predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market." *Id.*

To show attempted monopoly under Section 2, a plaintiff "must plausibly assert: (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Duty Free Ams.,* 797 F.3d at 1263. Moreover, a company "already enjoying a substantial monopoly in its area, violates the 'attempt to monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition." *Lorain Journal Co. v. United States*, 342 U.S. 143, 154 (1951).

## A.    Defendant Google Has Monopoly Power In The Relevant Markets

Google unquestionably has monopoly power—that is the "power to raise prices to supra-competitive levels or . . . *power to exclude competition* in the

19

relevant market either by restricting entry of new competitors or *by driving existing competitors out of the market.*"  *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,* 7 F.3d 986, 994 (11th Cir. 1993) (emphasis added).  The analysis of Google's monopoly power involves two steps: defining the relevant market and establishing the extent of Google's market power in those markets.  *Id.*

### B.     Inform Has Adequately Set Forth The Relevant Markets

"The relevant market is defined by both a product and a geographic dimension."  *T. Harris Young & Assocs., Inc. v. Marquette Elecs.,* 931 F.2d 816, 823 (11th Cir. 1991).  Moreover, "within [a] broad market, well defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."  *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962).  Defining the relevant markets is a fact question, which considers: "industry or public recognition . . . as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  *Polypore Int'l, Inc. v. F.T.C.*, 686 F.3d 1208, 1217 (11th Cir. 2012) (quoting *Brown Shoe Co.,* 370 U.S. at 325).

The Complaint details both the products and the geographic dimensions of

the markets at issue in this case. [24]  With respect to each of the markets, the

Complaint sets forth each product in detail; lays out product characteristics, uses

and how they operate; and specifies competitors and specialized vendors in the

market.  Comp. ¶¶ 20-30; 40-49; 63-65; 69-73; 85-88, 90-91.  The Complaint also

sets forth the Search Advertising Market and the Online Video Advertising Market

as "distinct subsets[s]" of the broader Online Advertising Market, in each of which

Inform directly competes with Google.  Comp. ¶¶ 2, 15, 86(c), 111, 138(c), 212;

*see also Jacobs,* 626 F.3d at 1337.  The Search Advertising Market in which

Google has a monopoly is a well-established, recognized submarket in the

---

[24] Indeed, "[b]oth the [FTC] and the Department of Justice have previously found online search advertising" to be a distinct product market.  Exhibit B, FTC Memo dated August 8, 2012 at 72.  This market has also been recognized by the EU Commission as a distinct product market in which Google is dominant.  In fining Google $1.49 billion, the Commission explained: "Google is an intermediary, like an advertising broker, between advertisers and website owners that want to profit from the space around their search results pages. Therefore, AdSense for Search works as an online search advertising intermediation platform."  Exhibit C, EU Commission Press Release dated March 20, 2019.  Compare Comp. ¶ 2.  Likewise, the French Competition Authority also fined Google for abusing its dominant position in the search advertising market $167 million on December 20, 2019.  As a result, Google is estopped from challenging such findings here and cannot argue to the contrary.  *See, e.g., Polypore Int'l,* 686 F.3d at 1213 (citing 15 U.S.C. § 45(c), which provides that "[t]he findings of the Commission as to the facts, if supported by evidence, shall be conclusive.")*; Corporacion Mexicana DeMantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion*, 832 F.3d 92, 110 (2d Cir. 2016) (enforcing foreign judgment because failing to do so would "offend[] basic domestic principles of claim preclusion").

industry.  The Complaint also sets forth how the Online Video Advertising Market is a separate and distinct submarket, with separate and distinct functions, and importance to online video, news organizations and these parties.  Comp. ¶¶ 15, 18; 34; 52; 61-63; 78; 88; 99-105; 108-110; 113; 131-32.  As to the geographic contours of the markets, as Google's market is worldwide, the markets are all defined as the entire country, if not globally.  Comp. ¶¶ 5, 12, 63, 67, 70, 72-73, 77-78, 80, 86-87, 90, 113, 140.  Google's argument that there is no defined market in the Complaint is simply not credible.  The referenced markets have in fact been previously recognized by other courts and regulatory agencies, including specific findings of abuse of monopoly power by Google. Comp. ¶ 10.

### C.    Inform Has Adequately Pled Market Power

Monopoly power may be shown either through circumstantial or direct evidence, including whether the defendant behaves like a monopolist.[25]  *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001); *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 830 (11th Cir. 2015).  Where there is direct evidence that Google has controlled prices or excluded competition, the existence of monopoly power is clear.  *See Microsoft Corp.*, 253 F.3d at 51.  Indeed, Google's behavior

---

[25]  Inform's assertions of market power are clear and supported by readily available and reliable statistics, as well as having been recognized in the industry and by other courts and regulatory agencies, both foreign and domestic.

"may well be sufficient to show the existence of monopoly power." *Microsoft*

*Corp.,* 253 F.3d at 57.

Absent direct evidence, the "existence of [monopoly] power ordinarily may

be inferred from the predominant share of the market,"[26] which acts as a proxy for

monopoly power.  *Grinnell,* 384 U.S. at 571.  As this Circuit has stated: "evidence

of a seller's market share may provide the most convenient circumstantial measure

of monopoly power."  *McWane*, 783 F.3d at 830 (citations omitted).  While market

share is the predominant factor for determining market power, others include

absolute and relative market shares of the purported predator and competitor;

strength and capacity of competitors; barriers to entry; historic intensity of

competition; impact of the legal or natural environment; industry pricing trends

and practices (*U.S. Anchor Mfg.,* 7 F.3d at 994); consumers' ability to substitute

comparable goods; and consumer demand.  *McWane*, 783 F.3d at 830.

Regarding attempted monopolization, a plaintiff need only allege that the

defendant is close to achieving monopoly power in the relevant market.  While

"'[a] dangerous *probability* of achieving monopoly power may be established by a

---

[26]  Citing the *summary judgment* decision in *Servicetrends, Inc. v. Siemes Med Sys*.,
870 F. Supp. 1042, 1052 (N.D. Ga. 1994), Google ignores the Court's statement:
"The existence of monopoly power can be inferred from a firm's dominant share of
the market."  Google likewise ignores two-thirds of *the same footnote*
acknowledging that 50% and 70% could constitute a monopoly.  *Id*. at 1052, n.4.

50% share' of the relevant market,"[27] *Duty Free Ams.*, 797 F.3d  at 1264 (quoting *U.S. Anchor Mfg.,* 7 F.3d at 1000), a lesser share is sufficient where direct evidence or a defendant's behavior makes monopolization clear or where other factors amplify defendant's market power.  *See, e.g., RxStrategies, Inc. v. CVS Pharmacy, Inc.*, No. 8:18-cv-1087-T-30TGW, 2019 WL 7584729, at *2 (M.D. Fla. December 4, 2019) (denying dismissal where other factors combined to amplify market power of defendant CVS with 30% market share). "[W]hether a dangerous probability of success exists is a particularly fact-intensive inquiry," and a court needs be "mindful that [this]. . . is a question of proximity and degree."  *Microsoft Corp.*, 253 F.3d at 80 (citations omitted).

The Complaint demonstrates that Google has either achieved or is dangerously close to achieving monopoly power in the relevant markets, supported by circumstantial evidence of Google's overwhelming market share.  Comp. ¶¶ 86-

---

[27] Google's reliance on *U.S. Anchor Mfg.*, 7 F.3d at 1000 (Google Br. at 16, 18) is misplaced.  *U.S. Anchor Mfg.* involved a predatory pricing scheme where defendant's market share dropped precipitously from 60% to 30% after plaintiff entered the market and remained at 30% during the alleged scheme.  Conversely, plaintiff's share of the market *exceeded* defendant's share at the time the alleged predatory pricing began.  Under these narrow circumstances, the court found there had not been a dangerous probability of success in that case.  *Id.* at 994-95.

87, 90.  Additionally, in the Online Advertising Market and submarkets,[28] Inform has pled adequate facts and factors that amplify Google's probability of achieving monopoly power, if monopoly power has not already been attained.[29]

In addition to asserting market share as the circumstantial proxy for Google's market power, the Complaint also sets forth conduct that demonstrates direct evidence of Google's behavior as a monopolist—including in the Online Advertising Market and the Search Advertising and Online Video Advertising Submarkets—behavior that in fact drove Inform and other existing competitors out of these markets.  Indeed, Google's ability to dictate terms and restrict competitors across these related markets is unprecedented.  The Complaint also explains that Google's dynamic position in the relevant markets and its dominance in the deeply intertwined markets are a force multiplier to Google's market power in the broader Online Advertising Market and its submarkets.  Comp. ¶¶ 86(a-d), 87, 90.

---

[28]  Google's market share of the other relevant markets is well over 50%.  Indeed, the fact that Google's market share has grown from 40% to over 49% in the past year demonstrates the need for the full scope of the relief sought in the Complaint.
[29]  Google's dominant market share in the Online Advertising Market and its submarkets is amplified by: (1) the natural environment of the industry itself; (2) barriers to entry; (2) the speed with which obscurity can occur in the industry; (3) the unique products and services at issue in this case, which can and have physically and technologically blocked competition on the merits; (4) the minimal strength and capacity of competitors, especially given Google's control of the Internet ecosystem; and (5) the interplay of Google's monopolies with one another. Comp. ¶¶ 8, 10, 33, 91, 113, 136.

Importantly, Google has already thwarted competition on the merits by excluding Inform and other competitors from the markets.  The Complaint more than adequately alleges direct and circumstantial evidence of Google's market power in each of the relevant markets.  The law requires nothing more.

### D.    Inform Has Adequately Pled Both Per Se Violations Of The Antitrust Laws And Acts That Exclude Competition

Predatory and anti-competitive conduct is "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 482–83 (1992) (quotation omitted).  For a practice to be exclusionary, "it must harm the competitive *process* and thereby harm consumers." *Morris Commc'ns Corp.,* 364 F.3d at 1294 (citing *Microsoft Corp.,* 253 F.3d at 58).  The anticompetitive conduct requirement is satisfied by alleging a "factual connection between the alleged harmful conduct and its impact [or likely impact] on competition in the market." *Duty Free Ams.,* 797 F.3d at 1263.  Google's predatory acts are relevant to the monopolization and attempted monopoly claims.

As an initial matter, the Complaint alleges that Google "engaged in a series of acquisitions and anticompetitive activities designed to thwart competition on the merits" (Comp. ¶ 6), squarely placing at issue both Google's predatory rise to monopoly power (Comp. ¶¶ 75-84) and its anticompetitive and predatory practices

in the interrelated markets in which Google has obtained monopoly power,

leveraged that power, and attempted to gain further monopoly power.[30]  Google

ignores all of the allegations concerning its acquisitions of more than 227

companies and the attendant products, manpower and patent portfolios that gave

rise to and enables it to maintain its monopoly power.  The Complaint highlights

Google's anticompetitive behavior as follows:

- Exclusionary disablement and/or disparagement of competitors' products and services (Comp. ¶¶ 10, 115-135)
- Exclusive dealing agreements and arrangements (Comp. ¶¶ 9-10, 53, 63-64, 114, 149, 187-89);
- The tying or bundling, including technological tying, of products and services (*id.* at ¶¶ 7, 9-10, 65, 140-45, 149-50, 151-53, 187-89);
- Unilateral and/or surreptitious altering of the technological standards by which products and services of competitors can be accessed and used (*id.* at ¶¶ 116-125, 129-32, 140(d) & (f));
- Manipulative and technological blocking, exclusion, or downgrading of competitors products and services (*id.* at ¶¶ 9-10, 59, 115, 121-25, 140(d), 145, 157, 182, 187-89);

---

[30]  Google contends that the Complaint's allegations in this regard are conclusory. This is nonsense.  The Complaint sets forth pages of detail explaining how Google's products and services operate and how Google controls the relevant markets and has manipulatively and anticompetitively impacted competition. Comp. ¶¶ 75-84.  Google argues the Court cannot "impose liability" where Inform has not proven a "lack of valid business purpose," "durable industry-wide harm," and precisely how each of the anticompetitive practices affected the relevant markets. Google Br. at 17, 20-24.  However, the Complaint sets forth the necessary facts to withstand a motion to dismiss.  Other than touching on tying allegations and exclusive contracts, Google makes no argument that Inform's allegations regarding Google's other anticompetitive actions are deficient in any respect.

- Preferential treatment of its own products and services, including exempting itself but not competitors from Google-imposed technology and operating standards, and prioritization of its own products and services through manipulation of its algorithms (*id.* at ¶¶ 9-10, 121, 125, 131, 145, 140(b) & (e), 145, 157, 182, 187-89);
- Predatory pricing and triangular predatory pricing of free services in some areas, while extracting huge ad revenue margins elsewhere (*id.* at ¶¶ 3, 9-10, 36-37, 120, 126, 146, 188);
- Breaching duty to deal and/or refusal to deal, including on terms offered to other parties, by, *inter alia*, strategically whitelisting certain competitors and itself (*id.* at ¶¶ 7, 131, 140);
- Manipulation and/or abuse of the patent process and attendant patents (*id.* at ¶¶ 7, 9-10, 75, 81, 170-75, 177-79);
- Numerous other means of illicit anticompetitive activities (*See, e.g.,* Comp. at ¶¶ 6-9, 33, 88, 137-38, 140-43, 157-58).

Moreover, Inform's Complaint sets forth the interplay among the various markets (Comp. ¶¶ 8, 10, 33, 91, 113, 136) and barriers to entry in each of the relevant markets. Comp. ¶¶ 72, 89, 139, 222.

### E.     Google's Actions Demonstrate Specific Intent To Monopolize

The intent element requires an intent to "destroy competition or build monopoly." *Times–Picayune Pub. Co. v. United States,* 345 U.S. 594, 626 (1953). Anticompetitive intent may be *inferred* from allegations of defendant's predatory conduct itself, "essentially reducing the analysis to two elements." *Servicetrends,* 870 F. Supp. at 1053–54 (citations omitted); *see also McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1503–04 (11th Cir. 1988) (predatory conduct may support an inference of intent to monopolize). The Complaint sets forth

Google's specific intent to monopolize, evidenced by: (1) extensive anticompetitive conduct cited above; (2) Google's "long history of acquisitions" (*United States v. Columbia Steel Co.*, 334 U.S. 495, 532 (1948)); (3) placement of Google executives in government that influencing action of the U.S. Patent Office and shut down the FTC's investigations; and (4) Google's interference with Inform's relationships.

### F.    Google Illegally Leverages Its Monopoly Power

Inform properly pleads that Google leverages its monopoly power in these markets both to maintain its numerous monopolies, as well as in an attempt to gain monopoly power in related markets.  Inform alleges that Google has leveraged:

- Its monopoly power in the Internet Search Market, the Licensable Mobile Device Operating System Market and the Search Advertising Market to maintain monopoly power in those markets;
- Its monopoly power in the Internet Search Market, the Licensable Mobile Device Operating System Market and the Search Advertising Market in an attempt to gain monopoly power in the Web Browser Market and the broader Online Advertising Market; and
- Its monopoly power in the Ad Server Market and the Web Browser Market in an attempt to gain monopoly power in the broader Online Advertising Market, including the video advertising market.

Comp. ¶¶ 5-6, 8, 33, 74, 84, 88, 112, 115, 127, 136-38; 140, 147, 207, 210, 215.

Inform's claims are well-supported in the law.  In *Verizon Communications v. Trinko,* 540 U.S. at 415 & n.4, the Supreme Court recognized the monopoly

29

leveraging theory under Section 2.  *See also Covad v. Bellsouth Corporation*, 374 F.3d at 1047 & n.4 (citing *Trinko* and applying it to each and every category of antitrust activity alleged by plaintiff).  Citing to its general treatment of Section 2 in *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459 (1993), the Court noted that monopoly leveraging also required a dangerous probability of success in monopolizing a second market in an attempt case and explained that "leveraging presupposes anticompetitive conduct."  *Trinko*, 540 U.S. at 415 & n.4.  Notwithstanding Google's misstatement of the Complaint (Google Br. at 27), this is precisely what Inform has pleaded.[31]

Unlike the claims in the cases[32] cited by Google, Inform's monopoly leveraging claim is not a "free-standing" leveraging claim because Inform alleges numerous forms of anticompetitive conduct, including multiple forms of tying in fact and technological tying; exclusive dealing; altering the technological standards by which products and services can be rendered; exempting itself but not

---

[31] Paragraph 137 of the Complaint expressly describes monopolistic leveraging.
[32] Unlike Inform's Complaint here, the Seventh Circuit noted in *Schor* that, "*Schor's* complaint does not allege any of the normal exclusionary practices—tie-in sales (or another form of bundling), group boycotts, exclusive dealing and selective refusal to deal, or predatory pricing." *Schor v. Abbot Laboratories*, 457 F.3d 608, 610 (7th Cir. 2006).

competitors from such standards; manipulative and technological blocking of competitors; and other means of disablement and illicit exclusion.  *See supra* IV.D.

Because the Complaint adequately alleges monopoly, monopoly maintenance, and attempted monopoly, including monopoly leveraging, Google's motion to dismiss Counts II, III, and IV fails.

## V.    GOOGLE VIOLATES THE SHERMAN AND CLAYTON ACTS

In its Complaint, Inform alleges that Google has entered into exclusive dealing agreements that violate both the Sherman Act and the Clayton Act. Specifically, Inform alleges: (1) exclusive agreements (2) that substantially foreclose competition (3) in a relevant market. *McWane*, 783 F.3d at 827, 835-36.

### A.    Allegations Of Exclusive Dealing By Google

In narrowly focusing on its agreements with OEMs to pre-install Google Search on Android devices, Google ignores Inform's numerous other allegations of Google's exclusive dealings related to other Google products and services in the relevant markets.[33]  Likewise, the Complaint describes how, by tying its AdX and

---

[33]  For example, Inform alleges that: (1) through AdSense agreements with Google, website owners and advertisers provide website space to Google for ads, divert traffic to Google, and provide Google with additional user data for monetization (Comp. ¶ 53); (2) as part of using its AdX service, Google requires use of DoubleClick for Publishers, another Google advertising service (*Id* . ¶¶ 63-65, 114); and (3) The EU Commission investigated and fined Google $1.7 billion for, in part, its exclusive agreements to provide search services to publishers.  *Id*. ¶ 9.

DoubleClick services, taking advantage of the demise of Adobe Flash, and using its overwhelming control of the Web Browser market, Google effectively forced advertisers and publishers into using Google's ad platform. Comp. ¶¶ 63, 65, 120, 125. This requirement of exclusive use of Google's ad platform further cemented Google's online dominance. Comp. ¶ 63, 114. Similarly, allegations concerning Google's exclusive agreements with advertisers and publishers regarding advertising requirements and platforms are supported by the findings of the EU Commission. *Id.* at ¶¶ 187-89.

For the one type of agreement that Google directly addresses (agreements between Google and OEMs), Google mischaracterizes Inform's allegation as being merely that "some consumers had Google applications pre-loaded on their mobile devices." As owners of Android OS phones know, Google applications coming pre-loaded and set as default is ubiquitous[34] and has resulted in billions of dollars in fines for Google's anticompetitive behavior.[35]

---

[34] Google conveniently ignores that there is a tremendous benefit to the maker of the pre-loaded software bundled with a device, even when the user is free to download other applications. *See Microsoft Corp.*, 253 F.3d at 60, 70, 73. Other applications must be approved by Google for Android OS and be installed through Google's Play Store, reinforcing its role as gatekeeper to a market in which it is also a competitor.

[35] Google's suggestion that Inform's Section 3 claim "cannot survive" is likewise baseless. The 50-year-old Fifth Circuit case (*Tri-State Broad. Co. v. United Press Int'l, Inc.,* 369 F.2d 268 (5th Cir. 1966)) cited by Google holds that information

## B.      Tying By Google Regarding The Ad Server And Android OS

Google's blatant exclusive agreements also concern its tying of products and services to the Google Ad Server or Android OS.  While Google recognizes that its tying agreements affect the Internet Search and Web Browser markets, it ignores Inform's allegations that these exclusive agreements further monopolize each of the markets set forth in the Complaint.[36]  Factual allegations of Google's tying agreements affecting these markets, including the Online Advertising Market and its submarkets, are set forth throughout the Complaint.  *See, e.g.,* Comp. ¶¶ 9, 140, 187-89.

## C.      Foreclosure Of The Relevant Markets

Finally, Inform directly alleges substantial foreclosure of the relevant markets due to Google's exclusive dealings.[37]  Google's continued attempt to

---

provided by a news service provider does not constitute a sale of a commodity under § 2(a).  Google's ad services, consisting of networks and servers, as well as discreet software components installed on physical phones and computers, are a far cry from the mere sale of "information" at the heart of *Tri-State Broad.*

[36]  Inform provides significant factual details in the Complaint concerning the Android OS (LMDOS) Market (Comp. ¶¶ 7, 9, 150-53), the Search Advertising Market (Comp. ¶¶ 9, 65, 140-4), and the Ad Server Market (Comp. ¶¶ 7, 65, 140).

[37]  For example: (1) forcing advertisers and publishers to use Google's ad network in order to maintain business after Google's changes to its Chrome browser following Adobe Flash's demise (¶¶ 120-26); (2) setting unreasonably high minimum bids targeted only at competing products or services in order to foreclose them from meaningful participation in the Google Ads auction system and thus several advertising markets (¶¶ 143 and 157); (3) Google's tying of its preinstalled

33

distill this issue down into whether users can download and install other applications falls flat.  *See supra* V.A.  Although Google's tying of its applications, including its search app and Chrome browser, to its Android OS substantially foreclose competition in at least the Search Advertising, Web Browser and Online Advertising Markets, even a passing glance at the Complaint makes it clear that the foreclosure is not solely related to consumer app usage, nor just those markets.

Given Google's size and ever-increasing monopolies and its distinct lack of competition in each of the identified markets, Inform has properly pled that Google's exclusive dealings have substantially foreclosed competition in these markets.

## VI.   DEFENDANTS MALICIOUSLY AND TORTIOUSLY INTERFERED WITH INFORM (COUNT VI)

Inform properly stated its claim of tortious interference by alleging that Google (1) acted improperly and without privilege, (2) acted purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with Inform and that (4) Inform suffered substantial financial injury.  *See FieldTurf USA Inc., et al. v. TenCate Thiolon*

---

browser and other apps to its Android OS forecloses competitors from the Search Advertising and Web Browser markets (¶ 15); and (4) driving smaller competitors in the Online Advertising market, such as Inform, out of any business independent of Google, by its agreements tying its various products and services together.  ¶¶ 2, 140-41.

*Middle East, LLC*, No. 4:11-cv-50-TWT, 2011 WL 13234177, at *4 (N.D. Ga. Dec. 20, 2011). Each of Google's arguments to dismiss this claim lacks factual support and legal merit. Inform specifically alleges that acting improperly and without privilege, Google used Inform's information—available to Google only because of its dominant in the Ad Server Market—to induce Inform's customers to discontinue business relationships with Inform based on false and misleading claims. Comp. ¶¶ 134, 230. Inform also alleges that Google's wrongful conduct "disrupted Plaintiff's customer relationships and future business with such customers," "directly caused significant monetary damages" to Inform, and "effectively put Inform out of business." *Id.* ¶¶ 2, 231-32. Inform has presented sufficient facts to plausibly allege a tortious interference claim. The law requires nothing more at this stage.[38]

## VII. CONCLUSION

For the foregoing reasons, Plaintiff Inform respectfully submits that the Defendants' Motion to Dismiss should be **DENIED** in its entirety. Alternatively, Inform seeks Leave to Amend in a manner that is consistent with any ruling by the Court.

---

[38] Notably, nearly every case cited by Google on this issue involves a motion for summary judgement, not a motion to dismiss. *See, e.g.*, *Tribeca Homes, LLC v. Marathon Inv. Corp.*, 745 S.E.2d 806, 808 (Ga. Ct. App. 2013).

Respectfully submitted, this 11th day of March, 2020.


HERMAN JONES LLP


*/s/ John C. Herman*
John C. Herman
  (Ga. Bar No. 348370)
Peter M. Jones
  (Ga. Bar No. 402620)
Carlton R. Jones
  (Ga. Bar No. 940540)
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia  30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501
jherman@hermanjones.com
pjones@hermanjones.com
cjones@hermanjones.com

Serina M. Vash
  *(pro hac vice)*
HERMAN JONES LLP
153 Central Avenue #131
Westfield, New Jersey  07090
Tel:  (404) 504-6516
Fax:  (404) 504-6501
svash@hermanjones.com

Counsel for Plaintiff
INFORM INC.

## CERTIFICATE OF COMPLIANCE WITH LR 5.1

I hereby certify that the foregoing document is written in 14-point Times New Roman font in accordance with Local Rule 5.1.

By:  /s/ *John C. Herman*
 John C. Herman
  (Ga. Bar No. 348370)
  jherman@hermanjones.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2020, I electronically filed the above document with the Clerk of Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By:  /s/ *John C. Herman*
 John C. Herman
  (Ga. Bar No. 348370)
  jherman@hermanjones.com