# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| INFORM INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | |
| vs. | ) | NO. 1:19-cv-05362-JPB |
| | ) | |
| GOOGLE LLC; | ) | |
| ALPHABET INC.; | ) | |
| YOUTUBE, LLC; | ) | |
| and JOHN DOES 1-100; | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

Pursuant to the Court's Order dated September 25, 2020 [Dkt. No. 33], Plaintiff Inform, Inc. ("Inform"), by and through its attorneys, hereby makes and files this First Amended Complaint against Defendants Google LLC, Alphabet Inc., YouTube, LLC (collectively, the "Google Defendants"), and John Does 1-100 (collectively with the Google Defendants, "Defendants"). Inform makes its allegations upon personal knowledge as to its own acts and upon information and belief as to all other matters, as well as based upon the ongoing investigation of its counsel. Plaintiff respectfully shows the Court as follows:

I.    <u>INTRODUCTION</u>

1.      This is an action under, *inter alia*, the Sherman Antitrust Act, the

Clayton Antitrust Act, and Georgia's common law tort of tortious interference to

restrain the anticompetitive conduct of Defendants, to remedy the effects of the

Defendants' past unlawful conduct, to protect free market competition from

continued unlawful manipulation, and to remedy harm to consumers and

competitors alike.

2.      Plaintiff Inform is a digital media advertising company that, for over a

decade, has directly competed with Google in the online advertising and online

video advertising markets, by providing a platform of services to online publishers,

content creators, and online advertisers.  While Inform had revenues in excess of

$100 million for its online advertising services between 2014 and 2016, since that

time Google has effectively put Inform out of business as a direct result of the

illegal conduct described herein.

3.      At its core, Google, and its parent Alphabet, are in the business of

online advertising, services from which they derive the vast majority of their

revenues.  In 2019, Alphabet reported a staggering $162 billion in revenues, out of

which $135 billion resulted from Google advertising revenues.[1] Users of the

---

[1]  Investigation of Competition in Digital Markets, U.S House of Representatives,
Majority Staff Report and Recommendations, Subcommittee on Antitrust,

Google search engine do not pay a monetary fee; rather Google collects personal data from the users of its search engine and monetizes that data to drive online advertising revenue.  In essence, Alphabet and Google are brokers of Internet user data for online advertising profits.

4.     For years, Google's goal has been to maximize profits in the online advertising market by: (1) amassing and controlling Internet user data, creating user super-profiles; (2) strategically acquiring companies that strengthen Google's ad tech capabilities, maximize data harvesting, or decrease competition;  (3) controlling the devices and tools with which users and competitors access the Internet; and (4) ultimately controlling which advertising content is served to and consumed by Internet users.

5.     Google has achieved monopoly power in a number of overlapping markets, all with a goal of dominating online advertising.  Google is the world's largest and most accessed search engine, with an overwhelming market dominance – well over 90%.  Google possesses monopoly power in the market for general online search (hereinafter the "Internet Search Market") and numerous interrelated and overlapping markets, including but not limited to the Search Advertising Market and the Ad Server Market.  Google is also dominant in the Web Browser

---

Commercial and Administrative Law, Committee on the Judiciary, October 5, 2020 (hereinafter "House Antitrust Report") at 206.

Market; the Online (or digital) Advertising Market; and the Online Video Advertising Market. Additionally, through its 2005 acquisition of the Android operating system ("OS"), Google has established a monopoly in the worldwide market for Licensable Mobile Device Operating Systems ("LMDOS").

6.     Google's breathtaking monopoly power has been amassed and maintained by engaging in strategic acquisitions and illegal anticompetitive practices for many years,[2] using its market dominance in several overlapping markets to drive online advertising dollars. Specifically, Google has monopoly power in the following markets:

- Internet Search Market – 92% monopoly[3];

- Licensable Mobile Device Operating System Market – 74% monopoly[4];

- Ad Server Market – 75% monopoly[5];

- Web Browser Market – 66% monopoly[6];

- Online Advertising Market – 49% monopoly[7];

---

[2]  House Antitrust Report at 14.
[3]  https://gs.statcounter.com/search-engine-market-share.
[4]  https://gs.statcounter.com/os-market-share/mobile/worldwide.
[5]  https://www.businessinsider.my/facebook-winds-down-atlas-ad-server-2016-11/. With respect to ad servers serving publishers, Google's market share is significantly higher. Competition & Mkts Auth., Online Platforms and Digital Advertising: Market Study Interim Report (2019) ¶ 5.174.
[6]  https://gs.statcounter.com/browser-market-share.
[7]  Percentage was calculated using Google's online advertising revenue disclosed in 2019 Alphabet 10-K.

- Search Advertising Market – 80% monopoly[8]; and

- Online Video Advertising Market – 52% monopoly.[9]

7.      Google uses its dominance in these overlapping markets (*i.e.*, "leveraging") to wipe out competition and drive its online ad sales.  Google is the largest monopoly in the history of the U.S. antitrust laws.  These markets comprise a heavily intertwined ecosystem, and the products and services themselves are the means by which Defendants' anticompetitive conduct is largely carried out.  Specifically, Google is not only able to use its monopoly power to engage in traditional anticompetitive behavior such as tying, but it also physically and technologically blocks competitors from the market through its own products and services.  For example, through its Chrome Browser and Android OS (LMDOS) monopolies, Google controls how and where billions of Internet users see the vast majority of online ads.  Through its ad server and related advertising intermediation products, Google controls how advertisers and publishers can participate in that online advertising market and connect with those users.  And through its complete dominance of online search, it controls how, when, and even if users can access the countless websites on which these ads are displayed. All the

---

[8]  https://www.vox.com/2017/3/14/14890122/google-search-ad-market-share-growth.

[9]  Percentage was calculated using YouTube's video advertising revenue disclosed in 2019 Alphabet 10-K.

while, Google feeds its monopoly power by amassing more user data. Collectively, the markets as described above have been leveraged by Google to gain and maintain monopoly power and, as defined more fully in ¶¶ 69-78 below, will be referred to herein as "Defendants' Leveraged Monopolies."

8.     There is significant interplay among the distinct markets that makes Google's monopolistic power in these markets more insidious.  Defendants have illegally used and leveraged their monopoly power and market dominance both to maintain dominance in those markets already monopolized by Google, as well as to gain further dominance in related markets and further stamp out competition. Substantial barriers to entry further assist in consolidating Google's market power and online dominance.

9.     To maximize their advertising profits, to protect their valuable monopolies against competitive threats and to extend Defendants' Leveraged Monopolies globally and across digital services, the Google Defendants have engaged in a series of inorganic strategic acquisitions, anticompetitive contracts and anticompetitive tactics designed to thwart competition on the merits.  This conduct includes, but is not limited to:

> Strategic and inorganic acquisition of ad tech companies and online video platforms to grow and maintain market power (*see*, *e.g.,* ¶¶ 60-68);
>
> Exclusionary disablement and disparagement of competitors' products and services (*see*, *e.g.,* ¶¶ 108-126, 108-26, 138-39);

6

Exclusive dealing agreements and anticompetitive contracts, including requiring default setting to Google products and services (*see*, *e.g.,* ¶¶ 132-33, 155-57);

Tying or bundling, including technological tying, of Google products and services (*see*, *e.g.,* ¶¶ 126, 134-36);

Unilateral or surreptitious setting or altering technological standards by which products and services of competitors can be accessed and used (*see*, *e.g.,* ¶¶ 108-126, 137-39);

Manipulative and technological blocking, exclusion, or downgrading of competitors' products and services (*see*, *e.g.,* ¶¶ 108-126, 140-41);

Preferential treatment of its own products and services, including exempting YouTube but not competitors from Google-imposed technology and operating standards, and prioritization of its own products and services through manipulation of its algorithms (*see*, *e.g.,* ¶¶ 108-126, 142-48);

Opacity as to function, pricing and data so as to disadvantage competition and restrict competitive pricing (*see*, *e.g.,* ¶¶ 150-51);

Denial of interoperability and purposeful incompatibility to exclude entry by competitors or raise their costs and/or coerce them to use Google products and services (*see*, *e.g.,* ¶¶ 108-126, 140-41, 149);

Gathering and using market intelligence about competitors through the Google and YouTube search engines and Google products and services to disadvantage competitors and interfere with competitors' businesses (*see*, *e.g.,* ¶¶ 127-30);

Predatory pricing and triangular predatory pricing by offering free services in some areas, while extracting huge ad revenue margins elsewhere (*see*, *e.g.,* ¶¶ 152-54); and

> Manipulation and abuse of the patent process and attendant
> patents (*see*, *e.g.,* ¶¶ 60, 65, 167, 170).

The above-referenced improper activities will be referred to herein collectively as

the "Defendants' Anticompetitive Restraints."

10.     Defendants' Anticompetitive Restraints are concerted attempts to

maintain Defendants' Leveraged Monopolies, not by innovation or other

competition on the merits, but rather by anticompetitive tactics that deter

innovation, exclude competition, and rob customers of quality products and their

right to choose among competing alternatives.

11.     Defendants' illegal conduct has been setting off alarm bells

worldwide for many years.[10]  The time has come to address these market abuses.

II.     THE PARTIES

12.     Plaintiff Inform, Inc. ("Plaintiff" or "Inform") is a Delaware

corporation with a principal place of business located at 3445 Peachtree Road NE,

---

[10] Google's monopolistic conduct has been the subject of numerous past and ongoing enforcement actions throughout the world.  In July 2019, the U.S. Justice Department announced that it will launch an antitrust investigation against Google and 50 state U.S. Attorneys General followed suit in September 2019. Additionally, Google has been the subject of numerous investigations by the Federal Trade Commission ("FTC"). And Google has been charged with anti-competitive conduct by regulatory agencies in the European Union, France, South Korea, India, and Russia, resulting in billions of dollars of fines. The recently released House Antitrust Report noted the same, stating that: "For years Google has been the subject of antitrust investigations and enforcement actions around the world." House Antitrust Report at 176.

Suite 1000, Atlanta, GA, 30326.  Inform was formerly known as News

Distribution Network, Inc. ("NDN").  Plaintiff is a digital media advertising

company that provides a platform of services to online publishers, content creators,

and online advertisers.

13.    Defendant Google LLC is a Delaware Limited Liability Company

with its principal place of business at 1600 Amphitheatre Parkway in Mountain

View California.  Google is the world leader in general Internet search conducted

on all devices.  It also is the owner of the Android OS and several popular and

exclusive mobile and tablet applications including YouTube, Google Maps, and

Gmail.

14.    In August 2015, Google announced its intention to create a new

holding company, Defendant Alphabet Inc.  The reorganization was completed on

October 2, 2015.  Since that date, Google has been a wholly-owned subsidiary of

Alphabet, which has continued to be the umbrella company for the Internet

interests of Google.  In or around 2017, Google Inc., which was originally

incorporated in California in September 1998 and reincorporated in Delaware in

August 2003, changed from a corporation to a limited liability company (LLC)

under the umbrella of Alphabet Inc.

15.    Defendant Alphabet Inc. is a Delaware corporation with its

headquarters and principal place of business at the "Googleplex" in Mountain

View, California.  Defendant Alphabet is one of the top ten largest companies in the United States with more than $162 billion in annual revenue.  Alphabet, ranking 15th in the list of Fortune 500 companies, is traded on the NASDAQ under the symbol "GOOGL" and is included in the S&P 100 Index.

16.     Defendant YouTube, LLC is a wholly-owned subsidiary of Google LLC and headquartered in San Bruno, California.  YouTube, Inc. was originally registered as a corporation in Delaware in October 2005 and was converted into YouTube, LLC a year later.

17.     Collectively, the Google Defendants are operated and controlled as a single entity, with Sundar Pichai acting as the CEO of both companies.  Not only did Google essentially create Alphabet as a holding company in 2015, but virtually all of Alphabet's revenues come from Google.  YouTube, in turn, is a wholly owned subsidiary of Google and is controlled and operated as such.  Alphabet filed its 10-K and 10-Q statements with the Securities and Exchange Commission, reporting consolidated revenues for all of the Google Defendants.  In fact, these statements expressly define Alphabet as "Alphabet Inc. and its subsidiaries."  *See, e.g.*, 2020 Alphabet 10-Q, July 30, 2020, at 2.

18.     John Does 1-100 are as yet unidentified agents of the Google Defendants who have assisted them in one or more overt acts in carrying out Defendants' Anticompetitive Restraints.

10

19.    The Google Defendants and Inform are competitors in several markets, including the Online Advertising Market and the Online Video Advertising Market.  As discussed below, Google provides services similar to Inform through its stable of advertising products and applications including, without limitation, Google Ads, the AdSense program, AdX, DoubleClick for Publishers (DFP) and Google Ad Manager.  Inform is also a user, customer and/or consumer of Google products and services.

## III.    JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, Section 1 and 2 of the Sherman Act, 15 U.S.C. § 1, *et seq.*, and Sections 3, 4 and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15 and 26, because Plaintiff alleges violations of federal law. The Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.    Venue is proper in this district under 15 U.S.C. §§ 15, 22 and 26 and under 28 U.S.C. § 1391(b) and (c) because: (1) Google transacts business and is found within this district, (2) Inform's principal place of business is in this district; and (3) a substantial portion of the events giving rise to the claims herein occurred within this district.

## IV.    FACTUAL BACKGROUND

### A.    Background on Online Advertising

22.     When the Internet started to become popular in the early 1990s, traditional print publishers established websites and began to publish their substantive content online, creating vast amounts of news and other content on the Internet and opening the door to generating advertising profits through search advertising, display advertising, online video advertising, and social media advertising (collectively "digital advertising" or "online advertising").

23.     Online or digital advertising consists of marketing advertisements, which are delivered through the Internet on both desktop and mobile devices. Online advertising involves the use of the Internet as a medium to obtain website traffic, and target and deliver marketing messages to the right users, customers, and consumers.

24.     Like other advertising media, online advertising often includes: (1) a publisher, who integrates advertisements into its online content; (2) an advertiser, who provides the advertisements to be displayed; and (3) advertising agencies that help create and place the ads. The goal of online advertising generally is to put an advertisement in front of the best possible audience for that ad.  A view of the ad by an Internet user is commonly referred to as an "impression."

25.     An "ad tech stack" refers to the series of companies and technologies on the Internet that gets an advertiser's message in front of the right consumer at the right time to maximize the chance for the advertisement to influence the

consumer to take some desired action.  Today, the ad tech stack facilitates the automated selling and buying of digital ad inventory on a large scale in real time.

26.     Ad servers are used by publishers, advertisers, ad agencies, and ad networks to manage and run online advertising campaigns.  Ad servers make the instantaneous decisions about what ads to show on a website, and then place the ad onto that site.  Additionally, ad servers collect and report data (such as the number of impressions and clicks) for advertisers to gain insights from and monitor the performance of their ads.  Ad servers are used to manage and display online advertising content to the right user on a website. The ad server: (1) determines which ads to display on the publisher's website based on collected user data and preferences across publishers; (2) serves the ad to the user; and (3) collects and reports on additional data such as impressions and clicks, which is used to determine the cost to the advertiser.

27.     Additional technologies in the ad tech stack include supply-side platforms (SSPs), which help websites sell unused ad space (or inventory) and demand side-platforms (DSPs), which are used by advertisers to buy ad impressions from ad exchanges for the cheapest price. The ad formats can include display, mobile, search, or video ads. Display advertising, as well as online video advertising use SSPs and DSPs.  Together, the publisher ad servers, supply side

platforms (SSP), advertiser ad servers, and demand side platforms (DSP) comprise the ad tech stack.

      B.      <u>Google's History: From Search Engine to Online Advertising Business</u>

      28.     Google began as a general online search engine - a two-sided platform that enabled users to search the Internet for content.  While at first it simply indexed the content of web pages, Google's key innovation, the PageRank algorithm, helped define second-generation search technology by looking at links to and from other Web pages as a way of determining relevance for users.

      29.     Google operated at a loss for the first two years.  In 2000, Google began to monetize its search engine, and launched AdWords, an online advertising service that let businesses purchase keywords ads to appear on Google's search results page.  This offering evolved to become the heart of Google's business model. Google turned its first profit in 2001.

      30.     The multisided nature of Google's general search platform, which connects distinct but interdependent demands, offers Internet users a service purportedly "free of charge."  This consumer strategy (which Google employs with various products and services) attracts users, who are critical assets that allow Google to sell advertising space to companies that are interested in reaching those users.  In this way, Google connects users' demand for information, products, and services with advertisers' and publishers' demand for access to those users.  While

Google's dominant business model suggests that users receive "free" access to services, the exchange in fact is for the commercial use of an individual's personal data, which is critical for attracting billions of dollars in advertising revenue. Google then stores and monetizes this data through its proprietary algorithms.

31.     Today Google is ubiquitous across the digital economy, serving as the infrastructure for core products and services online.  It has grown and maintained its search engine dominance, such that "Googling" something is now synonymous with online search itself. The company is now also the largest provider of digital advertising, a leading web browser, a dominant mobile operating system, and a major provider of digital services such as mapping, email, cloud computing, voice assistant services, as well as dozens of other offerings.[11]  Each of these services provides Google with a trove of user data, reinforcing its dominance across markets and driving greater monetization through online advertising.[12]

32.     As Google's dominance and market power in Internet search grew and its product and service offerings diversified, Google captured user data and critical information about users, such as: personally identifiable information, user impressions and preferences, location, browsing history, IP address, and insight into patterns, timing, trends, and demographics.  At the same time, Google

---

[11]  House Antitrust Report at 174.
[12]  House Antitrust Report at 175.

strategically acquired ad tech companies and competitors that provided the ad tech services Google needed to facilitate advertisers' placement of ads onto publishers' websites.  This combination has enabled Google to build a data set for its ad tech services utilizing the user data from its search engine and other customer facing properties, such as Google Maps and Gmail, providing Google with an unparalleled ability to target ads to the right viewers.

33.    Over time, Google's ad offerings have become considerably more sophisticated, resulting in tens of billions of dollars of annual revenue.  These services now include, *inter alia*, search campaigns, display campaigns and online video campaigns, which can be implemented and viewed across multiple devices, and the buying and selling of which is facilitated through Google's suite of ad tech services.  Moreover, Google's market power in search enables Google to harvest data generated not only by Internet users, but also by competitors, publishers, advertisers and intermediaries, and further monetize and utilize the same.

34.    Today, Google's ad-based revenue model generates the vast majority of Google's revenues, yielding billions in revenue each year as reflected in the following chart:



For example, in Q3 2019, the Google Defendants' advertising revenues hit a record $33.9 billion.

## V.   GOOGLE BECOMES A MONOPOLY

### A.   Google's Growth to Search Engine Market Dominance

35.   Google's flagship online service is its general search engine, Google Search, which is accessible either through Google's main website (www.google.com) or through localized websites.  Search engines, such as Google, Yahoo, Baidu and Bing, utilize automated software applications (referred to as robots, bots or spiders) that travel along the Web and gather information used to create a searchable index of websites.

36.   Google Search is ubiquitous, existing for static devices (personal computers and laptops), for handheld and mobile devices (smartphones and tablets), and for other smart devices, such as Google Home or devices running

Android TV or Android Auto operating systems.  Additionally, Google also powers other search engines – including Ask, which is the sixth largest search engine in the world.

37.    When a user enters a keyword or a string of keywords (a "query") in Google Search, Google's general search results pages return different categories of search results, including (1) generic search results; (2) specialized search results; and (3) online search advertisements.

38.    Generic search results typically appear on the left side of Google's general search results pages in the form of blue links with short excerpts ("snippets") in order of their rank.  Generic search results can link to any page on the Internet, including web pages of specialized search services that compete with Google's own specialized search services.

39.    To rank generic search results in response to a query, Google uses algorithms, including an algorithm called PageRank.  PageRank ostensibly measures the importance of a web page based on the interest in the page, as well as the number and quality of links to that page, the underlying assumption being that more important websites are likely to receive more links from other websites. Google applies a variety of adjustment mechanisms to the results of PageRank. Which adjustments are determined by Google. Through PageRank and the

adjustment mechanisms, Google determines and can manipulate the rank of a web page in the generic search results on Google's general search results pages.

40.     Google's clear dominance in online search also gives it significant control over the Search Advertising Market.[13]  Through this generic search process, Google has attained long-recognized and substantial market power and monopoly status in both the Internet Search Market and the Search Advertising Market.

B.     Google's Suite of Online Advertising Products and Services Consolidates Dominance Across Multiple Markets

41.     Over time, Google expanded its offerings to include a suite of advertising products and services through which it acts as a broker between publishers and advertisers in the Online Advertising Market.  These offerings were facilitated largely through Google's strategic acquisition of ad tech companies and competitors that provided the ad tech services Google needed to facilitate advertisers' placement of ads onto publishers' websites.

1.  AdSense and Google Ads

42.     AdSense enables publishers to reserve space for the placement of Google Ads on their own website (via text, video or images) and thereby monetize their own website content. AdSense is used to sell advertising space to Google.

---

[13]  House Antitrust Report at 196.

43.     Google Ads (formerly AdWords) enables businesses and marketers
to advertise on Google's network (search, display, etc.). Google Ads is used
to buy advertising space from Google.  Google Ads works by displaying a
provider's ad when people search online for the products and services that provider
offers.  Google Ads is powered by an auction bidding market.  Each time an ad is
eligible to appear for a search, it goes through the ad auction.
The auction determines whether the ad actually shows and in which ad position it
will show on the page.  To gain the top spot in Google advertisements, advertisers
have to outbid each other.  Higher bids move up the list, while low bids may not
even be displayed at all.

44.     Cost per impression (or "CPI") is the cost or expense incurred for
each potential customer who views the advertisement, while cost per thousand
impressions (or "CPM") refers to the cost or expense incurred for every thousand
potential customers who view the advertisement. CPI, along with pay-per-
click (PPC) and cost per order, are used to assess the cost-effectiveness and
profitability of online advertising.

45.     How often an ad shows, its position on the page, and how much the ad
costs are all purportedly driven by two factors: the advertiser's bid and the
projected quality of the ads (via a subjective "Quality Score").  However, other

factors determined by Google, including acceptable and bespoke minimum bids,

are also accounted for in the determining the winning bid.

46.     Importantly, Google not only runs the auction, but also competes in it.

While this process is held out by Google to be neutral and unbiased, Google alone

controls the algorithms that generate Google Ads results, the Quality Score

assigned to the search advertisements, and the minimum bids that a given

advertiser can offer in the auction.  As a result, the changing or selective

application of Google's auction process and/or algorithms can effectively box out

competition and limit consumer choice on what it may or may not be purchased,

and from whom, based upon what advertisements "win" the auction.

47.     The three most common Google Ads campaign types are:

- *Search campaigns* - usually in text form, these ads show on Google Search results pages when the user searches for a particular product or service;

- *Display campaigns* - usually in image form, these ads appear on websites or apps that consumers visit; and

- *Video campaigns* – these are digital advertisements, usually 6 or 15 second videos, that show right before or during substantive video content.

48.     Google's video campaigns can run in a number of formats, including

in-stream ads, video discovery ads, non-skippable in-stream ads, outstream ads,

and bumper ads.  Specifically, in-stream ads run before, during, or after other

videos on YouTube or across the Google network sites, games or apps. These ads may also run on YouTube videos that are embedded on other sites.

 2.  Double Click for Publishers (DFP) and DoubleClick Ad Exchange

49.    Google's DoubleClick for Publishers, or DFP, is Google's ad server that enabled advertisers to upload advertiser/ad network creative advertisements and tags (HTML codes that call other ad networks and exchanges for ads).  When there is an opportunity (or an ad call), DFP selects which ad will be served based upon the accumulated data and preferences of the individual user.  Thus, through DFP, Google instantaneously controls the vast majority of how, when, where and which ads are served to users on the Internet.  A recent Wall Street Journal article lays out the inner workings of Google's multi-billion dollar advertising conglomerate.[14]

50.    DoubleClick Ad Exchange or AdX is Google's auction-based system for premium websites to be paired with premium advertisers.  Google AdX is more exclusive than Google Ad Manager and can only be accessed in two ways.  First, one could obtain a Google Ad Manager account and then get Google's approval to access the AdX account.  Alternatively, AdX can be accessed by working with a Google Certified Publishing Partner, through which a publisher can obtain a

---

[14] *How Google Edged Out Rivals and Built the World's Dominant Ad Machine: A Visual Guide*, Wall Street Journal, November 7, 2019.

subsidiary AdX account.  In both cases, only large publishers approved by Google can use AdX.

### 3. YouTube

51.    In October 2006, Google acquired YouTube, an online video-sharing company, for $1.65 billion.  Launched by three former PayPal employees in 2005, YouTube is a video-sharing website that allows users to upload, view, rate, share, add to playlists, report, comment on videos and subscribe to another users' content. YouTube became the fastest growing online video-sharing platform.  Google acquired the company just over a year after its launch and it has now become the second largest search engine in the world — second only to Google Search.

52.    Approximately 1.3 billion people use YouTube, and it has become the second most visited website in the world.  YouTube gets over 30 million visitors per day, who watch an estimated 5 billion videos each day.  Three hundred hours of video are uploaded to YouTube every minute.[15]

53.    Like most other Alphabet properties, YouTube earns the bulk of its revenue through advertisements.[16]  YouTube is estimated to generate between $16 billion and $25 billion in annual revenue, putting it in the top half of the Fortune

---

[15]  https://merchdope.com/youtube-stats/.
[16]  https://www.investopedia.com/articles/personal-finance/053015/how-youtube-makes-money-videos.asp.

500.[17]  YouTube accounts for the second largest revenue stream generated by Google next to its online advertising business.  Moreover, YouTube is steadily becoming more valuable to Google due to the growing shift of consumer viewership from television to online video.

### 4.  Android Operating System

54.     Google understood early on that the shift from desktop PCs to mobile Internet, which started in the mid-2000s, would be a fundamental change for Google Search and would provide access to emerging and third-world markets, where mobile devices are significantly more prevalent.

55.     In 2005, Google acquired Android, a developer of an open source mobile device operating system, for $50 million.  In 2015, the Android OS was installed on more than 80% of the world's smartphones.  Google has continued to develop Android and to acquire Android-relevant patents since that time.

56.     Google's Android is now the most-used smartphone operating system in the world.  Today, over 75% of smart mobile devices worldwide run on the Android OS.[18]

57.     Because Android is a licensable smart mobile operating system, third-party manufacturers of smart mobile devices can license and run Android on their

---

[17]  https://www.nytimes.com/2019/07/24/technology/youtube-financial-disclosure-google.html.

[18]  https://gs.statcounter.com/os-market-share/mobile/worldwide.

devices.  As set forth below in ¶¶ 155-57, Google's complete and total control of

the Android OS has enabled Google to engage in certain anticompetitive behavior

to maintain and solidify its dominance across multiple markets.[19]

### 5. Google Chrome

58.    In 2008, Google released its Chrome web browser ("Chrome" or

"Chrome Browser"). A web browser is software that retrieves and displays pages

from the Internet. When a user wants to access a certain web page, the web

browser fetches information from the relevant server and displays it to the user.

Browsers are used to navigate and spend time on websites and to search the web.

Most activities online are made possible through a browser. Web browsers can be

installed on almost any device connected to the Internet. Google Chrome includes

synchronization with Google products and services and is designed to work with

YouTube and Gmail.  Google Chrome is used by over 50% of people in the US

and approximately 67% worldwide.   Google's Android OS, discussed in Section

---

[19]  Defendants' anticompetitive conduct in regard to its Android OS has been the subject of numerous regulatory investigations in the United States and abroad. Specifically, the FTC opened up investigations in 2011 and again in 2015. In July 2018, the European Commission fined Google a record $5.1 billion in Android antitrust case for, *inter alia*, illegally tying Google's search and browser apps; illegally making anticompetitive payments conditional on exclusive pre-installation of Google Search; and illegally obstructing the development and distribution of competing operating systems. In an April 2017 settlement with Russia's Federal Antimonopoly Service, Google agree paid US $7.8 million in fines and rewrite contracts with smartphone manufacturers under a settlement over Google's self-preference access to the Android operating system.

V(B)(4) above, requires preinstallation of the Chrome Browser under certain circumstances, including, *inter alia*, as a condition of accessing certain Google apps.

### 6. Other Google Products and Services

59.     Google also has additional product and service offerings designed to attract users and harvest their data.  These services include but are not limited to Google Maps, Gmail, Google Drive, Google Photos, Google Play Store, Google Earth, Google Pay Send, Google Hang Outs, and Google Analytics.

### C. Key Acquisitions Expand Google's Ad Tech Capabilities

60.     Google has steadily and systematically grown through acquisition of corollary ad tech, web application and online video platform companies.  Since its founding in 1998, Google has acquired more than 227 companies and spending over $27 billion for its top ten acquisitions.  Rather than growing organically, Google has grown through strategic acquisitions to yield products, manpower, and patent portfolios that directly and indirectly support and maintain its Internet Search and other monopolies and feed its online advertising business revenue.

61.     In addition to the significant acquisitions of YouTube and Android described above, Google has made numerous key acquisitions to enable expansion of its online advertising market dominance and its ad tech capabilities.

62.    In April 2003, Google acquired Applied Semantics for $102 million. This acquisition was instrumental in the creation of Google's AdSense product.

63.    In April 2007, Google announced its intention to acquire DoubleClick.  Following an investigation by the FTC prompted by antitrust concerns, Google acquired DoubleClick in March 2008 for $3.1 billion.[20]  The DoubleClick acquisition was instrumental in cementing Google's stronghold in the lucrative online advertising industry.  In addition to the DoubleClick software, Google also acquired the relationships with web publishers, advertisers and agencies, beating a host of other potential buyers like Microsoft to the acquisition. Integrated into AdSense, DoubleClick has been enormously successful for Google, with almost 83% of Alphabet's $162 billion in revenues in 2019 coming from its advertising business.  Since the acquisition by Google, DoubleClick has further expanded with DoubleClick for Publisher (DFP) and DoubleClick Ad Exchange. When Google purchased DoubleClick, it told Congress and the FTC that it would not combine the data collected on Internet users via DoubleClick with the data collected throughout Google's ecosystem. In 2016, however, Google reversed this commitment, and subsequently combined DoubleClick data with personal

---

[20]  *See* Section XII below.  In 2013, following the appointment of former Google outside counsel Joshua Wright as Obama's FTC Commissioner and despite a staff memo urging prosecution, the FTC issued two decisions effectively terminating the investigations into Google without any meaningful action against Google.

information collected through other Google services—effectively combining information from a user's personal identity with their location on Google Maps, information from Gmail, and their search history, along with information from numerous other Google products.[21]

64.    In 2010, Google acquired AdMob for $750 million and then began acquiring buyer services, including Invite Media for a reported $81 million.  The combination of deals gave Google unprecedented positioning in every facet of how ads end up on websites and smartphone apps around the world.

65.    In August 2011, Google acquired Motorola Mobility for $12.5 billion, a mobile device manufacturer.  Google acquired Motorola's smartphone patent portfolio, with more than 20,000 patents on mobile phones and wireless technologies, for $12.5 billion.  In the same year — prior to the Motorola acquisition — Google spent $4.9 million on the Mondu patent portfolio of Android-relevant technology.  Moreover, Google bought 1,029 patents related to the Android OS from IBM.  *See* MIT Technology Review, October 2011.[22]

66.    In 2011, Google purchased Ad Meld, one of the largest SSPs, which it integrated into AdX, Google's existing exchange.

---

[21]  House Antitrust Report at 209-10.

[22]  *Google Buys Motorola Mobility for $12.5 B, Says "Android Will Stay Open,"* TECHCRUNCH (Aug. 15, 2011), https://techcrunch.com/2011/08/15/breaking-google-buys-motorola-for-12-5-billion/ (reporting that Google purchased Motorola primarily to protect the Android ecosystem from patent litigation).

67.     In January 2019, Google acquired some of Fossil's smartwatch technology for $40 million. On November 1, 2019, Fitbit announced agreement to be acquired by Google LLC for approximately $2.1 billion. This wearable technology enables significant harvesting of user data, already alarming regulatory agencies.[23]

68.     With these and other acquisitions, Google has maintained its dominance in online search and search advertising, and gained dominance in related markets and market power as set forth below.

D.     The Relevant Markets

69.     Google has a durable monopoly in each of the following markets:

a.     The Internet Search Market -- Google overwhelmingly dominates the recognized market for general online search with control over 94 percent of the search engine market.  Despite notable changes in the market—such as the switch from desktop to mobile—Google has maintained this dominance for more than a decade, a period during which its lead over its most significant competitors has only

---

[23]  On August 2020, European Union authorities on announced an investigation into Google's $2.1 billion purchase of the fitness-tracking company Fitbit, as raising alarms about the health data the Internet giant would be acquiring as part of the deal.  https://www.ft.com/content/aba45bc9-ffc8-411e-ac29-dbb3171f4886

increased. The next largest competitor is Microsoft's Bing, with a market share of about 2.8%.

b. <u>Licensable Mobile Device Operating Systems</u>: Through Android OS, Google is dominant in the worldwide market for Licensable Mobile Device Operating Systems, with a market share of approximately 75%.[24]



**Global Mobile OS Market Share**
*February 2019*

---

[24] https://money.cnn.com/gallery/technology/mobile/2013/01/29/smartphone-market-share/index.html; https://gs.statcounter.com/os-market-share/mobile/worldwide (citing 76.2% share).

c.  <u>The Search Advertising Market</u>: Google has approximately 80%[25]

   market share in the Search Advertising Market followed by Microsoft

   and Yahoo with 7.2% and 2.5%, respectively.

d.  <u>The Ad Server Market</u>: as early as 2016, Google had approximately

   75% market share in the Ad Server Market[26];



70.   Google is achieving monopoly power in the following markets:

---

[25] https://www.vox.com/2017/3/14/14890122/google-search-ad-market-share-growth.

[26] https://www.businessinsider.my/facebook-winds-down-atlas-ad-server-2016-11/.

a. <u>The Web Browser Market</u>: Google has effectively achieved monopoly

power in the Web Browser Market, with an estimated market share of

66% and growing; and



b. <u>Online Advertising Market</u>: Google dominates the broader Online

Advertising Market with about a 49% market share; and

c. <u>Online Video Advertising Market</u>:  Google dominates the Online

Video Advertising Market with about a 52% market share.

71.    The visual of Google's Internet Search Market share can be seen

below:



72.    As the Google Defendants operate world-wide, everywhere the Internet is available, the relevant geographic market is both the United States and world-wide.

73.    Internet search, search advertising and licensable mobile operating device services have been recognized as distinct markets and Google's dominance in them has been established.[27]

---

[27]  *See* House Antitrust Report 177, 180, 183, 196, 213; *see also, e.g.*, https://ec.europa.eu/commission/presscorner/detail/en/MEMO_16_1484.

74.    In addition to Google's market share set forth above, Google's market power in each of the above markets is demonstrated by the interoperability of the Google products within each of the markets; Google's unilateral ability to control how and on what terms market participants can interact with its products and services; Google's collection and weaponized usage of data from its products and services; Google's ability to both set pricing and maintain opacity in the fees its receives for its services; and the self-reinforcing advantages of the data it collects for each of its services in garnering additional market share.

75.    Each of the above is a market for the purposes of antitrust law. There are no reasonable substitutes for general Internet search; search advertising; Web Browsers; or licensable mobile operating devices systems.  Nor is there a reasonable technological substitute for ad servers, which work across the ad tech stack and provide particularized functionality in delivering and tracking online advertisements.

76.    Likewise, there is no reasonable substitute for online advertising services.  Online advertising is not substitutable with traditional forms of advertising, such a print, television, radio, or billboard advertisements. Each of these forms of advertising reaches a distinct group of potential customers, and advertisers and advertising agencies view each of these forms of advertising as complementary rather than as potential replacements for each other. Online

advertising also is different in kind from traditional forms of advertising, because online advertisements can be continuously tracked, updated and improved based on data showing how consumers are responding. Likewise, each of the component markets is not substitutable for the others as they serve and target distinct audiences. In addition, online display advertising, online search advertising and online video advertising perform different roles and are treated as distinct by advertisers. Search is intent-based advertising that seeks to induce consumers who have already shown an interest in buying a product or service to make a purchase. Display and video, by contrast, is suitable for raising awareness about a product, service, or brand and reaching new audiences that may not yet have shown an interest.  Social media advertising is employed on a closed, rather than open network and targeted at users of the social network itself.  Moreover, non-video advertising is not a substitute for video advertising because they are directed at different audiences, often delivered on different platforms and the decision as to whether to employ a video verses a non-video advertisements are driven by the desire to convey the message in the best way for the brand or advertiser.

77.    These durable markets have significant barriers to entry including, but not limited to: network effects that make platforms more valuable as they gain more users; the advantages of big data which enable platforms and companies to use the treasure trove of data they collect from users to improve the effectiveness

of their products and services; and lock-in effects that cause users to avoid switching platforms or companies so as not to lose their personal contacts, history of searches, photos, apps, and other information. For general search, additional barriers to entry include: economies of scale in developing a web index; access to click-and-query data at scale; and Google's extensive implementation of default positions. Also, for the LMDOS Market, there are high barriers to entry in part due to specific network effects: the more popular an OS is, the more developers write apps for that system – which in turn attracts more users.  Furthermore, significant resources are required to develop and distribute a successful licensable smart mobile operating system.

78.     Defendants' Anticompetitive Restraints have restrained competition in each of the above markets, including but not limited to the Online Advertising and Online Video Advertising Markets. Google's conduct had the intent and effect of suppressing competition across markets and in particular in the online advertising market as well as in the online video advertising market, in order to consolidate, maintain and gain dominance across markets.

## VI.    ANTITRUST LAWS

79.     Congress passed the first antitrust law, the Sherman Act, in 1890 as a "comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade."  In 1914, Congress passed two

additional antitrust laws: the Federal Trade Commission Act, which created the FTC, and the Clayton Act. With some revisions, these are the three core federal antitrust laws still in effect today.

80.     The Sherman Act is divided into two main sections: Section 1, which prohibits concerted activity of two or more entities that combine, contract, or conspire in restraint of trade; and Section 2, which addresses unilateral actions and prohibits monopolization or attempted monopolization in restraint of trade. Specifically, Section 2 of the Sherman Act establishes three offenses, commonly termed "monopolization," "attempted monopolization," and "conspiracy to monopolize."[28]

81.     At its core, Section 2 makes it illegal to acquire or maintain monopoly power through improper means. The long-standing requirement for monopolization is both (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. To be found unlawful, monopoly power must be accompanied by an element of anticompetitive conduct, often described as "exclusionary" or

---

[28] *See, e.g.*, 1 Section of Antitrust Law, Am. Bar Ass'n, <u>Antitrust Law Developments</u> 225, 317 (6th ed. 2007).

"predatory" conduct. This includes both conduct used to acquire a monopoly unlawfully and conduct used to maintain a monopoly unlawfully.

82.    Section 2 also proscribes "attempt[s] to monopolize." Establishing attempted monopolization requires proof (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.

83.    Section 3 of the Clayton Act, 15 U.S.C. § 14, prohibits exclusionary practices, such as tying, exclusive dealing, and predatory pricing, that lessen competition.  Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits share acquisition or mergers that would lessen competition or create a monopoly.  The Clayton Act allows for monetary penalties that are three times as large as the harm caused by the illegal behavior.

VII.   <u>PLAINTIFF INFORM: HISTORY, INNOVATION, AND VALUE PROPOSITION</u>

84.    Inform, formerly known as NDN, is a digital media advertising company.  Inform provides a platform of services to online publishers, content creators, and online advertisers.  Inform is a competitor, user, consumer and/or customer in each of the relevant markets set forth above.

85.    Inform specializes in providing data-driven technology solutions for the syndication and monetization of contextually relevant video content on publisher websites.  Specifically, Inform manages the distribution and delivery of

video from content creators into articles on newspaper, magazine, radio, and television websites.  In other words, Inform enables publishers to pair corresponding video with their original text content in order to enhance the user's experience and understanding of the publisher's story.  At the same time, Inform's platform provides brands with an opportunity to deliver video advertisements to the audience that is most likely to consume their products.

86.     Like Google, Inform works with both publishers (*i.e.*, newspaper, magazine, radio and television sites, and website operators, like yahoo.com or msn.com) and advertisers, enabling publishers to monetize their websites by, among other things, selling space on their web pages to online advertisers.

A.     The Evolution of Inform's Online Video Advertising

87.     With the evolution of online video streaming in or around 2005, there was growing demand from publishers for video content to enhance and augment their online text content and thus a growing opportunity for brands to present video advertisements to consumers.  Early on, Inform recognized that video content clips and video advertisements would become increasing valuable for online publishers, just as they had been for cable television networks.  By embedding video content and video advertising into a publisher's articles, Inform could create a better user experience and offer video advertising to help monetize website space for online

publishers, the way television commercials monetized air space for cable television networks.

88.    The Inform platform is the tech provider, the substantive content provider and the advertiser.  For example, using the Inform platform in the context of a newspaper, magazine, radio, or television website, a typical story-level web page will likely include instream video (within the text of the article near the headline), outstream video (within the text of the article outside of the user's initial view), and right rail video (outside of the text of the article), as shown below:





89.     The video content played in these spaces are video clips, usually one to three minutes in length, that relate to the publisher's story or article.  In the context of newspaper, magazine, radio, and television websites, relevant video content is most often created by a news service, like the Associated Press.

90.     Inform established an extensive library of premium video content that could either be manually selected by the publisher to match the substantive text content or automatically selected for them by Inform's content matching technology.

91.     Each substantive video clip that plays on a web page presents an opportunity for a brand, product or service (e.g., Marriot Hotel) to present the user with a video advertisement.  The three ways that Inform enabled and supported

video advertising were through: (1) a pre-roll ad; (2) a video carousel that highlighted the trending videos for the publisher; and (3) placement of a display ad, that is a companion ad to the content posted on the site.  A "pre-roll ad" is a promotional video message that plays before the substantive video content.  These promotional video messages are often repurposed television ads, sometimes shortened to 10 or 15 seconds.  Pre-roll ads are particularly valuable because they stand between the user and substantive video content that the user is seeking to view, which virtually assures that the advertisement is viewed by the user.

92.     Brands often employ advertising agencies to develop an advertising strategy, create the advertisements themselves, and manage their advertising spending.  The advertisements themselves are commonly referred to as "the creative."  As noted, a pre-roll ad is one example of a creative.

93.     At its peak, Inform had an inventory of ad space from a network of approximately 5,000 publishers.  This aggregated digital audience allowed Inform to work with a brand (or the advertising agency representing a brand) to optimize the placement of its ads and to reach that brand's specific target demographic.

94.     Inform also provides the infrastructure, including the video player, allowing them to manage the technical delivery of the video for the content creator and the creative from the advertiser.  Inform's infrastructure also allowed it to collect third-party data regarding users.  Inform's access to third-party data

dramatically increases its ability to target specific demographics, driving a

significant portion of the value of the ad to brands.

95.     Third-party data is information about the user and his or her online

behavior that is not personally identifying.  First-party data, like name, address,

and credit card numbers, is personally identifying.

96.     Inform's platform was extremely valuable to publishers, content

creators, and advertisers.  Between 2010 and 2017, Inform garnered revenue of

more than $180,000,000.  Indeed, in 2014, Yahoo.com and Inform had a signed

term sheet to for Yahoo to acquire Inform for approximately $375,000,000, an

acquisition that did not ultimately occur.  In each of 2014, 2015 and 2016, Inform

had annual revenue of approximately $35,000,000. In 2015, Inform was ranked as

the No. 1 Online News & Information Property by comScore, with 27 million

unique monthly viewers and 230 million videos viewed each month.

Unfortunately, Google took notice of Inform's competitiveness and decided to take

action.

     B.     <u>Inform Competes with Google</u>

97.     Google and Inform are competitors in the Online Advertising Market

and the Online Video Advertising Market.  Google provides services similar to

Inform through Google Ads, which sells advertising to publishers through its ad

auction, the AdSense program, which places paid for advertising onto third-party

websites.   These third-party websites are paid by Google when users click on a particular advertisement.

98.     Inform is also a user, customer and consumer of Google products and services.  As a result of Google's market dominance, competitors such as Inform have no choice but to use some of Google's intermediation services.  In addition to Inform's own video player technology, Inform relies on both Google's Ad Server and Chrome Browser.  In order to reach the vast majority of the potential market, Inform's video player is, and must be, integrated with Google's Ad Server, which is the gatekeeper that determines whether an ad is delivered.  Thus, Inform must use the Google Ad Server to function as the delivery method for both display and online video advertisements or creatives.  The Web Browser is essentially the key without which a video advertisement will not function properly, if at all.  The Ad Server and the Web Browser work together to assure that an ad is properly placed and functions as designed.  Inform is essentially forced to use both of these Google products.

99.     While the Google Ad Server delivers Informs' advertisements, it is Google's algorithms that are responsible for the delivery pattern, frequency and pace at which Inform's creatives are served.  Google's Ad Server tracks the impressions, click through rate, completion rates and other delivery metrics for Inform's billing.  Additionally, Google's algorithms forecast the fill rate and

choose whether to fill additional inventory with one of Inform's ads or one of Google's own less expensive ads, for which Google garners a larger profit.

100.   Inform – and every other competitor, publisher or advertiser – is one side (the paying side) of Google's two-sided platform, relying on the Google search engine, Android OS, and Chrome to supply the users who see, hear, view, click on and interact with Inform's ad campaigns for potential profit.

101.   Thus, Defendants' Leveraged Monopolies, as set forth above in ¶¶ 6-7 and 69-78, are critical to the Online Advertising Market because 92% of consumers use Google's search engine; 80% of consumers use Google for search advertising; 75% of consumers use Google's Android OS to search the Internet and more than 66% of users worldwide view websites, online video and the associated video advertisements through Google Chrome.  Google is the digital infrastructure, without which there is no market.

## VIII.   GOOGLE WIELDS MONOPOLY POWER IN MULTIPLE MARKETS TO IMPEDE COMPETITION

102.   While anticompetitive conduct by the Google Defendants with respect to any single market in which Google wields monopoly power runs afoul of the antitrust laws, the totality of the Google Defendants' illegal and anticompetitive conduct across multiple, inter-related markets is more insidious.

### A.   Monopolistic Leveraging

103.   Monopolistic leveraging is the use of monopoly power in one market to strengthen or gain a monopoly share in another market. Leveraging may be achieved through many anticompetitive practices including but not limited to contractual and/or technological tying, bundling, exclusive dealing, and predatory or below cost pricing.  Monopoly leveraging is often used to describe the way in which a monopolist in one market uses its power to monopolize or attempt to monopolize a second market. In digital markets, the Department of Justice has noted that monopolistic leveraging and relationships between markets is as important as dynamics within the market, such as barriers to entry and market power.[29]

104.   Plaintiff alleges that monopoly leveraging by the Google Defendants includes but is not limited to the following:

a.   Google has leveraged its monopoly power in the Internet Search Market, the Licensable Mobile Device Operating System Market and

---

[29]  In a December 10, 2019 address to the National Association of Attorneys General, U.S. Attorney William Barr warned: "In addition to understanding the dynamics within a market, like barriers to entry and market power, we also need to look at relationships between markets.  This is especially important because today's digital platforms frequently operate across multiple areas.  A dominant firm may seek to leverage its monopoly power in one market to gain an unfair advantage in another." https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-national-association-attorneys-general

the Search Advertising Market and its dominance in the Web Browser

Market to maintain monopoly power in those markets;

b.  Google has leveraged its monopoly power in the Internet Search

Market, the Licensable Mobile Device Operating System Market and

the Search Advertising Market in an attempt to gain monopoly power

in the Web Browser Market, the Online Advertising Market and

Online Video Advertising Market; and

c.  Google has leveraged its monopoly power in the Ad Server Market

and its dominance (and/or monopoly) in the Web Browser Market in

an attempt to gain monopoly power in the broader Online Advertising

Market and the Online Video Advertising Market.

105.   For example, Google leveraged its monopolies in online search,

search advertising and LMDOS to require default installation and global

dissemination of its Chrome Browser.

106.   In turn, Chrome Browser now serves as a way for Google to control

the entry points for its core markets: online search and online advertising,

including online video advertising.[30] Moreover, both Chrome Browser and

Google's Ad Server control the delivery, functioning and operability of online

---

[30]  House Antitrust Report at 224.

advertising, including online video advertising and competing online advertising technology, like Inform's video player.

107.   The October 5, 2020 House Antitrust Subcommittee found that Google repeatedly leveraged its monopoly power to maintain and gain dominance across related markets.[31] Specifically, the House Antitrust Subcommittee found that "Google used its search engine dominance and control over the Android operating system to grow its share of the web browser market and favor its other lines of business. *Reciprocally*, Chrome's dominance in the browser market gives it significant gatekeeper power over managing and monitoring users' browsing activity—power Google can wield to shape outcomes *across markets* for search, mobile operating systems, and digital advertising. These advantages across markets feed back into and reinforce one another, advantages that [competitors] lack."[32]

B.   Google's Anti-Competitive Conduct and Manipulation of the Online Advertising Market

108.   To compete in the Online Advertising Market, a company's services must be compatible with Google's ad products and services and Google's Chrome Browser.  Importantly, this enables Google to influence industry standards in its own favor and to set arbitrary and anti-competitive rules by which video content and video advertisements are enabled, viewable and audible in ways that

---

[31]  House Antitrust Report at 15, 183-187, 193, 211, 215, 217, 246.
[32]  House Antitrust Report at 225 (emphasis supplied).

preference Google, YouTube and Google's products and services. In this way, Google has illegally leveraged its monopoly power through its algorithms, its arbitrary rules for advertisers and marketers, and certain technological changes.

109.   As set forth herein, Google has engaged in exclusionary disablement and/or disparagement of competitors' products and services; unilateral and/or surreptitious setting or altering technological standards by which products and services of competitors can be accessed and used;  manipulative and technological blocking, exclusion, or downgrading of competitors' products and services; preferential treatment of its own products and services; denial of interoperability and purposeful incompatibility to exclude entry by competitors or raise their costs and/or coerce the use of Google products and services; and purposeful opacity as to function, pricing and data so as to disadvantage competitors and restrict competitive pricing.

110.   For example, Flash is a proprietary digital software developed by Adobe.  For more than a decade, Flash was the standard for playing video on websites.  As such, content and creatives were developed in Flash and online advertisers' infrastructure was based on Flash.  Moreover, publishers liked using Flash on their websites because it gave them significant control and flexibility over the user experience, including how and when videos played.  With Flash, publishers controlled whether a video would start automatically when the web page

loaded.  This feature is commonly referred to as "autostart." It also gave publishers control over whether the video would be accompanied by audio and over the audio volume.

111.   Flash was superior in many respects and Google's primary reason for wanting to marginalize Flash was Google's lack of control over Abode's proprietary product.  With Adobe Flash enabled in the web browsers settings, the publishers (as opposed to Google) were able to control how and when the video content and advertising was delivered to the user.

112.   Google's Chrome Browser initially came with Flash pre-loaded.  But in or around 2014, Google began to roll out changes to Chrome designed to force advertisers to migrate to the Google advertising network, while keeping its users fixated on Google, Google products and Google services.

113.   In September 2014, Google began offering Flash-to-HTML5 conversion tools for the Google Display Network[33] and DoubleClick Campaign Manager that would create a backup HTML5 video advertisement to run when Flash was disabled or otherwise not supported. On January 27, 2015, Google-owned YouTube announced that it would no longer be using Adobe Flash by

---

[33]  The Google Display Network has over 2 million sites and reaches over 90% of people on the Internet, enabling ads to appear across a large collection of Google-preferred websites, mobile apps, and video content. https://support.google.com/google-ads/answer/117120?hl=en

default, but would instead be using its HTML5 video player by default in Google's Chrome and other browsers.  By February 2015, Google started to automatically convert Flash campaigns, both existing and new, to HTML5 but only when the advertiser uploaded their ads through Google's AdWords, AdWords Editor, or third-party tools that work with Google's ad platform.

114.   As a result, advertisers that had creatives supported by Adobe Flash were faced with the Hobson's choice of converting their content to HTML5 or, alternatively, migrating to the Google network to reach target users, the latter of which substantially added to Google's own advertising revenue. Converting to HTML5 was a lengthy and costly process, requiring the transcoding of all files and reaching out to each and every one of an advertiser's 100s or 1000s of vendors who had been issued flash tags to change and convert the affected content.   At the same time, to continue to monetize their websites with advertising revenue, publishers were required to wait until advertisers had either migrated their creatives to Google products and services or had converted the advertising content to HTML5, both of which meant forgoing substantial revenues. Alternatively, the publisher themselves could suspend or sever prior relationships with advertisers and utilize Google's platform to fill their inventory with Google's HTML5-ready creatives.  In this way, Google syphoned off customers from Inform and other competitors and hundreds of online advertisers and publishers withered and died,

while Google and YouTube plundered valuable video advertisements that had
supported publishers' websites.

115.   Also, in June 2015, Google Chrome began to "intelligently pause" ads
that were supported by Adobe Flash.  Specifically, Chrome introduced features
to automatically pause Flash content that wasn't "central to the webpage" while
keeping central content playing without interruption.  For example, the main video
that a user wanted to watch was unaffected while animations on the side, such as
video advertising, were paused.  Google admitted knowing that the feature would
pause a lot of plugin content, including "many Flash ads."  At the time there was
considerable concern that HTML5 was not as versatile for users as Adobe Flash.
According to one commentator:

> The Flash-pause feature can be seen as yet another move by Google
> designed to increase digital dominance under the guise of a user benefit.
> Google wants to maintain web monetization dominance . . . . In the past,
> Google dealt with threats to its dominance by forcing publishers into
> exclusive deals. Now, Google found a more subtle means to the same
> end: developing features to 'protect' users who don't understand how
> the web works. [34]

116.   On August 9, 2016, Google announced that "Chrome will de-
emphasize Flash in favor of HTML5."  On or about August 31, 2016, Google

---

[34] *See* Google's New Flash Pause Tool — Are Video Ads Crippled?
https://www.linkedin.com/pulse/googles-new-flash-pause-tool-video-ads-crippled-
vincent-meyer/

Chrome discontinued the use of Adobe Flash in update 53 of their browser.  While the software could still be enabled through Chrome settings, Google confirmed that, effective the date of end of life for Flash, Google would completely block Flash from being able to run under the Chrome.  Eventually, in 2017, Google changed Chrome's default settings to disable Flash entirely.

117.   Notably, most creatives were built to run on Adobe Flash.  Because the vast majority of users never change the default settings on their web browser (and Google enjoyed dominance if not monopoly power with Chrome), Google's decision effectively meant that a video (and the associated video advertisement) presented in Flash would not be seen by an overwhelming majority of consumers. Instead, users would see a screen similar to the following:





118.   A vast majority of users presented with a screen similar to the above behaved as anticipated, closing and ignoring it – never seeing the video or the associated advertisement.  Google's decision to disable Flash in its Chrome's default settings had the immediate effect of foreclosing a very significant portion of online advertisers from reaching users and target audiences.

119.   The only place this did not occur was if advertisers or publishers migrated to Google's Display Network and uploaded their ads through AdWords, AdWords Editor, or third-party tools that worked with Google's ad platform. Since Google and YouTube had quietly been preparing to disable Flash, content and advertising on the YouTube site were likewise unaffected.  In order to achieve their market domination, Google even offered to convert to HTML5 for free to entice advertisers to migrate to the Google ecosystem.

120.   Google's restrictions on Flash, and the way in which Google and YouTube implemented them, dramatically and anticompetitively impacted

competing online advertising platforms and digital publishers and secured a larger share of the Online Advertising Market and the Online Video Advertising Market for Google.  Competitors like Inform and dozens of digital advertisers and publishers were severely impacted overnight, including many of Inform's downstream digital publishers, sending Inform's business plummeting. Importantly, the advertising market share that had been garnered by competing online advertising platforms, such as Inform, went directly to Google.  That Google was able to impact so many competitors, digital advertisers and publishers virtually overnight simply reinforced Google's dominance and made digital advertisers and publishers all the more vulnerable to Google's illegitimate and anticompetitive conduct, forcing them to kowtow to Google's arbitrary and anticompetitive rules or likewise face corporate death.[35]   Again, the result was that dozens of previously profitable competitors, ad networks, publishers and advertisers were forced into bankruptcy or fire sales, while Google's revenue and market share markedly increased.

---

[35]  "All website owners live in constant fear of Google's algorithm updates. Without explanation or recourse, Google can deliver a fatal blow to a website's search ranking visibility." Submission from Celebrity Net Worth, to H. Comm. on the Judiciary, 10 (Oct. 14, 2019) (on file with Comm.).

121.   Another way in which Google illegally leverages its monopoly power is through its control of the functionality of HTML5 and operability of competitors products, through *inter alia* the Chrome Browser.

122.   The alternative to using Flash to play video content on websites is HTML5.  Adobe Flash was a proprietary technology owned by Adobe, and Google had no control over how it functioned.  However, HTML5 is open source technology.   As such Google has used its monopoly powers to not only set the rules for how HTML5 will function, but to be the self-declared enforcer of how HTML5 operates.  When HTML5 is used to present video content, Google, through Chrome, has significantly more control over how, when, and what videos are played.  For example, Google controls whether a video will autostart and whether a video will play with the sound on or off.  Google even controls the allowable size of the video player to enable compatibility and interoperability with Chrome Browser.

123.   Google also purportedly uses a Google-regulated calculation called media engagement index ("MEI") to determine when and how video and other ads are displayed.  The MEI measures an individual's propensity to consume media on a particular site. Google Chrome calculates a media engagement score which is highest on sites like YouTube where media/video is played on a regular basis. When Google Chrome determines that that the MEI is high enough (a standard set

56

by Google), Google Chrome will allow media playback on autoplay. This enables Google to allow autoplay when it serves Google and to effectively shut down Inform's and other competitors' video players.

124.   Moreover, certain Google-owned or preferred sites such as YouTube are whitelisted, and thus algorithmically exempt from the restrictive Chrome Browser settings. Thus, Google and YouTube allow the autostart feature and sound features to remain unrestricted. Effectively, video advertising on YouTube reaches the Internet user uninterrupted. This favorable treatment by Google and YouTube cannot be overstated – as the very purpose of advertising is to be seen and to be heard by the end user. And, advertisers and brands will necessarily pay to go where they are sure to been seen and heard by prospective customers.[36]

125.   Effectively, through Google's products and services, including their Ad Server and Chrome Browser, Google can manipulate how, when and where ads are placed; how, where and whether they are seen; how, where and whether they are heard; and how efficiently and effectively they are delivered. Moreover, as stated these restrictive rules are altered and/or not in place for the video advertisements that run in front of Google's own YouTube videos. Advertisers,

---

[36]  In the House Antitrust Report, it was noted that certain anticompetitive activity by Google could have a "network effect in reverse." That is, reduction in traffic led to fewer consumers, which led to fewer listings, and less revenue, reduced investment and further decline. Id. at 190. In video advertising, a network effect in reverse means: if it doesn't work customers stop using it.

tracking the efficacy of their ad spend, can tell where their video advertisements are seen.

126.   Additionally, Google has a monopoly in the Ad Server Market with a near 75% market share.  In order to use Google's AdX service, advertisers and publishers are required to use Google's Ad Server, Double Click for Publishers (DFP), which is programed to control how, when, where and to whom paid for advertisements are served.[37]  Coupled with its unparalleled user data, this unfairly advantages Google over Inform and other competitors.

C.   <u>Google Affirmatively Interferes with Competitors Using Data Harvested from Its Leveraged Monopolies</u>

127.   Google has touted that "Our tools and platforms make it easy for advertisers and publishers of all sizes to choose whom they want to work with in this open, interconnected ad system."  In reality, Google collects market intelligence on its competitors and engages in anticompetitive conduct by directly interfering with its competitors' businesses.

128.   By way of example, on or about April 4, 2016, Google contacted one of Inform's customers, sending them a screenshot to give them a "heads up" when

---

[37]  Smaller, competing ad servers have noted, "The ubiquity of Google's ad server provides virtually total control over which ads are shown and monetized for the majority of the Internet. This control of the ad server is strategically critical to Google."  https://www.reuters.com/article/us-tech-antitrust-google-explainer/explainer-advertising-execs-point-to-five-ways-google-stifles-business-idUSKBN1WB2Q1.

Inform's floating video player with that client's advertisement appeared next to content that Google misleadingly characterized as objectionable.  Google obtained information about Inform's customer through Inform's forced use of Google's Ad Server, took this information to Inform's customer and used it in an attempt to convince Inform's customer that Google offered superior services.  Google's malicious conduct caused purposeful interference with Inform, its customers and business relationships.  Inform eventually lost this customer relationship.

129.   On information and belief, this was not an isolated occurrence.  Given the nature and timing of Google's affirmative actions and Google's vast online power, this can hardly be assumed to be an isolated incident.  Google's purposeful trolling of competitors' services and content demonstrates not only specific anticompetitive intent and an unethical effort to wrongly discredit Google's competitors and steal market share, but also a show of Google's market power.

130.   By using market intelligence from its Leveraged Monopolies on competitors and competing online video platforms Google can both directly and surreptitiously interfere with competitors' businesses and contracts and garner additional market share for Google.  Google's "near-perfect market intelligence" has been recognized as enabling Google to covertly set up programs to more closely track its potential and actual competitors.[38]

---

[38]  House Antitrust Report at 15.

D.    Defendants' Anticompetitive Behavior Across Markets

131.   In addition to the anti-competitive practices set forth in ¶¶ 102-130 above, Google has engaged in numerous anticompetitive, illegal and deceptive practices across markets that unfairly disadvantage competitors.

1.   Exclusive Dealing and Anticompetitive Contracts

132.   Google engages in exclusive dealing and anticompetitive contracts that restrict competition.  With respect to Google ad offerings, Google insists on exclusivity by (1) requiring the website owners that use AdSense not to allow search ads from Google's competitors to appear on the website; (2) requiring premium placement of a minimum number of Google search ads; (3) requiring the website owners to allow a minimum number of search ads from Google to be displayed on the most prominent space on their search results pages; (4) prohibiting competing search ads from being placed above or next to Google search ads; and (5) establishing a right to authorize competing ads by requiring the website owners to obtain Google's approval before making any changes to display competing search ads.

133.   Google Ads also imposes obligations that prevent sellers and advertisers from managing search advertising campaigns across Google's AdWords and non-Google advertising services.  These obligations include, but are not limited to, various restrictions in the AdWords API terms and conditions.

## 2.  Illegal Tying and Bundling of Services

134.   Google has engaged in illegal tying or bundling, including technological tying, of Google products and services.  Specifically, Google has bundled and illegally tied the use of Google's DoubleClick Ad Server with the real-time bids from Google's AdX marketplace.

135.   Google and YouTube have also illegally tied the purchase of ads on YouTube, the world's largest video streaming website, with Google's own ad buying tools – including Google Ads, AdSense, AdX and now Google Ad Manager –  which harms competitors by making rival tools for placing ads in video streams less attractive to advertisers who can only access smaller audiences. In this way, Google has leveraged control over YouTube to further foreclose competition by excluding competitors from having access to YouTube.[39]

136.   Google has further consolidated its market power through a series of product mergers, whereby Google bundled two distinct products together and rebranded the bundled products as a single integrated product.  Specifically, in June 2018, Google underwent a major "rebranding" of its ad platform.  Google has now tied its DFP Ad Server with AdX under a single tool, Google Ad Manager, as follows:

---

[39]  House Antitrust Report at 211.

**Google Rebranding Their Advertising Platform.**

Google AdWords
will become
Google Ads



DoubleClick and the Google
Analytics 360 Suite
will become
Google Marketing Platform



DoubleClick for Publishers
and DoubleClick Ad Exchange
are becoming
Google Ad Manager



This rebranding is essentially the express tying of services to further Google

products and services.  By integrating and "rebranding" them into the Google Ad

Manger Google illegally and blatantly ties its stable of advertising services

together and compel use of Google services.

3. Unilateral Setting and Altering of Technological Standards

137.   By virtue of its dominance in the web browser market, Google can

effectively set standards for the industry through changes to Chrome's

functionality creating *de facto* standards (as set forth above). Market participants

must adhere to these standards or risk their technology no longer being compatible

with most websites.[40]

138.   Google also coerces users into using Google services by changing

and/or altering algorithms to exempt Google-owned and Google-preferred

---

[40]  House Antitrust Report at 229.

platforms, products and services from the onerous and arbitrary rules that enable or disable online videos from being viewed and heard by users.

139.   Google also deceptively phased out and/or disabled Adobe Flash in favor of HTML5, while simultaneously coercing the use of Google products and services by providing the antidote to online advertisers who uploaded their ads through AdWords, AdWords Editor, or third-party tools that work with Google's ad platform.

4.   <u>Manipulative and Technological Blocking, Exclusion, Downgrading, and Denial of Interoperability</u>

140.   Google has engaged in manipulative and technological blocking, exclusion and downgrading of competitors products.  Google has used its Ad Server to control how ads end up on websites and smartphone apps, through the Android OS, and has manipulated this control to give preference to Google's own stable of products and services.  Google has also used its Chrome Browser to force publishers and advertisers to comply with a host of arbitrary, unilaterally-imposed rules to allow their online videos to be enabled, viewable and audible on Google's dominant Chrome Browser, while effectively preventing competitor advertisements to be enabled.  The reverse network effect caused when Google products work while others will not, harms Inform and other competitors.

141.   Google likewise inhibits interoperability between Google's ad platforms and non-Google ad platforms.

### 5.  Preferential Treatment of Google Products and Services

142.   In July the *Wall Street Journal* reported that Google gives preferential treatment to Defendant YouTube. Tests conducted by the *Journal* found that searching Google for videos delivered YouTube in results much more prominently than competing video providers, even when competitor videos had more engagement. Reflecting interviews with those familiar with the matter, the piece stated that Google engineers: "[M]ade changes that effectively preference YouTube over other video sources. Google executives in recent years made decisions to prioritize YouTube on the first page of search results, in part to drive traffic to YouTube rather than to competitors, and also to give YouTube more leverage in business deals with content providers seeking traffic for their videos."[41]

143.   Google has likewise engaged in anticompetitive conduct and self-dealing by, *inter alia*, prioritizing its own services and affording its own products and services favorable treatment in its general search algorithms over competitors (as set forth above); and placing undue restrictions on advertisers and their video content.

---

[41]  Sam Schechner, Kristen Grind & John West, *Searching for Video? Google Pushes YouTube Over Rivals*, WALL ST. J. (July 14, 2020), https://www.wsj.com/articles/google-steers-users-to-youtube-over-rivals-11594745232.

144.   Google likewise preferences its own products and services by engaging in a practice that provides Google customers who use Google's AdX with a second opportunity to outbid competing advertisers (who are using non-Google marketplaces) a practice which is known as "last look."  Similarly, through Google's market dominance, Google Ads has engaged in a practice of setting unreasonably high minimum bids targeted only at competing products or services in order to foreclose them from meaningful participation in the Google Ads auction system.  In doing so, Google has foreclosed participation by its competitors, illegally restrained trade, and stifled competition.

145.   Google has usuriously increased the cost of rival online video platforms' use of Google's goods and services, unilaterally terminating contracts with rival online advertising platforms, and/or expressly or constructively refusing to deal and/or do business with competitors.  Additionally, Google has contractually restricted small businesses from advertising on competing search platforms.

146.   Additionally, Google has taken part of the content of competing sites and misappropriated such content by placing it in Google's own search results. When competitors have objected, Google threatens to remove them entirely from Google's search results.[42]  Google's practice of misappropriating third-party

---

[42]  House Antitrust Report at 185-187.

content to bootstrap its own rival search services and to keep users on Google's own webpage has been cited by the House Judiciary Committee as further evidence of its monopoly power and an example of how Google has abused that power.[43]

147.   Moreover, Google is the default search provider on 87% of desktop browsers and the vast majority of mobile devices.  Specifically, Google has used its search dominance to promote the use of its Chrome Browser on laptops, personal computers, and workstations, which sets Google Search as its default.

148.   Google also pays Apple an undisclosed amount, estimated to be $12 billion per year, to secure the search default across iOS devices.  This self-preference favors Google because users tend to stick with the default presented. Moreover, Google takes steps to hamper and dissuade even those users that do attempt to switch search engines on Chrome. Combined, Google's conduct significantly impedes other search providers from reaching users at scale—and further expands and entrenches Google's dominance.[44]

6. Denial of Interoperability and Purposeful Incompatibility

149.   Google also engages in denying interoperability with competitors' products and services and purposefully renders certain of its products and services

---

[43]  House Antitrust Report at 187.
[44]  House Antitrust Report at 178.

incompatible to exclude entry by competitors, raise their costs and/or coerce the use of Google products and services. By way of example, Google made video players incompatible unless they met certain restrictions including as to size of video player.

### 7.  Opacity as To Function, Pricing and Data

150.   Through a culture of secrecy as to pricing and data collection, Google deprives competitors, advertisers and publishers of key market and pricing information and maintaining market opacity, inhibiting their ability to compete.

151.   Additionally, in January 2020, Google announced that it plans to phase out third-party cookies in Chrome, which will likely have the effect of reinforcing Google's power and harming rivals, shifting more advertisers toward Google.  In particular, while Google phases out third-party cookies needed by other digital advertising companies to effectively compete, Google can still rely on data collected throughout its digital ecosystem.

### 8.  Predatory Pricing

152.   Google's ubiquitous practice of offering various free services on one side of the two-sided markets it controls enables the Google Defendants to extract higher prices from the other side.  By way of example, users' "free" Internet search is paid for in billions of dollars of advertising revenue.  The "free" conversion of creatives into HTML5 meant Google could garner more advertisements through its

own revenue generating ecosystem. Likewise, the "free" Android OS puts Google and its products and services in the hands of a vast majority of mobile users world-wide.

153.   While Google touts that AdSense is a "free" service, website owners pay for this "free" service by providing their own websites "real estate," *i.e.*, blank spaces on their websites that Google can then populate with paid for advertising; by enabling Google to trade on their names, good and services; by driving web traffic to the Google platform; and by essentially providing digital client lists to Google for further data mining and monetization.  Additionally, Google takes a piece of the profit paid by the advertiser to the website owner.

154.   These free products and services are in essence predatory pricing and triangular predatory pricing. Only Google's dominance across markets enables these "free" offerings. Other market participants cannot compete.

        9.   <u>Google Leverages Its Monopoly in Android Operating System to Maintain Its Monopoly Power and Attempt to Gain Further Monopoly Power</u>

155.   Google has obtained default placement of both its Google Search and Chrome Browser across the mobile and desktop ecosystem through both integration and contractual arrangements.  Through its ownership and complete control of Android, Google has been able to ensure that Google Search remains

dominant even as mobile replaced desktop as the critical entry point to the
Internet.[45]

156.   Google has required that any smartphone manufacturer seeking to
license Android preinstall Google Search and Google Play Store, alongside a host
of other apps selected by Google. Google has also offered mobile device
manufacturers revenue-share agreements, under which smartphone manufacturers
would receive a cut of the search advertising revenue that Google made from the
use of Google's apps on their devices, as well as a cut of Play Store revenues. In
return, however, manufacturers had to not only carry Google's apps, but also
ensure that Google Search was the default *and* exclusive search app pre-installed
on the manufacturers' devices.[46] Moreover, Google has established Chrome as the
default browser on the majority of Android devices. This further feeds Google's
preestablished rules and parameters for enabled, viewable, and audible online
video advertisements and use of HTML5 and disadvantages Inform and other
competitors.

157.   The illegal ties, restrictive agreements, self-preference and promotion
of Chrome and Google Search through its Android OS, maintains and enhances

---

[45]  House Antitrust Report at 181.
[46]  House Antitrust Report at 213 (referencing documents provided by Google
including the March 2011 Mobile Application Distribution Agreement).

Google's ability to provide preferential placement of its own advertising products and services to the detriment of Inform and other competitors.

## IX.   INTERSTATE TRADE AND COMMERCE

158.   Google's conduct as alleged herein has had a substantial effect on interstate and intrastate commerce. At all material times, Google conduct participated in the conduct set forth herein in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

## X.   ANTITRUST HARM

159.   Defendants' conduct goes far beyond aggressive competition. Defendants' anticompetitive and predatory actions intend to, and in fact do, exclude rivals and harm the competitive process.  The conduct is not competition on the merits or otherwise privileged.  Worse yet, the conduct has been systematically planned and thoroughly executed over many years; it is willful.

160.   Defendants' conduct harms consumers by depriving customers of valid competitive choice, degrading consumer privacy, degrading quality and variety of products and services offered to consumers, stifling innovation and ultimately raising the prices of goods and services in the marketplace.

161.   Defendants' conduct harms competition, by artificially and unlawfully reducing and foreclosing competition, foreclosing competitors from meaningfully participating in purportedly neutral and unbiased competitive processes including

the ad auction and bidding processes, which are in fact skewed and rigged to favor Google and Google products and services; and surreptitiously altering algorithms and compatibilities with competing platforms without sufficient notice to allow them to alter their product to run on the Google platform.

162.   Defendants' conduct adversely affects competition and innovation, including by:

a.   Impairing the incentive of Google's competitors and potential competitors to undertake research and development, because they know that Google will be able to limit the rewards from any resulting innovation;

b.   Impairing the ability of Googles' competitors and potential competitors to obtain financing for research and development;

c.   Inhibiting Google's competitors that nevertheless succeed in developing promising innovations from effectively marketing their improved products to customers;

d.   Reducing the incentive and ability of advertising platforms, web application developers, and other competitors to innovate and differentiate their products in ways that will appeal to customers; and

e.   Reducing competition and the spur to innovation by Google and others that only competition can provide.

163.    The purpose and effect of Defendants' conduct has been, and if not restrained, will be:

a. To preclude competition on the merits between competing online advertising platforms, advertisers, publishers seeking advertising space and websites offering their "real estate" for ad placement;

b. To preclude competition on the merits between Google's search and browser apps and other apps;

c. To preclude potential competition between Google's Android OS and competing operating systems, other companies, and software apps whose use is facilitated by bundled Google products and services, which systems could otherwise choose to offer competing Internet and advertising platforms;

d. To maintain and extend Google's numerous monopolies including Internet Search, Search Advertising, and Ad Server monopolies; and

e. To move toward and attain monopoly power in the Web Browser Market; and

f. To move toward and attain monopoly power in the colossally lucrative Online Advertising and Online Video Advertising Markets.

164.    In light of the synergistic effect that Defendants have acquired from their antitrust activities in the Internet Search Market, the Search Advertising

Market, the Licensable Mobile Device Operating System Market, and the Ad Server Market — all connected by an Internet platform that enables Google to gather and monetize massive consumer and competitor data for its targeted and location-specific advertising (which accounts for about 83% of Alphabet's total revenue), Google's conduct has resulted in real harm to competition, consumers, and innovation.

165.   Google's systematic and predatory conduct across markets threatens to change the trajectory of digital and online competition permanently.  As has been recognized: "because it can be so difficult for courts to restore competition once it has been lost, the true cost of exclusion to consumer welfare — and its benefit to dominant firms — are likely to be understated."[47]

XI.   <u>PRIOR ANTITRUST ENFORCEMENT ACTIONS</u>

166.   For years, Google has been the subject of antitrust investigations and enforcement actions around the world.  From 2011 to 2013, the Federal Trade Commission investigated Google's role in search and advertising markets, culminating in a staff recommendation to file a complaint against Google— although the Commission ultimately decided not to do so. At various points over the last decade, Mississippi, Missouri, and Texas have each separately investigated

---

[47]   Andrew I. Gavil,  *Exclusionary Distribution Strategies by Dominant Firms: Striking a Better Balance*, 72 Antitrust L.J. 3, 33 (2004).

Google for antitrust violations, and, in September 2019, attorneys general from 50

U.S. states and territories announced that they were opening a fresh antitrust

inquiry into the search and advertising giant. The Department of Justice has also

been investigating Google since the summer of 2019, and recent news reports state

that a lawsuit may be imminent. These ongoing U.S. investigations follow multiple

antitrust inquiries worldwide, as well as antitrust-related penalties levied on

Google by the European Commission, France, India, and Russia.[48]

XII.   GOOGLE'S IMPROPER INFLUENCE ON GOVERNMENT

167.   Beginning sometime after its domination of the search and search

advertising markets, Google began to exert its influence on the U.S. government to

maintain and increase its monopoly in those areas as well as others.  Multiple

Google employees and agents went to work in the U.S. government and proceeded

to assist Google in maintaining its monopolies.  For example, Andrew

McLaughlin, Google's head of global public policy, who left Google in 2009 to

join the White House as the deputy chief technology officer, and Michelle Lee, the

deputy general counsel at Google, left Google to become the Commissioner of the

United States Patent and Trademark Office, a position she held from March 2015

until June 2017.

---

[48]  House Antitrust Report at 176.

168.   In late 2012, a senior attorney in the Federal Trade Commission, Robert Mahini, took a position as Google's senior policy counsel.  At or around the same time, Eric Schmidt, the CEO of Google, visited President Obama in the White House in late 2012.  Most importantly, Joshua Wright, a senior counsel at Wilson Sonsini – Google's long-time outside counsel – became the Commissioner of the Federal Trade Commission.

169.   By early 2013, and despite a recommendation from Federal Trade Commission staff that Google's conduct in the online search and search advertising markets harmed consumers and innovation, Obama's Federal Trade Commission resolved an anti-competitive inquiry with a virtual slap on the wrist, avoiding an enforcement action altogether.

170.   Another example of Google's influence on government policy during the Obama administration is the administration's dismissal of the Registrar of Copyrights for the first time in 119 years.  This dismissal occurred shortly after she chastised Google for its attempts to abuse and weaken the U.S. Copyright system.[49]

XIII.  <u>CLAIMS</u>

COUNT I - VIOLATION OF SECTION 1 OF THE SHERMAN ACT
(Unreasonable Restraints on Trade)
Against the Google Defendants

---

[49]  https://www.theregister.co.uk/2016/10/24/murder_in_the_library_of_congress/.

171.   The Defendants' Anticompetitive Restraints, as described in ¶¶ 9 and 102-57 above, have had and are having a substantial anticompetitive effect on interstate commerce.

172.   The Google Defendants jointly have market power in Defendants' Leveraged Monopolies as described in ¶¶ 6-7 and 69-78 above.

173.   The Google Defendants are combinations within the meaning of Section 1 of the Sherman Act.

174.   Individually and in combination, the Defendants' Anticompetitive Restraints constitute illegal restrictions, agreements, and barriers that are intended to and do in fact prevent, restrict or interfere with competition in Defendants' Leveraged Monopolies in violation of the Sherman Act.

175.   Plaintiff has suffered, continues to suffer, and will suffer until the Court enters the relief requested below, an antitrust injury resulting from the Defendants' Anticompetitive Restraints as described herein.  The effects of the Defendants' Anticompetitive Restraints have resulted in significant monetary injury to Plaintiff, as well as in higher prices paid by consumers for retail products, higher prices for advertising, and the forcing of Plaintiff and others to use Google products and services through improper tying.  Plaintiff has no adequate remedy at law.

## COUNT II - VIOLATION OF SHERMAN ACT SECTION 2
### (Monopoly Maintenance)
### Against the Google Defendants

176.   The Google Defendants have monopoly power in the Defendants' Leveraged Monopolies as described in ¶¶ 9 and 102-57 above.  Through the Defendants' Anticompetitive Restraints described in ¶¶ 6-7 and 69-78 above, the Google Defendants have willfully maintained, and unless restrained by the Court, will continue to willfully maintain that power by anticompetitive, illegal, deceptive, and unreasonably exclusionary conduct.  The Google Defendants have acted with the intent illegally to maintain their monopoly power in each of the Defendants' Leveraged Monopolies, and their illegal conduct has enabled them to do so in violation of Section 2 of the Sherman Act.

177.   As a direct and proximate result of the Defendants' Anticompetitive Restraints, competition and consumers will continue to be immediately and irreparably injured through the following:

   a.   Loss and degradation to competition in each of the relevant markets;

   b.   Degradation of the quality of products and services offered to the consumer;

   c.   Degradation of data protection and the privacy rights of consumers; and

   d.   Curtailing and stifling of innovation by would-be competitors.

178.   The Defendants' Anticompetitive Restraints have directly caused significant monetary damages to Plaintiff.  The precise amount of damages Plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

179.   In addition, the Google Defendants' monopolization of the relevant markets are ongoing wrongs that cause incalculable and irreparable injury for which there is no adequate remedy at law.  Unless the Google Defendants are enjoined by appropriate Order of this Court, the asserted harm will continue unabated.

### COUNT III - VIOLATION OF SHERMAN ACT SECTION 2
(Monopoly Leveraging)
Against the Google Defendants

180.   The Google Defendants have monopoly power in each of the Defendants' Leveraged Monopolies, including but not limited to the Internet Search Market, the Search Advertising Market, the Market for Licensable Mobile Operating Systems, and the Ad Server Market, as set forth above in ¶¶ 6-7 and 69-78 above.   Through the anticompetitive conduct described herein, the Google Defendants have leveraged each of these markets in an effort to gain monopoly power and further dominance in the Web Browser Market and the Online Advertising Market and the Online Video Advertising Market.  The Google Defendants have done so willfully, and unless restrained by the Court, will

continue to willfully leverage that power by further anticompetitive, illegal, deceptive, and unreasonably exclusionary conduct (Defendants' Anticompetitive Restraints) as described in ¶¶ 9 and 102-57 above.  The Google Defendants have acted with the intent illegally to maintain and gain monopoly power in each of these markets, and their illegal conduct has enabled them to do so in violation of Section 2 of the Sherman Act as described in ¶¶ 102-105 above.

181.   The Google Defendants have used and leveraged their monopoly power and dominance in Google Search, Search Advertising, Android OS, Chrome Browser, and Google's Ad Server to anticompetitively and illegally disadvantage and harm Inform and other competitors in the Online Advertising and Online Video Advertising Markets.

182.   As a direct and proximate result of Defendants' Anticompetitive Restraints in the Defendants' Leveraged Monopolies, and as set forth in ¶¶ 159-65 above, competition and consumers will continue to be immediately and irreparably injured through the following:

   a.  Loss and degradation to competition in each of the relevant markets;

   b.  Degradation of the quality of products and services offered to the consumer;

   c.  Degradation of data protection and the privacy rights of consumers; and

d.  Curtailing and stifling of innovation by would-be competitors.

183.   The Google Defendants' illegal conduct has directly caused significant monetary damages to Plaintiff.  The precise amount of damages Plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

184.   In addition, the Google Defendants' monopolization of the relevant markets and monopoly leveraging are ongoing wrongs that cause incalculable and irreparable injury for which there is no adequate remedy at law.  Unless the Google Defendants are enjoined by appropriate Order of this Court, the asserted harm will continue unabated.

## COUNT IV - VIOLATION OF SHERMAN ACT SECTION 2
### (Attempted Monopolization)
### Against All Defendants

185.   Defendants have attempted to monopolize multiple markets, including the Web Browser Market, and the Online Advertising Market, and the Online Video Advertising Market.

186.   The Defendants' Anticompetitive Restraints, as described in ¶¶ 9 and 102-57 above, have created a dangerous probability that they will achieve monopoly power in the Web Browser Market, the Online Advertising Market and the Online Video Advertising Market.

187.   Defendants have a specific intent to achieve monopoly power in the Web Browser Market, the Online Advertising Market and the Online Video Advertising Market.

188.   Defendants have the power to exclude competition in the Web Browser Market, the Online Advertising Market, and the Online Video Advertising Market and have used that power, including by way of their unlawful practices in restraint of trade and monopoly leveraging as described in ¶¶ 9 and 102-57  above, in an attempt to monopolize these relevant markets.

189.   Defendants' Anticompetitive Restraints, including their unlawful practices in restraint of trade, are exclusionary with respect to competitors in the markets for Online Advertising, Online Video Advertising and Web Browsers.

190.   Defendants have combined and leveraged their own monopolies in an attempt to monopolize the Web Browser, Online Advertising Markets and Online Video Advertising Market, with the effect being that competition is foreclosed, that innovation is stifled, and that consumer choice is gravely diminished.

191.   There is no business necessity or other pro-competitive justification for Defendants' conduct.

192.   Plaintiff has been injured, and will continue to be injured, in their businesses and property by way of Defendants' conduct, including by way of overpaying for goods and services, being shut out of meaningful and fair

participation in advertising exchange, and being foreclosed from competing in the

Online Advertising and the Online Video Advertising Markets on their merits.

### COUNT V - VIOLATION OF SHERMAN ACT SECTION 2
(Exclusive Dealing)
Against the Google Defendants

193.   As detailed in ¶¶ 6-7 and 69-78 above, the Google Defendants have

monopoly power in Defendants' Leveraged Monopolies, including the power to

control prices and exclude competition.

194.   The Google Defendants have willfully and intentionally entered into

anti-competitive, exclusionary, and unjustified agreements with publishers,

advertisers, original equipment manufacturers, and others creating high barriers to

entry and unreasonably excluding competition in the attendant markets as

described in ¶¶ 126 and 132-57 above.

195.   These exclusive dealing agreements are unreasonably restrictive in

terms of breath duration and market coverage.

196.   This web of exclusive dealing agreements cannot be justified by any

purportedly procompetitive purpose; thus Google's exclusive dealing arrangements

agreements are not only unduly restrictive and unreasonable in length, but also

serve the anti-competitive purpose of cutting competitors off from resources they

need to compete with Google.

197.   This conduct has substantially foreclosed competition in the relevant markets.

198.   These exclusionary agreements violate both Section 2 of the Sherman Act, 15 U.S.C. § 2, because these agreements constitute anti-competitive acts intended to maintain Google's monopoly in the Defendants' Leveraged Monopolies.

199.   As a direct and proximate result of the Google Defendants' anti-competitive and monopolistic conduct, Plaintiff has been damaged in fact.

## COUNT VI - VIOLATION OF CLAYTON ACT SECTION 3
### (Exclusive Dealing and Tying)
### Against the Google Defendants

200.   As detailed in ¶¶ 6-7 and 69-78, the Google Defendants have monopoly power in Defendant's Leveraged Monopolies, including the power to control prices and exclude competition.

201.   Google has willfully and intentionally entered into anti-competitive, exclusionary, and unjustified agreements with publishers, advertisers, original equipment manufacturers, and others creating high barriers to entry and unreasonably excluding competition in the attendant markets as set forth above in ¶¶ 126 and 132-57.

202.   These exclusive dealing agreements and tying of products as described in ¶¶ 126 and 131-36 above are unreasonably restrictive in terms of breath duration and market coverage.

203.   This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose; thus Google's exclusive dealing arrangements agreements are not only unduly restrictive and unreasonable in length, but also serve the anti-competitive purpose of cutting competitors off from resources they need to compete with Google.

204.   This conduct has substantially foreclosed competition in the relevant markets.

205.   These exclusionary agreements violate Section 3 of the Clayton Act, 15 U.S.C. § 14 because these agreements constitute anti-competitive acts intended to maintain Google's monopoly in the Defendants' Leveraged Monopolies.

206.   As a direct and proximate result of the Google Defendants' anti-competitive and monopolistic conduct, Plaintiff has been damaged in fact.

COUNT VII - TORTIOUS INTERFERENCE
Against Defendant Google

207.   Plaintiff has had customer contracts and customer relationships with various advertisers for more than a decade.  These customer contracts and customer relationships are valuable assets of Plaintiff.

208.   Without privilege, and without permission, authorization or even notice, Defendant Google acted improperly and wrongfully by, *inter alia*, approaching Plaintiff's customers with the intent to divert those customers from Plaintiff to Google as described in ¶¶ 127-30 above.  In so doing, Google used information derived from its algorithms, which Plaintiff is forced to use to deliver advertisements, in order to make false or misleading claims to Plaintiff's customers.

209.   Google's actions were done with malice and with the specific intent to injure Plaintiff.  Google's actions have disrupted Plaintiff's customer relationships and future business with such customers.

210.   Google's illegal conduct has directly caused significant monetary damages to Plaintiff.  The precise amount of damages Plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

211.   Google's actions show willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which would raise the presumption of conscious indifference to consequences.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that the Court enter a final judgment against each Defendant as follows:

1. A declaratory judgment finding that the Google Competitive Restraints constitute unreasonable restraints of trade and are illegal under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act;

2. A preliminary, and thereafter permanent, injunction as follows:

   a. prohibiting each Defendant from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out or renew any of the Google Competitive Restraints as alleged herein or any other similar restraint having a similar purpose or effect in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, *et seq*. and Section 3 of the Clayton Act, 15 U.S.C. § 14;

   b. imposing certain affirmative obligations on Google regarding aspects of its corporate governance and corporate mandate, including requiring Google to sell to, or provide interconnection with, rivals in each of the relevant markets in order to lower entry barriers;

   c. requiring that Defendants be legally separated into independent corporations to include, but not be limited to: (1) one separate and independent corporate entity for its flagship Internet search business; (2) one separate and independent corporate entity for its Internet advertising exchanges; (3) one separate and independent corporate entity for its Android mobile operating systems business; (4) one separate and

independent corporate entity for its Ad Server business; and (5) one

separate and independent corporate entity for its Web Browser business;

d.  requiring that a corporate monitor assist in the breakup or allocation of

business activities between and among the resulting entities designed to

maximize competition and benefit to the consuming public *en masse*; that

the monitor be empowered to advise the Court as to further divestment or

reallocation of Google assets or further corporate government changes or

board membership changes;

3.  An award of monetary damages, including treble damages, punitive

damages, the costs of this action and reasonable attorneys' fees pursuant to

Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

4.  An award of pre-judgement and post-judgement interest at the highest legal

rate from and after the date of service of this Complaint to the extent

provided by law; and

5.  An award of such other relief as may be appropriate and as the Court may

deem proper.

<u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues herein.

Respectfully submitted, this 9th day of October, 2020.

HERMAN JONES LLP

/s/ John C. Herman
John C. Herman
   (Ga. Bar No. 348370)
Peter M. Jones
   (Ga. Bar No. 402620)
Carlton R. Jones
   (Ga. Bar No. 940540)
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia  30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501
jherman@hermanjones.com
pjones@hermanjones.com
cjones@hermanjones.com

Serina M. Vash
   (pro hac vice)
HERMAN JONES LLP
153 Central Avenue #131
Westfield, New Jersey  07090
Tel:  (404) 504-6516
Fax:  (404) 504-6501
svash@hermanjones.com

Counsel for Plaintiff
INFORM INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 9, 2020, I electronically filed the above document with the Clerk of Court using CM/ECF which will send electronic notification of such filing to all registered counsel.


By: <u>/s/ *John C. Herman*</u>
    John C. Herman
    (Ga. Bar No. 348370)
    jherman@hermanjones.com