IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

INFORM INC., )
                  Plaintiff, )    CIVIL ACTION FILE
  )
     vs. )    NO. 1:19-cv-05362-JPB
  )
GOOGLE LLC: )
ALPHABET INC., )
YOUTUBE LLC; )
and JOHN DOES 1-100; )
            Defendants. )
_____ )

PLAINTIFF INFORM INC.'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

I.    LEGAL STANDARD FOR MOTION TO DISMISS ....................................3

II.    PLAINTIFF'S FIRST AMENDED COMPLAINT COMPLIES WITH THIS COURT'S SEPTEMBER 25, 2020 ORDER..............................................................4

III.    INFORM HAS STANDING TO BRING THIS ACTION .............................9

    A.    The Article III and Antitrust Injury Standing Requirements ........................9

    B.    Inform Has Suffered Article III Injury and Antitrust Injury......................11

    C.    Inform is an Efficient Enforcer .....................................................................16

IV.    GOOGLE'S MONOPOLY POWER, MONOPOLY LEVERAGING AND ATTEMPTED MONOPOLY (COUNTS II, III AND IV)......................................18

    A.    Defendant Google Has Monopoly Power In The Relevant Markets ..........19

        1.    Inform Has Adequately Set Forth The Relevant Markets .......................19

        2.    Inform Has Adequately Pled Market Power...............................................21

        3.    Inform Has Adequately Pled Both Per Se Violations Of The Antitrust Laws And Anticompetitive Acts That Exclude Competition..........................24

        4.    Defendants' Actions Demonstrate Specific Intent To Monopolize.........27

        5.    Defendants Illegally Leverage Monopoly Power .....................................28

        6.    Inform Has Adequately Pled Harm to Competition .................................29

V.    PLAINTIFF PLAUSIBLY ALLEGES A SECTION 1 VIOLATION............30

    A.    Inform Alleges A Per Se Tying Violation...................................................30

    B.    Inform's FAC Properly Pleads a Section 1 Violation Under the Rule of Reason .......................................................................................................33

        1.    Inform's FAC Plausibly Alleges Concerted Action by Google, Its Former Employees and Third Parties. .......................................................33

        2.    Inform's FAC Plausibly Alleges an Unreasonable Restraint on Competition and Harm in Defendants' Leveraged Markets..........................34

VI.    INFORM HAS PROPERLY PLED A CLAIM FOR EXCLUSIVE DEALING UNDER THE SHERMAN AND CLAYTON ACTS (COUNTS IV AND V)...........................................................................................................34

    A.    Inform's FAC Includes Allegations of Exclusive Dealing by Google .......35

    B.    Inform's FAC Includes Allegations of Substantial Foreclose of Relevant Markets.....................................................................................................38

VII.    DEFENDANTS MALICIOUSLY AND TORTIOUSLY INTERFERED WITH INFORM (COUNT VII)..............................................................................39

VIII.   CONCLUSION ..............................................................................40

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Adinolfe v. United Techs. Corp.*, 768 F.3d 1161 (11th Cir. 2014) ............................4

*Amin v. Mercedes-Benz USA*, LLC, 349 F. Supp. 3d 1338 (N.D. Ga. 2018)............8

*Andrx Pharms., Inc. v. Elan Corp.*, *PLC*, 421 F.3d 1227 (11th Cir. 2005)...............4

*Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019) ........................................... 4, 9, 10, 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .....................................................................3

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985) .............25

*Associated Gen. Contractors of California, Inc. v. California State Council of
    Carpenters*, 459 U.S. 519 (1983).............................................................. 9, 10, 11

*Austin v. Blue Cross & Blue Shield of Ala.,*903 F.2d 1385 (11th Cir. 1990) ... 14, 15

*Bailey v. Allgas, Inc*., 284 F.3d 1237 (11th Cir.2002).............................................22

*Beckwith v. Bellsouth Telecommunications Inc.*, 146 F. App'x 368 (11th Cir. 2005)
    ............................................................................................................................8

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ....................................10

*Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340 (N.D. Ga.
    2012) .................................................................................................................33

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ..........................................21

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477 (1977).............. 11, 15

*Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc*., 101 F. Supp. 3d 1319 (N.D.
    Ga. 2015)......................................................................................... 20, 21, 22, 29

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)................................7

*Covad Communications Co. v. BellSouth Corp.*, 374 F.3d 1044 (11th Cir. 2004) 12,
    28, 29

*Diverse Power, Inc. v. City of LaGrange, Georgia*, No. 3:17-CV-3-TCB, 2018 WL 9651475 (N.D. Ga. Feb. 21, 2018) ......................................................30

*Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248 (11th Cir. 2015) .......................................................................... 19, 22, 25

*E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n*, 357 F.3d 1 (1st Cir. 2004) ...............................................................................................37

*Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86 (2d Cir. 2019)....................11

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451 (1992)..................24

*Feldman v. American Dawn, Inc*. 849 F.3d 1333 (11th Cir. 2017).........................10

*FieldTurf USA Inc., et al. v. TenCate Thiolon Middle East, LLC*, No. 4:11-CV-50-TWT, 2011 WL 13234177 (N.D. Ga. Dec. 20, 2011)........................................39

*Gen. Cigar Holdings, Inc. v. Altadis*, *S.A.*, 205 F. Supp. 2d 1335 (S.D. Fla. 2002) ...............................................................................................23

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961 (11th Cir. 2006) .......................................................................... 14, 15, 29

*Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc*., 818 F.2d 1530 (11th Cir. 1987) ...............................................................................................33

*Ill. Tool Works Inc. v. Indep. Ink, Inc*., 547 U.S. 28 (2006) ...................................30

*In re Aluminum Warehousing Antitrust Litig*., 833 F.3d 151 (2d Cir. 2016) ..........13

*In re Dealer Mgmt. Sys. Antitrust Litig*., No. 18-CV-864, 2018 WL 6629250 (N.D. Ill. Oct. 22, 2018) .................................................................... 25, 26

*International Salt Co. v. United States*, 332 U.S. 392 (1947) .................................30

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020) ...........................10

*Johnson v. Univ. Health Services, Inc.,* 161 F.3d 1334 (11th Cir. 1998)................14

*Key Enters. of Del., Inc. v. Venice Hosp*., 919 F.2d 1550 (11th Cir.1990) .............28

*Kyle K. v. Chapman*, 208 F.3d 940 (11th Cir. 2000)..................................................8

*Lemley v. Red Bull N. Am., Inc.*, No. 4:17-CV-33, 2017 WL 2126595 (S.D. Ga. May 16, 2017) ..................................................................................................6

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir. 2017) ........................................................................................................7

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) .....................................19

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ......................................................9

*Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001)....................................8

*McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487 (11th Cir. 1988) .............27

*McWane, Inc. v. F.T.C.*, 783 F.3d 814 (11th Cir. 2015)....................... 21, 22, 24, 35

*Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705 (11th Cir. 1984) ....32

*Monge v. Madison Cnty. Record, Inc.*, 802 F. Supp.2d 1327 (N.D. Ga. 2011) ......40

*Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004).. 18, 25

*Omni Healthcare, Inc. v. Health First, Inc.*, No. 6:13-CV-1509-ORL, 2015 WL 275806 (M.D. Fla. Jan. 22, 2015)............................................................... passim

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291 (11th Cir. 2010) ................................................................................................... passim

*Parkhurst v. Hiring 4 U, Inc.*, No. 219CV863FTM38NRM, 2020 WL 5797709 (M.D. Fla. Sept. 29, 2020) ..................................................................................6

*Polypore Int'l, Inc. v. F.T.C.*, 686 F.3d 1208 (11th Cir. 2012)................................19

*Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376 (11th Cir. 1997) ........................................................................................................29

*Robles v. Humana Hosp. Cartersville*, 785 F. Supp. 989 (N.D. Ga. 1992)............15

*RxStrategies, Inc. v. CVS Pharmacy, Inc.*, No. 8:18-CV-1087-T-30TGW, 2019 WL 7584729 (M.D. Fla. December 4, 2019)............................................................23

*Schor v. Abbot Laboratories*, 457 F.3d 608 (7th Cir. 2006)....................................28

*Servicetrends, Inc. v. Siemes Med Sys*., 870 F. Supp. 1042 (N.D. Ga. 1994) . 22, 27, 37

*Smith v. United States*, 873 F.3d 1348 (11th Cir. 2017) ...........................................3

*Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447 (1993) ............................... 23, 28

*State of Colorado, et al. v. Google LLC*, 1:20-cv-03715 (D.D.C.) (December 17, 2020) ...........................................................................................................1

*State of Texas, et al. v. Google LLC*, 20-cv-957 (E.D.Tex.) (December 16, 2020) ..1

*T. Harris Young & Assocs., Inc. v. Marquette Elecs.,* 931 F.2d 816 (11th Cir. 1991) ...............................................................................................................19

*Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407 (11th Cir. 1987) ................................................................................................. 30, 31

*Times–Picayune Pub. Co. v. United States,* 345 U.S. 594 (1953)...........................27

*Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir. 1991)............... 14, 15

*Tribeca Homes, LLC v. Marathon Inv. Corp.*, 745 S.E.2d 806 (Ga. Ct. App. 2013) ...............................................................................................................40

*Tri-State Broad. Co. v. United Press Int'l, Inc.,* 369 F.2d 268 (5th Cir. 1966).......37

*U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,* 7 F.3d 986 (11th Cir. 1993).. 19, 22, 24

*U.S. v. Google LLC*, 20-cv-3010 (D.D.C.) (October 20, 2020)...........................1, 36

*United States v. Columbia Steel Co*., 334 U.S. 495 (1948) ....................................27

*United States v. Grinnell Corp.*, 384 U.S. 563  (1966).................................... 18, 22

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).......... 21, 23, 25, 38

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ...................................................................................... 12, 28

*Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015) .....5, 8

*Wilding v. DNC Servs. Corp.*, 941 F.3d 1116 (11th Cir. 2019) .................................9

**Statutes**

15 U.S.C. § 2 .................................................................................................18

15 U.S.C.A. § 1 ............................................................................................30

Since plaintiff Inform Inc. ("Inform") was effectively put out of business by Defendants and forced to file this case in November 2019, the U.S. House of Representatives filed a report labeling Google a monopolist and detailing significant anticompetitive conduct[1]; the U. S. Department of Justice (DOJ), together with 11 state Attorneys General, filed an enforcement action against Google for monopolizing the general search, search advertising and search text advertising markets[2]; 10 state Attorneys General filed another enforcement action for Google's monopolizing and attempting to monopolize several components of the digital advertising industry[3]; and 38 state Attorneys General filed yet another action against Google for monopolizing the general search, search advertising, and search text advertising markets.[4]   Still, Defendants insist they do not have fair notice of what this case is about.

The gravamen of an antitrust case is a company wielding monopoly power and engaging in anticompetitive acts to maintain and enforce that monopoly.  Defendants have yet to deny Inform's fundamental allegations on these points.  Instead, Defendants

---

[1] "Google increasingly functions as an ecosystem of interlocking monopolies." Investigation of Competition in Digital Markets, U.S House of Representatives, Majority Staff Report and Recommendations, Subcommittee on Antitrust, Commercial and Administrative Law, Committee on the Judiciary, October 5, 2020 (hereinafter "House Antitrust Report") at 15.
[2] *U.S. v. Google LLC*, 20-cv-3010 (D.D.C.) (October 20, 2020).
[3] *State of Texas, et al. v. Google LLC*, 20-cv-957 (E.D.Tex.) (December 16, 2020).
[4] *State of Colorado, et al. v. Google LLC*, 1:20-cv-03715 (D.D.C.) (December 17, 2020).

present a Goldilocks argument – that the First Amended Complaint ("FAC") is simultaneously too detailed and not detailed enough.  These arguments lack merit.

As set forth in the FAC, Defendants have amassed dominant market power in multiple markets through a series of inorganic strategic acquisitions, and a well-executed campaign of anticompetitive contracts and anticompetitive tactics designed to thwart competition on the merits. FAC ¶ 9.  Ignoring the substantial reworking of the complaint to comply with this Court's Order, Defendants claim the FAC is again a shotgun pleading.  But they are plainly wrong.  After complaining that FAC contains too many allegations, Defendants then claim the FAC does not contain specific allegations as to the various markets.  The FAC clearly states claims under §2 of the Sherman Act for unlawful monopoly/monopoly maintenance and attempted monopoly and monopoly leveraging (Counts II, III, IV), providing specific allegations as to how Defendants have willfully acquired and maintained monopoly power and dominated the relevant antitrust markets. These allegations that must be accepted as true at this juncture.  The FAC also supports stand-alone claims for unreasonable restraint of trade under Sherman Act §1 (Count I); per se violations of both the Sherman Act and Clayton Acts for exclusive dealing (Counts V and VI); and Tortious Interference with Business Advantage (Count VII).  Indeed, many of the same factual allegations and claims appear in the enforcement actions now pending.

Defendants repeat their previous claim that Inform, a direct competitor to Google in providing a platform of services to online publishers, content creators and online advertisers, has no standing.  In pushing this claim, Defendants completely ignore the fact that Defendants have caused Inform to lose hundreds of millions of dollars.  Inform clearly has standing and is well suited to bring this action, seeking to restore competition on the merits in the online advertising, online video advertising and related markets. For the reasons set forth below, the Defendants' motion should be denied.

## I.    LEGAL STANDARD FOR MOTION TO DISMISS

To survive a motion to dismiss under F.R.C.P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).  "In assessing the sufficiency of a claim, we accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor." *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017).

In plain violation of Eleventh Circuit law, Defendants seek to recast Inform's claims in the light most favorable to the Defendants and superimpose pleading standards that are not supported by the law.  As set forth in detail below, Defendants' repeatedly and inappropriately wade into factual arguments on the merits of the case, attempt to persuade the Court to draw inferences in their favor, and ignore inconvenient factual allegations.  Such tactics have been repeatedly rejected. *Apple Inc. v. Pepper*, 139 S.

Ct. 1514, 1519 (2019); *Adinolfe v. United Techs. Corp*., 768 F.3d 1161, 1168 (11th Cir. 2014) ("The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial").

Moreover, Google's dominance in these digital markets and the products and services at issue here, give rise to the fact-intensive issues of defining the relevant markets, antitrust standing, and market power, which are uniquely unsuited for dismissal at this early stage of litigation.  Indeed, "antitrust cases are 'fact-intensive,' and require appropriate market analysis, and therefore are typically inappropriate for a Rule 12 dismissal." *Andrx Pharms., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1236 (11th Cir. 2005) (internal citations omitted).  Relying on summary judgment cases, cases post-trial and cases decided after substantial discovery, Google invites legal error by ignoring the appropriate standard.

## II.   PLAINTIFF'S FIRST AMENDED COMPLAINT COMPLIES WITH THIS COURT'S SEPTEMBER 25, 2020 ORDER

In its September 25, 2020, the Court dismissed the initial Complaint as an improper shotgun pleading and directed Inform to file an amended complaint. In compliance with this Court's Order, the FAC significantly pares down background information; clarifies and supports the anticompetitive conduct alleged; connects the allegations of the FAC to particular causes of action; and addresses the Court's instructions in good faith.  Inform has complied in good faith as follows:

Instruction No. 1: At its core, this case is about Google's willful acquisition and maintenance of monopoly power, attempted monopoly and monopoly leveraging to amass and hoard online advertising profits.  Facts that the Court may have seen as conclusory, vague or immaterial were removed from the FAC.  Inform did not simply excise certain allegations, but rather substantially reworked the complaint, removed numerous allegations, clarified market allegations and included specific facts from investigative findings that recognize and detail Defendants' anticompetitive conduct.[5]

Instruction No. 2: The FAC does not incorporate every factual paragraph into each count and does not incorporate the allegations of *predecessor counts*.[6]  Rather, each count sets forth particular paragraphs relevant to each specific count.

Instruction No. 3: As is clear on the face of the FAC, Inform expressly set forth which of the factual paragraphs support each individual count.  Contrary to Defendants' arguments, facts alleged in connection with one count, defense, or paragraph may be

---

[5] The description of the search engine (or internet search) is one of the markets pled and describes the contours of that market, which Defendants claim Inform failed to specifically plead. The allegations concerning acquisitions are not only relevant to establishing Defendants' monopolies in fact but also, *inter alia*, establish market power and demonstrate specific intent to monopolize. Allegations concerning influence on the government (both the FTC and the USPTO) likewise demonstrate specific intent to monopolize and concerted conduct.

[6] Importantly, the Eleventh Circuit has recognized that the flaw in this "type" of shotgun pleading is not in incorporating preceding *factual* allegations, but rather in incorporating the allegations of "predecessor *counts*."  *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1324 (11th Cir. 2015).  In accordance with this Court's instruction, Inform has remedied this.

incorporated by reference in a different count, defense, or paragraph of the same pleading. *Lemley v. Red Bull N. Am., Inc.*, No. 4:17-CV-33, 2017 WL 2126595, at *1 (S.D. Ga. May 16, 2017).  Indeed, when a plaintiff "asserts several claims for relief or defenses that rest on a common factual pattern, incorporation by reference eliminates any unnecessary repetition of the transactions and events upon which the pleader relies." *Id.*  Moreover, realleging factual allegations in each count is appropriate where, as here, the counts are based on a common set of facts. *Parkhurst v. Hiring 4 U, Inc.*, No. 219CV863FTM38NRM, 2020 WL 5797709, at *2 (M.D. Fla. Sept. 29, 2020).

Instruction No. 4: Inform has pled allegations concerning the claim for tortious interference as against Google LLC only.  The FAC ¶ 17 also asserts that Defendants (Alphabet, Google and YouTube) operate as a single entity:

> Collectively, the Google Defendants are operated and controlled as a single entity, with Sundar Pichai acting as the CEO of both companies. Not only did Google essentially create Alphabet as a holding company in 2015, but virtually all of Alphabet's revenues come from Google. YouTube, in turn, is a wholly owned subsidiary of Google and is controlled and operated as such. Alphabet filed its 10-K and 10-Q statements with the Securities and Exchange Commission, reporting consolidated revenues for all of the Google Defendants. In fact, these statements expressly define Alphabet as 'Alphabet Inc. and its subsidiaries.'

The FAC pleads that all three companies are operated and controlled as a single entity under centralized control and that each of the parent companies closely controls and dictates the policies of its subsidiary. FAC ¶¶13-17, 51-53. Alphabet is traded on the NASDAQ under the symbol "*GOOGL*" (FAC ¶15), defines itself as "Alphabet Inc. and

its subsidiaries" in SEC filings (FAC ¶17), and purposefully reports consolidated revenues for all of the Google Defendants.  FAC ¶17.  Defendants, represented by the same counsel, have filed a single motion to dismiss with a single set of arguments and jointly assert that "[a] parent corporation and its subsidiary are incapable of engaging in the concerted activity required for a violation of section 1 of the Sherman Act" (Def. Br. at 15), underscoring Inform's appropriate treatment that Defendants are operated as a single entity.

Inform has pled facts that entitle it to pursue its claims for monopolization, monopoly maintenance, attempted monopoly and monopoly leveraging against Defendants as a single entity for antitrust purposes[7] and "to prove the elements of those claims based on the collective conduct attributable to the enterprise as a whole." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1246 (10th Cir. 2017). Inform also alleges that its Section 1 claims adequately assert claims of tying, and that Defendants' colluded with other companies, former executives and lawyers.  Where, as here, the complaint can be fairly read to aver that all defendants are responsible for the alleged conduct, the fact that defendants are accused collectively does not render the

---

[7] "Any anticompetitive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies . . . [are] fully subject to § 2 of the Sherman Act." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 777 (1984).

complaint deficient. *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000).[8]

Instruction No. 5: Each individual count is based on a single legal claim.

Under Eleventh Circuit law, where the complaint "give[s] the defendants adequate notice of the claims against them and the grounds upon which each claim rests" sufficiently that they can discern a plaintiff's claims and frame a responsive pleading, a district court must not dismiss under Rule 8(a). *Weiland*, 792 F.3d at 1323 (district court abused its discretion in dismissing plaintiff's complaint); *see also Amin v. Mercedes-Benz USA*, LLC, 349 F. Supp. 3d 1338, 1351 (N.D. Ga. 2018) (defendants' own filings in support of their Rule 12(b) motion reveal that they understand nature of claims against them).[9]  Defendants' request that the FAC be dismissed with prejudice "is a drastic sanction," which may be imposed only when failure to comply with a court order is a result of willfulness or bad faith. *Beckwith v. Bellsouth Telecommunications Inc.*, 146 F. App'x 368, 372 (11th Cir. 2005).  Inform respectfully submits that it has addressed the Court's concerns in good faith and has remedied the issues.

---

[8] The cases cited by Defendant involve *individual* defendants and/or unrelated entities, pointing out that "geographic and temporal realities make plain that all of the defendants could not have participated" in the conduct as alleged. *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).

[9] Defendants did not move for a more definite statement under Rule 12(e), but rather put forth arguments under Rule 12(b), belying the assertion that they could not frame a responsive pleading. *See Amin*, 349 F. Supp. 3d at 1351.

## III.   INFORM HAS STANDING TO BRING THIS ACTION

Holding that the Sherman Act "broadly affords injured parties a right to sue under the antitrust laws," the Supreme Court recently found that iPhone purchasers had standing to sue Apple for monopolization claims in connection with the iPhone app market. *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019); *see also Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("[h]arm to the antitrust plaintiff is sufficient to satisfy the Constitutional standing requirement of injury in fact."). In so holding, the Supreme Court stated, "At this early pleadings stage of the litigation, we do not assess the merits of the plaintiffs' antitrust claims against Apple, nor do we consider any other defenses Apple may have." *Apple Inc.* at 1519. Failing to even cite the *Apple Inc.* precedent, Defendants ask the Court to violate this very principle by arguing defenses to, and the weighing of evidence supporting, Inform's standing.

### A.   The Article III and Antirust Injury Standing Requirements

Article III standing requires: (1) injury in fact that is concrete, particularized, and actual or imminent; (2) causal connection between the injury and the conduct complained of; and (3) likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).[10]

---

[10] "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, . . . we 'presum[e] that general allegations embrace

A plaintiff must also have antitrust standing to bring an antitrust action. *Associated Gen.*, 459 U.S. at 529, 534-35, 535 n.31.   As the Supreme Court has recognized: "[t]he statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472 (1982) (citation omitted).   Indeed, as the Supreme Court recently confirmed, the Sherman Act "broadly affords injured parties the right to sue under the antitrust laws." *Apple Inc.*, 139 S. Ct. at 1522.   No rule excludes a class of market participants; rather, antitrust standing is a case-specific inquiry. *Associated Gen.*, 459 U.S. at 536 ("[T]he infinite variety of claims . . . make it virtually impossible to announce a black-letter rule that will dictate the result in every case.").   Even *non-market participants* have antitrust standing where the injury is "inextricably intertwined" with the injury defendant seeks to inflict on the market. *See McCready*, 457 U.S. at 484; *Feldman v. American Dawn, Inc.* 849 F.3d 1333, 1341 (11th Cir. 2017).   Moreover, "There is no rule in antitrust law

---

those specific facts that are necessary to support the claim.'" *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1124 (11th Cir. 2019), *cert. denied*, 140 S. Ct. 2828 (2020) (citation omitted). As to causation, "plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, *and not the result of the independent action of some third party not before the court*.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (emphasis supplied).

that defendants who undertake [anticompetitive conduct] can be liable to victims in only one market, much less that they can be liable only in the market that is the first locus of restraint, regardless of the identity of the market that motivated the restraint." *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 96 (2d Cir. 2019).

With respect to Section 4 of the Clayton Act, the Eleventh Circuit employs a two-prong test: (1) a plaintiff must have alleged an antitrust injury, and (2) the plaintiff must be an efficient enforcer of the antitrust laws. *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) ("[a]ntitrust injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. *The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.* It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause.") (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977).

As set forth below, Inform plainly meets both prongs of the antitrust standing. Meeting the antitrust standing requirement establishes Article III standing as well. *Associated Gen.*, 459 U.S. at 535 n.31.

### B.   Inform Has Suffered Article III Injury and Antitrust Injury

This case is unique in that every aspect of the digital advertising chain is controlled almost exclusively by Defendants. If a user starts with an Android or

iPhone,[11] opens the Chrome browser,[12] does a Google search[13] and then views the advertisements served, each step in this process is virtually controlled by Defendants. As set forth in the FAC, Defendants have – or nearly have – a monopoly in each of these markets.  FAC ¶¶ 69-77.  The FAC details how Inform's products and services run on the digital ecosystem controlled by Defendants.  Inform competes with Google in the Online Advertising Market and Online Video Advertising Markets; is a direct customer of Google in the Ad Server Market; and, along with its customers, is forced to participate in the Google ecosystem through Google's monopolies in Internet Search, Chrome Browser, and Android OS and its exclusive agreement with Apple. FAC ¶¶ 2, 5-7, 12, 19, 84-86, 97-101, 108, 148. Because Google provides the infrastructure without which there is no Online Advertising or Online Video Advertising Markets (*i.e.*, the platform and the gatekeeper), "the particular structure and circumstances of the industry at issue"[14] force Inform to rely on Google's monopolies, both to technologically function as an online advertising business and to reach potential users. *See Covad Communications Co. v. BellSouth Corp.*, 374 F.3d 1044, 1049 (11th Cir. 2004) (plaintiff as "both customer and competitor").

---

[11] Collectively, 99.37% of the market for *all* mobile devices. *See* Ex. A.
[12] *See* Ex. B
[13] *See* Ex. C.
[14] "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004).

Here, Inform's antitrust standing (and hence Article III standing) is plainly alleged in the FAC.   Inform seeks recovery for injuries it sustained in the Online Advertising and Online Video Advertising Markets.[15]   Effectively putting Inform (and other online advertising competitors) out of business and wiping out competition on the merits "was the precisely intended consequence" of Defendants' anticompetitive conduct (FAC ¶¶ 4-10, 159-64). *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 159 (2d Cir. 2016); *see, e.g., Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 273 (D. Conn. 2003) (denying motion to dismiss antitrust matter where the harm alleged was the harm intended).[16]   Notably, a defendant's conduct may directly restrain more than one market and antitrust injury is suffered by participants in each restrained market or markets.   *See, e.g., Aluminum Warehousing*, 833 F.3d at 161; *infra* FN 24.

As antitrust laws were enacted to protect competition, an antitrust injury must

---

[15] Defendants recast the allegations of the FAC to make the false argument that Inform seeks to recover in markets in which it is not a direct competitor, like search.  But this is not true. Rather, evidence of Defendants' anticompetitive acts and monopoly leveraging are relevant to the harm caused to Inform in the Online Advertising and Online Video Advertising Markets.

[16] Defendants ignore detailed allegations and ask the Court to engage in an evidence-based assessment of one of its purported defenses. As recently confirmed by the Supreme Court in *Apple Inc.*, this is inappropriate at this stage of the case. It also ignores allegations that Defendants technologically cut off competitors while algorithmically exempting its own products and services (including YouTube and its YouTube player) from the very restrictions used to kill competitors. (FAC ¶¶9, 109, 119, 124, 138).

"result from interference with the freedom to compete," *Johnson v. Univ. Health Services, Inc.,* 161 F.3d 1334, 1338 (11th Cir. 1998), and plaintiff's action must further the public "goal of increased competition."[17] *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1450 (11th Cir. 1991); *Palmyra*, 604 F.3d at 1299. The antitrust injury requirement ensures that the plaintiff, although motivated by private interests, is seeking to vindicate the type of injury to the public that the antitrust laws were designed to prevent. *Austin v. Blue Cross & Blue Shield of Ala.*,903 F.2d 1385, 1389-90 (11th Cir. 1990).[18]

Inform also expressly pleads direct financial harm[19] caused by Defendants' anticompetitive conduct that excluded Inform and other competitors from the relevant markets. Inform's case against Google "is about suppression of potential competition by a monopolist—the very essence of anti-competitive conduct." *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 969 (11th Cir. 2006) (Cudahy, Circuit Judge, concurring in part and, perhaps, dissenting in part).

Defendants cite cases that unremarkably stand for the proposition that there is no antitrust injury when the alleged conduct *increases competition*. But Defendants cannot

---

[17] Plaintiff and the public need not suffer the same injury: "the two injuries can differ as long as they 'coincide.'" *Omni Healthcare, Inc. v. Health First, Inc.*, No. 6:13-CV-1509-ORL, 2015 WL 275806, at *8 (M.D. Fla. Jan. 22, 2015).
[18] Here, that includes competition on the merits with other platforms, consumer choice among competing alternatives, and providing the impetus for innovation. (FAC ¶¶ 10, 160-164).
[19] *See, e.g.*, FAC ¶¶ 2, 9-10, 96, 159, 163, 175, 178, 192, 199, 206, 210.

rewrite the facts as alleged in the FAC – that Defendants' have eviscerated competition in the Online Advertising and Online Video Advertising Markets by and through the anticompetitive conduct alleged across markets.  FAC ¶¶2, 7-10.  Unlike the cases cited by Google, this is not a case in which Google's actions have *promoted* competition[20]; or in which Inform seeks to share in Google's ill-gotten monopoly profits[21]; or in which Inform is a "disappointed competitor . . . forced to provide services elsewhere."[22] Rather, the FAC details numerous violations of the antitrust laws and articulates that Defendants' anticompetitive actions excluded Inform and other competitors from the relevant markets, effectively putting Inform out of business and wiping out competition on the merits. FAC ¶¶ 2, 7-10, 159-65.  This is precisely the type of injury the antitrust laws were enacted to prevent.  *See Gulf States*, 466 F.3d at 967 ("We conclude that the injury to the Group—its exclusion from the relevant market—is inseparable from the alleged harm to competition.").

---

[20]  *See Brunswick Corp.*, 429 U.S. 477, 488 (no antitrust standing to pursue "the loss of *windfall profits*" that might have resulted if not for defendant's *pro-competitive* conduct); *Austin*, 903 F.2d at 1391 (finding that "the agreements actually promote competition").

[21]  *See, e.g., Todorov*, 921 F.2d at 1454 (doctor has no antitrust standing because "[t]he antitrust laws were not enacted to permit one person to profit from the anticompetitive behavior of another person").

[22]  *Robles v. Humana Hosp. Cartersville*, 785 F. Supp. 989, 999 (N.D. Ga. 1992) ("plaintiff['s] claims rest . . . merely on the fact that [he] is a disappointed competitor who will now be forced to provide [obstetric] services elsewhere").

### C.     **Inform is an Efficient Enforcer**

Inform is also an efficient enforcer and a proper plaintiff to bring this action.

There is no bright-line rule for determining whether a plaintiff is an efficient enforcer;

rather, courts must weigh several factors, including:

> the directness or indirectness of the injury, the remoteness of the injury, whether
> other potential plaintiffs [are] better suited to vindicate the harm, whether the
> damages [are] highly speculative, the extent to which the apportionment of
> damages [would be] highly complex and would risk duplicative recoveries, and
> whether the plaintiff would be able to efficiently and effectively enforce the
> judgment.

*Palmyra,* 604 F.3d at 1299.  These factors are nonexclusive[23] and "often intertwined,"

and "no single factor will necessarily predominate over the others." *Id.*  "[T]here is no

'customer or competitor' requirement to being an efficient enforcer," and a plaintiff can

indeed be an "efficient enforcer[] of the antitrust laws in all of the [overlapping]

relevant markets."  *Omni Healthcare,* 2015 WL 275806, at *9.

That Inform is an efficient enforcer of the antitrust laws is clear on the face of the

FAC.  Like Google, Inform operates across markets, either as a competitor or as a

consumer, customer, or user of Google's stable of products and services.  *See supra* at

III.B.  While Inform had considerable financial success with digital ads, the FAC plainly

---

[23]   Other factors the Court can consider in finding Inform an efficient enforcer are the
secrecy and complexity with which Google purposefully operates, that fear has been
identified as a reason plaintiffs so often forgo action against Google, and the FTC's
failure to bring this case in the face of internal findings that Google violated antitrust
laws, as set forth in the Complaint.  *See Palmyra*, 604 F.3d at 1306.

alleges that Defendants' anticompetitive behavior effectively put it out of business. (FAC ¶ 2). This financial loss, which is neither speculative nor remote, makes Inform particularly well-suited to enforce this case. [24]  As the Eleventh Circuit held in *Palmyra Park Hosp.,* Palmyra suffered an antitrust injury when Phoebe leveraged its monopoly power to force insurers to exclude Palmyra from their provider networks.  604 F.3d at 1296.  The Eleventh Circuit held that, as a result of defendant's actions, "there [was] less competition[,] ... higher prices and fewer choices for consumers," which "is precisely the type of harm that we allow plaintiffs to vindicate through the antitrust laws." *Id.* at 1303.

Additionally, Inform is also seeking a structural remedy to restore competition on the merits.  "When antitrust plaintiffs seek dissolution of an anticompetitive scheme rather than inclusion in it, their interests coincide with those of the consuming public." *Omni Healthcare,* 2015 WL 275806, at *8.

Finally, as a single plaintiff, Inform can efficiently and effectively enforce a

---

[24]   Google's argument that Inform's injury is indirect is unavailing.  Even where there are several steps in causal chain, plaintiff's injury is not remote. *See Palmyra*, 604 F.3d at 1304. Inform alleges that Defendants directly impaired its ability to compete in online advertising, resulting in damages that are discrete, calculable, and directly caused by Google's anticompetitive conduct.  Moreover, while Defendants' conduct has certainly harmed competition (and thus other competitors, market participants, and consumers) there is no issue of apportionment of damages or duplicative recoveries.  *See Palmyra,* at 1306. The Supreme Court makes this clear. *Apple Inc.*, 139 S. Ct. at 1525 ("Apple's alleged anticompetitive conduct may leave Apple subject to multiple suits by different plaintiffs. . . . Multiple suits are not atypical.").

judgment, facing "none of the logistical difficulties or diluted incentives that would . . .hinder a class representative seeking to enforce a judgment in favor of a class." *Palmyra*, 604 F.3d at 1306.  For these reasons, Inform plainly has Article III standing, has suffered antitrust injury and is an efficient enforcer to bring this case.

## IV.    GOOGLE'S MONOPOLY POWER, MONOPOLY LEVERAGING AND ATTEMPTED MONOPOLY (COUNTS II, III AND IV)

Section 2 of the Sherman Act makes it illegal to acquire or maintain monopoly power through improper means, or attempt or conspire to do so. 15 U.S.C. § 2.[25] "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293–94 (11th Cir. 2004). "The first element, monopoly power, is the power to control prices in or to exclude competition from the relevant market." *Id.* at 1294. "The second element requires predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market." *Id.*

To show attempted monopoly under Section 2, a plaintiff "must plausibly assert: (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a

---

[25] The pleading requirements for the Section 2 offenses are treated together here.

specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1263 (11th Cir. 2015). Moreover, a company "already enjoying a substantial monopoly in its area, violates the 'attempt to monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition." *Lorain Journal Co. v. United States*, 342 U.S. 143, 154 (1951).

### A.   Defendant Google Has Monopoly Power In The Relevant Markets

Google unquestionably enjoys monopoly power across multiple markets—that is the "power to raise prices to supra-competitive levels or . . . *power to exclude competition* in the relevant market either by restricting entry of new competitors or *by driving existing competitors out of the market*." *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,* 7 F.3d 986, 994 (11th Cir. 1993) (emphasis added). The analysis of Google's monopoly power involves two steps: defining the relevant markets and establishing Google's market power in those markets. *Id.*

### 1.   Inform Has Adequately Set Forth The Relevant Markets

"The relevant market is defined by both a product and a geographic dimension." *T. Harris Young & Assocs., Inc. v. Marquette Elecs.,* 931 F.2d 816, 823 (11th Cir. 1991). The parameters of the markets are a deeply-fact intensive issue,[26]

---

[26] Defining the relevant product markets is a deeply fact intensive question, which considers: "industry or public recognition . . . as a separate economic entity, the

satisfied at the pleading stage where the complaint sets forth "enough information . . . to plausibly suggest the contours of the relevant geographic and product markets." *Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc*., 101 F. Supp. 3d 1319, 1335–36 (N.D. Ga. 2015). The FAC defines both the products and the geographic dimensions of each relevant antitrust market in this case.[27]

Demonstrating how they interrelate and interlock, the FAC sets forth the contours of each product market *up front*, framed by how the markets evolved, how the products were developed, how they function, and how they work together to establish Defendants' dominance and market power. For each of the product markets, the FAC defines and describes the product[28] and competitors within the markets (FAC ¶¶ 69-71); explains that there are no reasonable alternatives to the various products (supported by the history, description and function of each product) (FAC ¶¶ 75-76); sets forth specific barriers to entry (FAC ¶ 77); and sets forth Google's *industry-recognized* comparative market share (FAC ¶¶ 69-71). The FAC lays out component markets of Online

---

product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Polypore Int'l, Inc. v. F.T.C.*, 686 F.3d 1208, 1217 (11th Cir. 2012).

[27] Many of the antitrust markets in the FAC have been recognized by the U.S. House of Representatives, the FTC, the DOJ, Attorneys General and numerous foreign enforcement agencies, as well as previously recognized by courts and regulatory agencies, including specific findings of abuse of monopoly power by Google.

[28] Internet Search (FAC ¶¶ 5, 28-32, and 35-39); Search Advertising (FAC ¶¶ 29, 37-40); Licensable Mobile Device Operating Systems (FAC ¶¶ 54-57); Ad Server Market (FAC ¶¶ 24-27); Web Browser (FAC ¶ 58); Online Advertising  (FAC ¶¶ 22-27, 47); and Online Video Advertising (FAC ¶¶ 47-48, 87-89).

Advertising Market, how they function, why they are distinct and the importance of various products to distinct customers. (FAC ¶76). The geographic contours of the markets are both the United States and world-wide (FAC ¶72) to "both correspond to the commercial realities of the industry and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37 (1962).

The FAC plainly sets forth enough information to plausibly suggest the contours of the relevant geographic and product markets. *Cobb Theatres III,* 101 F. Supp. 3d at 1335–36. Defendants' argument to the contrary is not credible.[29]

## 2.     **Inform Has Adequately Pled Market Power**

Monopoly power may be shown either through circumstantial or direct evidence, including whether the defendant behaves like a monopolist.  *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001); *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 830 (11th Cir. 2015). Where there is direct evidence that Defendants have controlled prices or excluded competition, the existence of monopoly power is clear.  *See Microsoft Corp.*, 253 F.3d at 51.  Indeed, Defendants' behavior "may well be sufficient to show the existence of monopoly power." *Microsoft Corp.,* 253 F.3d at 57. Inform has pled such exclusion.

Absent direct evidence, the "existence of [monopoly] power ordinarily may be

---

[29] For the first time, Defendants' raise contours, cross-elasticity and barriers to entry as issues. Because these issues were not previously raised, they are waived.

inferred from the predominant share of the market," which acts as a proxy for monopoly power.[30] *Grinnell,* 384 U.S. at 571. As the Eleventh Circuit has stated: "evidence of a seller's market share may provide the most convenient circumstantial measure of monopoly power." *McWane*, 783 F.3d at 830 (citations omitted). While market share is the predominant factor for determining market power, other factors may be considered to amplify market power. *McWane*, 783 F.3d at 830; *U.S. Anchor Mfg.,* 7 F.3d at 994. Additionally, a high market share (as Defendants enjoy in the Internet Search, Search Advertising, LMDOS, Web Browser and Ad Server Markets) coupled with sufficient barriers to market entry has resulted in a *finding* of market power in this Circuit and is thus more than adequate at the pleading stage. *Bailey v. Allgas, Inc*., 284 F.3d 1237, 1250 (11th Cir.2002); *accord Cobb Theatres III,* 101 F. Supp. 3d at 1340.

Regarding attempted monopolization, a plaintiff need only allege that the defendant is close to achieving monopoly power in the relevant market. While "'[a] dangerous probability of achieving monopoly power *may* be established by a 50% share' of the relevant market,"[31] *Duty Free Ams.*, 797 F.3d at 1264, a lesser share is

---

[30] Citing the *summary judgment* decision in *Servicetrends, Inc. v. Siemes Med Sys*., 870 F. Supp. 1042, 1052 (N.D. Ga. 1994), Defendants ignore that: "The existence of monopoly power can be inferred from a firm's dominant share of the market" which "is a question of fact." They likewise ignore two-thirds of *the same footnote* which acknowledges that 50% and 70% may constitute a monopoly, as might 16% with "compelling structural evidence." *Id*. at 1052, n.4.

[31] Defendants' reliance on *U.S. Anchor Mfg*., 7 F.3d at 1000 (Def. Br. at 23-24) is misplaced and their reading of the law has been rejected. *U.S. Anchor Mfg.* involved a predatory pricing scheme where defendant's market share *dropped* precipitously from

sufficient where direct evidence of a defendant's behavior makes monopolization clear or where other factors amplify defendant's market power. *See*, *e.g.*, *RxStrategies, Inc. v. CVS Pharmacy, Inc.*, No. 8:18-CV-1087-T-30TGW, 2019 WL 7584729, at *2 (M.D. Fla. December 4, 2019) (denying dismissal where other factors combined to amplify market power of defendant CVS with 30% market share); *Omni Healthcare*, 2016 WL 4272164, at *16 (where defendant had 27% market share, no per se requirement that a defendant possess 50% market share). "[W]hether a dangerous probability of success exists is a particularly fact-intensive inquiry," and a court needs be "mindful that [this]. . . is a question of proximity and degree." *Microsoft Corp.*, 253 F.3d at 80 (citations omitted); *see generally Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 457 (1993) (to determine dangerous probability of monopolization courts consider *defendant's ability to lessen or destroy competition in market*).

The FAC demonstrates that Defendants have either achieved or are dangerously close to achieving monopoly power in all of the relevant markets, supported by circumstantial evidence of Defendants' overwhelming market share.  FAC ¶¶ 69-70. In

---

60% to 30% after plaintiff entered the market, and plaintiff's share of the market *exceeded* defendant's share when the alleged predatory pricing began.  Under these narrow circumstances, the court found there had not been a dangerous probability of success *in that case*.  *Id.* at 994-95; *accord Omni Healthcare*, 2016 WL 4272164, at *16; *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1351 (S.D. Fla.), *aff'd sub nom. Gen. Cigar Holdings v. Altadis, S.A.*, 54 F. App'x 492 (11th Cir. 2002) ("consistent with *U.S. Anchor*, if a plaintiff is to sustain an attempted monopolization claim with an allegation of less than 50% market share, he must also allege other reasons that make a monopoly 'dangerously probable'").

the Online Advertising Market and submarkets, the FAC pleads factors that amplify Defendants' probability of achieving monopoly power, if it has not already been attained.[32] FAC ¶¶ 74, 77. In addition, the FAC sets forth conduct that demonstrates direct evidence of Defendants' behavior as a monopolist — including in the Online Advertising Market and Online Video Advertising Market—behavior that *in fact* drove Inform and other competitors out of the markets.[33] The FAC adequately alleges direct and circumstantial evidence of Defendants' market power in the relevant markets. The law requires nothing more.

### 3.   Inform Has Adequately Pled Both Per Se Violations Of The Antitrust Laws And Anticompetitive Acts That Exclude Competition

Predatory and anti-competitive conduct is "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 482–83 (1992) (quotation omitted). Anti-competitive conduct is behavior that tends to impair the opportunities

---

[32] Defendants' market share in the Online Advertising Market is amplified by: (1) the structure of the industry itself; (2) barriers to entry; (3) products and services at issue, which technologically blocked competition; (4) minimal strength and capacity of competitors, given Google's control of the digital ecosystem; (5) the interplay of Google's monopolies; (6) Google's substantial relevant patents; (6) Google's ability to offer services for free to users; (7) the ability to maintain opacity and secrecy as to pricing and data collected; and (9) harvesting and use of user and competitor data. *McWane*, 783 F.3d at 830; *U.S. Anchor Mfg.,* 7 F.3d at 994

[33] Defendants' ability to dictate terms and restrict competitors across these related markets is unprecedented. They have thwarted competition on the merits and *have excluded* Inform and other competitors from the markets. FAC ¶¶ 9-10, 153, 163.

of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 605 (1985)*; accord In re Dealer Mgmt. Sys. Antitrust Litig*., No. 18-CV-864, 2018 WL 6629250, at *8 (N.D. Ill. Oct. 22, 2018). For a practice to be exclusionary, "it must harm the competitive process and thereby harm consumers." *Morris Commc'ns Corp.,* 364 F.3d at 1294 (citing *Microsoft Corp.,* 253 F.3d at 58). The anticompetitive conduct requirement is satisfied by alleging a "factual connection between the alleged harmful conduct and its impact [or likely impact] on competition in the market." *Duty Free Ams.,* 797 F.3d at 1263.

As in *U.S. v. Microsoft*, Inform alleges that Defendants "violated § 2 by engaging in a variety of exclusionary acts . . . to maintain its monopoly by preventing the effective distribution and use of products that might threaten its monopoly" (253 F.3d at 58) and in an attempt to gain monopoly power in the Online Advertising Market and Online Video Advertising Market. The FAC details Defendants' inorganic strategic acquisitions, anticompetitive contracts and anticompetitive activities, all of which are designed to thwart competition on the merits. (FAC ¶¶ 60-68, 108-157, 166-70). The FAC squarely places at issue both Defendants' predatory rise to monopoly power and the anticompetitive and predatory practices Defendants' employed to gain, maintain and leverage monopoly power, all with the goal of hoarding online advertising profits (FAC ¶¶7-10). The FAC lays out the type of anticompetitive conduct alleged (much in the

way the District Court did in the case against Microsoft) (FAC ¶ 9), supported by the factual allegations of Defendants' conduct. (FAC ¶¶ 60-68, 108-157, 166-70). This includes the allegations relevant to Section 1, because a defendant also violates Section 2 of the Sherman Act if it "has acquired or maintained his strategic position, or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under [Section] 1.'" *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6629250, at *8. Inform has adequately plead anticompetitive conduct.

Defendants' response is to improperly argue the merits of the case, stating that this Court cannot "impose liability" on "supposedly" anticompetitive conduct, and citing to cases rendered after directed verdicts, trial and summary judgement. Defendants boldly argue that their conduct "did not exclude or harm competition" (Def. Br. at 25); that their designs had a "valid business purpose" (*id.* at 27) "improv[ed] user experience" and "protected users"[34] *(id.);* and that the "market chose" to take certain actions (*id.* at 11). Defendants variously argue that although their conduct "increased costs" and caused "lost profits," it impacted existing products rather than future products, were not the right kind of losses, or the losses could have been averted if

---

[34]Defendants' arguments are not credible.  Inform does not plead that Defendants "protected users;" Inform pleads that Defendants manipulated Chrome to shut down competitors, while protecting *Google* and *YouTube*. FAC ¶¶ 9, 109, 124, 138-39, 140-42. Moreover, Defendants' manipulative, self-preferencing, predatory and exclusionary acts are not the "essence of competition"; they are the "essence" of Sherman Act violations. Defendants' can assert their purported defenses at trial.

everyone migrated to Google's profit machine.  These arguments are simply not proper at this stage. Defendants' anticompetitive behavior, detailed in the FAC, must be accepted as true and inferences thereon must be construed in light most favorable to Inform.

      **4.**     **<u>Defendants' Actions Demonstrate Specific Intent To Monopolize</u>**

The intent element requires an intent to "destroy competition or build monopoly." *Times–Picayune Pub. Co. v. United States,* 345 U.S. 594, 626 (1953). Anticompetitive intent may be *inferred* from allegations of defendant's predatory conduct itself, "essentially reducing the analysis to two elements." *Servicetrends,* 870 F. Supp. at 1053–54 (citations omitted); *see also McGahee v. Northern Propane Gas Co*., 858 F.2d 1487, 1503–04 (11th Cir. 1988) (predatory conduct may support an inference of intent to monopolize).  The FAC sets forth Google's specific intent to monopolize, evidenced by *inter alia*: (1) anticompetitive conduct cited above; (2) "long history of acquisitions" (*United States v. Columbia Steel Co*., 334 U.S. 495, 532 (1948)); (3) placement of Google executives into the USPTO and the FTC; (4) harvesting/use of competitors' data; (5) Google's actual interference with competitors; (6) purposeful consolidation of revenues to hide market power; and (7) culture of

secrecy in pricing of products and use of data.[35]

### 5.   Defendants Illegally Leverage Monopoly Power

Inform properly pleads violations of Section 2 by alleging that Defendants have leveraged monopoly power in the relevant antitrust markets both to maintain its numerous monopolies, as well as in an attempt to gain monopoly power in related markets through anticompetitive conduct.[36]   (FAC¶104).  Inform's Section 2 claims are well-supported in the law.  In *Verizon Communications v. Trinko,* 540 U.S. at 415, 415 n.4, the Supreme Court recognized the monopoly leveraging theory under Section 2.[37] *See also Covad Commc'ns Co. v. BellSouth Corp.*, 374 F.3d 1044, 1047, 1047 n.4 (11th Cir. 2004) (citing *Trinko* and applying it to each and every category of antitrust activity alleged by plaintiff).   Moreover the 11th Circuit and district courts herein have

---

[35] The secrecy with which Defendants operate cannot be overstated, especially, given the Goldilocks argument that the FAC is both too detailed and not detailed enough. After subpoenas and substantial hearings by the House Antitrust Subcommittee, the DOJ and two sets of Attorneys General have filed three comprehensive complaints detailing *the very anticompetitive conduct* competitor Inform complains of herein. We look forward to getting these documents in discovery.

[36] Unlike the cases cited by Google, Inform's monopoly leveraging claim alleges numerous forms of anticompetitive conduct. FAC ¶¶ 9, 108-157.  *Cf. Schor v. Abbot Laboratories*, 457 F.3d 608, 610 (7th Cir. 2006)( "Schor's complaint does not allege any of the normal exclusionary practices—tie-in sales (or another form of bundling), group boycotts, exclusive dealing and selective refusal to deal, or predatory pricing.").

[37] Citing to treatment of Section 2 in *Spectrum Sports, Inc,* 506 U.S. 447, 459 (1993), the *Trinko* Court noted that, in an attempt case, monopoly leveraging requires a dangerous probability of success in monopolizing a second market explaining that "leveraging presupposes anticompetitive conduct." 540 U.S. at 415, 415 n.4.

recognized this theory of liability under Section 2 both before and after *Trinko*.[38]

### 6.   **Inform Has Adequately Pled Harm to Competition**

Similarly, Google's "harm to competition" argument must fail. In addition to alleging economic harm in fact and exclusion of competitors (including Inform) from the markets (FAC ¶¶ 159, 161-64), the FAC alleges harm to competition by Defendants' harvesting and malicious use of competitors proprietary data; syphoning off of customers and users; increase costs in distribution of products; abuse of its gatekeeping function and increase cost of market access; exclusionary disablement – that is causing competitors' products not to function properly; and reverse network effects when Google's products work while competitors' products are unlawfully shut down by Google.  *See*, *e.g.*, FAC ¶¶ 122-24, 127, 140-42. *See Gulf States*, 466 F.3d at 967 ("injury to the Group—its exclusion from the relevant market—is inseparable from the alleged harm to competition.") Antitrust harm is presumed for a *per se* violation of antitrust law.  *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc*., 105 F.3d 1376, 1381 (11th Cir. 1997) (with per se violations, "deleterious effect on market will be presumed and no detailed market analysis is required.").

---

[38] Monopoly leveraging can violate Section 2: "[W]hen a party with monopoly power abuses its monopoly power in one market as a means of gaining an unlawful competitive advantage in and monopolizing another market, we have no hesitation to conclude that the Sherman Act prohibits such conduct." *Key Enters. of Del., Inc. v. Venice Hosp*., 919 F.2d 1550, 1568 (11th Cir.1990), *vacated as moot by* 9 F.3d 893 (11th Cir.1993); *see also Covad Commc'ns Co.*, 374 F.3d at 1047; *Cobb Theatres III*, 101 F. Supp. 3d at 1335–36; *Omni Healthcare* 2016 WL 4272164, at *13.

Because the FAC adequately alleges monopoly, monopoly maintenance, and attempted monopoly, including monopoly leveraging, Google's motion to dismiss Counts II, III, and IV fails.

## V.   PLAINTIFF PLAUSIBLY ALLEGES A SECTION 1 VIOLATION

### A.   <u>Inform Alleges A Per Se Tying Violation</u>

Google's motion to dismiss Inform's Section 1 claim should be denied because Inform has properly pled a per se tying violation.[39]  The United States Supreme Court and the Eleventh Circuit have long recognized that a tying arrangement is a per se violation under Section 1.[40]   *See International Salt Co. v. United States*, 332 U.S. 392, 396 (1947); *Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407, 1414 (11th Cir. 1987), *holding modified by Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991); *see also Diverse Power, Inc. v. City of LaGrange, Georgia*, No. 3:17-CV-3-TCB, 2018 WL 9651475, at *5-6 (N.D. Ga. Feb. 21, 2018), *aff'd*, 934 F.3d 1270 (11th Cir. 2019).

To plead an unlawful tying arrangement, a plaintiff must allege facts demonstrating that: (1) there are two separate products, a "tying" product and a "tied"

---

[39] Section 1 provides, in pertinent part, "[e]very contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1.

[40] *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34-38 (2006) (noting that tying cases have been brought under "four different rules of law," including Sections 1 and 2 of the Sherman Act).

product; (2) those products are in fact "tied" together—that is, the buyer was forced to buy the tied product to get the tying product; (3) the seller possesses sufficient economic power in the tying product market to coerce buyer acceptance of the tied product; and (4) involvement of a "not insubstantial" amount of interstate commerce in the market of the tied product. *Tic-X-Press, Inc.*, 815 F.2d at 1414 (citing *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486 (11th Cir. 1985)).

Inform's FAC plausibly alleges that Google has illegally tied its stable of advertising services in several ways. First, "Google has bundled and illegally tied the use of Google's DoubleClick Ad Server with the real-time bids from Google's AdX marketplace." FAC ¶¶ 126, 134, 136. The FAC alleges that:

- Google's DoubleClick Ad Server and AdX marketplace are different products that, until recently, were offered by Google separately. (FAC ¶ 136);
- In June 2018, Google tied the DoubleClick Ad Server and the AdX marketplace by selling them exclusively under the name Google Ad Manager. (FAC ¶ 136);
- Google has sufficient market power in the tied product, the DoubleClick Ad Server, to coerce a buyer into acceptance of the "tying product," the AdX marketplace. (FAC ¶ 126 (alleging Google had 75% market share in the Ad Server Market)); and
- Google's anticompetitive practices, including its tying of products, has resulted in significant harm to the relevant markets. [41] FAC ¶¶ 158-65; *see also infra* V.A.6.

The FAC also alleges that "Google and YouTube have also illegally tied the purchase of ads on YouTube, the world's largest video streaming website, with Google's own ad buying tools – including Google Ads, AdSense, AdX and now Google

---

[41] Given that Google reaps over $135 billion in advertising revenues annually, it is inconceivable the interstate commerce requirement is not met.

Ad Manager – which harms competitors by making rival tools for placing ads in video streams less attractive to advertisers who can only access smaller audiences." FAC ¶ 135. And the FAC includes allegations regarding Youtube's significant market power. FAC ¶¶ 51-53.

Google wishfully ignores Inform's allegations or asks the Court to ignore them as "vague." Def. Br. at 21-22. For example, Google argues that Plaintiff has not "pled that Google has market power in any purported Ad Server 'market.'" Def. Br. 21-22. But Inform clearly alleges that "as early as 2016, Google had approximately 75% market share in the Ad Server Market." FAC ¶ 69; *see also* FAC ¶ 126.

Google also presents unsupported legal arguments. For example, Google argues that "[b]undling two products for sale is not *per se* unlawful." Def. Br. 21. But *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705 (11th Cir. 1984) (per curiam), the case relied upon by Google for that proposition, does not involve the bundling of two products. There, the Eleventh Circuit determined that a tie is a per se violation of antitrust law "if the seller has sufficient economic power with respect to the tying product to restrain free competition in the market for the tied product and if a not insubstantial amount of interstate commerce is affected" and "the seller of the tying product has a financial interest in the source of the tied product." *Id.* at 711-12. Both conditions are met here. Because the FAC contains sufficient allegations to plead a per se tying violation under Section 1, Google's motion to dismiss Count I should be denied.

**B.**     **Inform's FAC Properly Pleads a Section 1 Violation Under the Rule of Reason**

Even if the Court determines that Inform has not pled a per se tying violation, the Court should still deny Google's motion to dismiss Count 1.  To state a claim under Section 1, a plaintiff need only "plead sufficient facts to plausibly show that Defendants (1) engaged in concerted action that (2) unreasonably restrained competition."  *Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340, 1356 (N.D. Ga. 2012) (citing *Jacobs v. Tempur–Pedic Int'l, Inc.*, 626 F.3d 1327, 1332–33 (11th Cir. 2010)).

**1.**     **Inform's FAC Plausibly Alleges Concerted Action by Google, Its Former Employees and Third Parties.**

Inform has adequately alleged concerted action by Google, third parties and its former executives to restrain trade.  "[A]t the motion to dismiss stage, 'Plaintiffs need not allege the existence of collusive communications in "smoke-filled rooms" in order to state a § 1 Sherman Act claim.'" *Bolinger*, 838 F. Supp. 2d at 1375 (citation omitted). The factual allegations need only be sufficient to plausibly establish "a conscious commitment to a common scheme to achieve an unlawful objective."  *Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1535 (11th Cir. 1987) (quotations omitted).

Here, Inform's allegations are not limited to an assertion "that Defendants entered into agreements among themselves." Google Br. at 15. The FAC contains sufficient facts to plausibly infer that Google engaged in concerted action with a number of its

former executives and lawyers who were installed into key government positions, including Michelle Lee, Joshua Wright, and Andrew McLaughlin (FAC ¶¶ 167-70) and with other Google-preferred companies and sites whitelisted by Google (such as Apple and Facebook[42]).  FAC ¶¶ 124, 138, 148.  Coupled with Google's gobbling up of patent portfolios, both to use and to neutralize (FAC ¶¶ 9, 60, 65), Google's improper action has been adequately pled.

### 2. <u>Inform's FAC Plausibly Alleges an Unreasonable Restraint on Competition and Harm in Defendants' Leveraged Markets</u>

Google's "relevant market" arguments, again factual questions, must fail because they mischaracterize Inform's FAC.  Inform's FAC adequately alleges an unreasonable restraint on competition in the relevant markets and alleged harm in those markets as set forth in Section IV.A above.  Inform has pled sufficient facts to plausibly show that Google (1) engaged in concerted action that (2) unreasonably restrained competition in Defendants' Leveraged Markets, including the Online Advertising Market.  Rule 8(a) requires nothing more.

## VI.   INFORM HAS PROPERLY PLED A CLAIM FOR EXCLUSIVE DEALING UNDER THE SHERMAN AND CLAYTON ACTS (COUNTS IV AND V)

Inform's FAC properly pleads a claim for exclusive dealing in violation of both

---

[42] Google's unlawful agreement with Facebook (which protected its monopoly power) is cited by the attorneys general in the Texas case.  *See supra* at I.

the Sherman Act and the Clayton Act.  To assert an exclusive dealing claim, a plaintiff

must plead: (1) exclusive agreements (2) that substantially foreclose competition (3) in

a relevant market. *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 827, 835-36 (11th Cir. 2015).

### A.   <u>Inform's FAC Includes Allegations of Exclusive Dealing by Google</u>

Google does not dispute that Inform's FAC contains numerous allegations

regarding exclusive dealing.  Def. Br. at 36.  For example, Inform alleges as follows:

- Google engages in exclusive dealing and anticompetitive contracts that restrict
competition. With respect to Google ad offerings, Google insists on exclusivity by
(1) requiring the website owners that use AdSense not to allow search ads from
Google's competitors to appear on the website; (2) requiring premium placement of
a minimum number of Google search ads; (3) requiring the website owners to allow
a minimum number of search ads from Google to be displayed on the most
prominent space on their search results pages; (4) prohibiting competing search ads
from being placed above or next to Google search ads; and (5) establishing a right
to authorize competing ads by requiring the website owners to obtain Google's
approval before making any changes to display competing search ads.  FAC ¶ 132.

- Google Ads also imposes obligations that prevent sellers and advertisers from
managing search advertising campaigns across Google's AdWords and non-Google
advertising services. These obligations include, but are not limited to, various
restrictions in the AdWords API terms and conditions.  FAC ¶ 133.

- Google also pays Apple an undisclosed amount, estimated to be $12 billion per year,
to secure the search default across iOS devices.  FAC ¶ 148.

- Google has required that any smartphone manufacturer seeking to license Android
preinstall Google Search and Google Play Store, alongside a host of other apps
selected by Google. Google has also offered mobile device manufacturers revenue-
share agreements, under which smartphone manufacturers would receive a cut of the
search advertising revenue that Google made from the use of Google's apps on their
devices, as well as a cut of Play Store revenues. In return, however, manufacturers
had to not only carry Google's apps, but also ensure that Google Search was the

default and exclusive search app pre-installed on the manufacturers' devices.  FAC ¶ 156.

The FAC also describes how Google effectively forced advertisers and publishers into using Google's ad platform. FAC ¶¶ 98, 112, 120, 134-39.   This requirement of exclusive use of Google's ad platform further cemented Google's online dominance.[43]

FAC ¶¶ 132-33.

On October 20, 2020, the U.S. Department of Justice filed an antitrust action against Google citing some of the same anticompetitive acts set forth by Inform.  *See generally United States v. Google LLC*, Case No. 1:20-cv-0310 (D.D.C. October 20, 2020).  By way of example only, the Department of Justice alleges:

> For years, Google has entered into exclusionary agreements, including tying agreements, and engaged in anticompetitive conduct to lock up distribution channels and block rivals. Google pays billions of dollars each year to distributors—including popular-device manufacturers such as Apple, LG, Motorola, and Samsung; major U.S. wireless carriers such as AT&T, T-Mobile, and Verizon; and browser developers such as Mozilla, Opera, and UCWeb— to secure default status for its general search engine and, in many cases, to specifically prohibit Google's counterparties from dealing with Google's competitors. Some of these agreements also require distributors to take a bundle of Google apps, including its search apps, and feature them on devices in prime positions where consumers are most likely to start their internet searches.[44]

Two sets of Attorneys General have since filed suits.

---

[43] Similarly, allegations concerning Google's exclusive agreements with advertisers and publishers regarding advertising requirements and platforms are supported by the findings of the EU Commission.  FAC ¶¶ 11, 56, 73, 166.

[44]  *Id.* at ¶ 4.

Unable to dispute the existence of exclusive dealing allegations, Google argues that Inform fails to substantiate its claims with "details" and fails to show how the agreements are "exclusive." These arguments lack merit.[45] Google's argument that Inform's allegations lack sufficient detail is based on a false legal premise. *Servicetrends, Inc. v. Siemens Medical Systems, Inc.*, 870 F. Supp. 1042 (N.D. Ga. 1994) does not establish a pleading standard for an exclusive dealing claim. There, the court granted a motion for summary judgment because it found no factual basis to support plaintiff's claim. *Servicetrends* does not apply here.[46]

Similarly, Google's argument that Inform "fails to describe how such agreements could be viewed as 'exclusive'" is specious. Notably, Google only addresses this argument to one type of agreement (agreements between Google and OEMs). And, in doing so, Google conveniently ignores that, even when the user is free to download

---

[45] In a footnote, Google argues that Inform's "Clayton Act claim fails because Section 3 applies only to tangible commodities." Def. Br. at 35, FN 13. This argument is likewise baseless. The 50-year-old Fifth Circuit case cited by Google holds that information provided by a news service does not constitute a sale of a commodity under § 2(a). *See generally Tri-State Broad. Co. v. United Press Int'l, Inc.,* 369 F.2d 268 (5th Cir. 1966). Google's ad services, consisting of networks and servers, as well as discreet software components installed on physical phones and computers, are a far cry from the mere sale of "information" at the heart of *Tri-State Broad.*

[46] Similarly, in *E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n*, 357 F.3d 1 (1st Cir. 2004), the court determined it was obvious from the allegations in the complaint that the conduct at issue only applied to a small portion of a much larger market. Contrary to Google's representation, *E. Food Servs.* does not establish a standard that certain "details" must be included to properly allege a claim of exclusive dealing.

other applications, the other applications must be approved by Google for Android OS and be installed through Google's Play Store, reinforcing Google's role as gatekeeper to a market in which it is also a competitor. *See Microsoft Corp.*, 253 F.3d at 60, 70, 73. For these reasons, Google applications coming preloaded and set as default is ubiquitous and has resulted in billions of dollars in fines for Google's anticompetitive behavior.

### B.   Inform's FAC Includes Allegations of Substantial Foreclose of Relevant Markets

Finally, Inform directly alleges substantial foreclosure of the relevant markets due to Google's exclusive dealings.[47] As set forth above, Inform properly defines the antitrust markets, Google's dominance in those markets and the substantial foreclosure of those markets. While Google attempts to distill the issue down to whether users can download and install other applications, the FAC clearly alleges that Google's tying of its applications (including its search app and Chrome browser) to its Android OS

---

[47] For example: (1) forcing advertisers and publishers to use Google's ad network in order to maintain business after Google's changes to its Chrome browser following Adobe Flash changes that Google exempted itself from (FAC ¶¶ 114, 119); (2) setting unreasonably high minimum bids targeted only at competing products or services in order to foreclose them from meaningful participation in the Google Ads auction system and thus several advertising markets (FAC ¶¶ 45, 143-44); (3) Google's tying of its preinstalled browser and other apps to its Android OS forecloses competitors from the Search Advertising and Web Browser markets (FAC ¶¶ 58, 155-57); and (4) driving smaller competitors in the Online Advertising market, such as Inform, out of any business independent of Google, by its agreements tying its various products and services together. FAC ¶¶ 2, 134-36, 175.

substantially foreclose competition in the Internet Search, Search Advertising, Web Browser, and Online Advertising Markets. Even a passing glance at the FAC makes it clear that the foreclosure is not solely related to consumer application usage, nor just those markets. Given Google's size, interrelated monopolies and distinct lack of competition in each of the identified markets, Inform has properly pled that Google's exclusive dealings have substantially foreclosed competition in these markets.

## VII.   DEFENDANTS MALICIOUSLY AND TORTIOUSLY INTERFERED WITH INFORM (COUNT VII)

Inform's FAC plausibly alleges each element required to state a claim of tortious interference.[48] The FAC describes how, due to Google's monopoly, it is forced to be a customer of Google, use Google's Ad Server and maintaining compatibility with Google's ever-shifting Chrome browser. FAC ¶¶ 98, 126.  In its role, Google has access to information on Inform's customers in addition to the trove of market intelligence data from its ubiquitous Ad Server and other monopolies.  FAC ¶¶ 98, 127, 130, 164.  Using this information, Google improperly and without privilege contacted Inform's customer and intentionally and maliciously making false and misleading claims to induce that customer to end its business relationship with Inform.  FAC ¶¶ 127-28, 208-09. Inform's

---

[48] Specifically, that Google (1) acted improperly and without privilege, (2) acted purposely and with malice with the intent to injure, (3) induced a customer to cease a business relationship with Inform, and (4) that Inform suffered financial injury. *See FieldTurf USA Inc., et al. v. TenCate Thiolon Middle East, LLC*, No. 4:11-CV-50-TWT, 2011 WL 13234177, at *4 (N.D. Ga. Dec. 20, 2011).

customer contracts and relationships are "valuable assets," wrongfully disrupted by Google, and Inform lost the customer which Google improperly contacted as a result. FAC ¶¶ 127-29.  This directly caused significant monetary damages.  FAC ¶¶ 210.

Defendants' arguments for dismissal are unavailing, seek a level of detail well beyond that which is required at this stage,[49] and require a weighing of facts that should not be considered here.   Defendants also ignores the FAC's clear allegations of Google's abuse of its role as both a competitor and monopolistic provider of services in order to poach Inform's customers. Those actions are blatantly predatory—far from "fair competition."[50]

## VIII. CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied or the Court should permit Inform to amend the FAC in accordance with any Order from the Court.

Respectfully submitted, this 18th day of December, 2020.

---

[49]   Nearly every case cited by Google on this issue involves a motion for summary judgement, not a motion to dismiss.  *See*, *e.g.*, *Tribeca Homes, LLC v. Marathon Inv. Corp.*, 745 S.E.2d 806, 808 (Ga. Ct. App. 2013). Also, *Monge v. Madison Cnty. Record, Inc.*, 802 F. Supp.2d 1327 (N.D. Ga. 2011) is inapposite here as the wrongful conduct in question in that case was *only* based on defamation and false light claims that otherwise failed.

[50]   Google's claim that its "offers [of] 'superior services' could [not] conceivably constitute wrongful conduct" strains credulity by wholly ignoring the surrounding context, as if Google's innocent offering its services were its only action.

HERMAN JONES LLP

/s/ *John C. Herman*

John C. Herman
  (Georgia Bar No. 348370)
Peter M. Jones
  (Georgia Bar No. 402620)
Carlton R. Jones
  (Georgia Bar No. 940540)
HERMAN JONES LLP
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Telephone:  (404) 504-6500
Facsimile:  (404) 504-6501
jherman@hermanjones.com
pjones@hermanjones.com
cjones@hermanjones.com

## CERTIFICATE OF COMPLIANCE WITH LR 5.1

I hereby certify that the foregoing document is written in 14-point Times New Roman font in accordance with Local Rule 5.1.

By: /s/ *Carlton R. Jones*
     Carlton R. Jones
      (Ga. Bar No. 940540)
     HERMAN JONES LLP
     cjones@hermanjones.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2020, I electronically filed the above document with the Clerk of Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By: /s/ *Carlton R. Jones*  _____

Carlton R. Jones

(Ga. Bar No. 940540)

HERMAN JONES LLP

cjones@hermanjones.com

43