UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| INFORM INC., <br><br> Plaintiff, <br><br> v. <br><br> GOOGLE LLC, et al., <br><br> Defendants. | CIVIL ACTION NO. <br> 1:19-CV-05362-JPB |

## **ORDER**

This matter is before the Court on Google LLC, Alphabet Inc. and YouTube, LLC's (collectively, "Defendants") Motion to Dismiss the Complaint [Doc. 38]. This Court finds as follows:

### **BACKGROUND AND FACTUAL ALLEGATIONS**

On November 25, 2019, Inform Inc. ("Plaintiff") filed this action against Defendants asserting federal anti-trust claims and a state law claim for tortious interference. [Doc. 1]. Defendants promptly moved for dismissal on January 22, 2020. [Doc. 16]. On September 25, 2020, the Court granted in part and denied in part Defendants' motion. [Doc. 33]. Without ruling on the merits of Defendants' motion, the Court determined that Plaintiff's Complaint, which was 105 pages, was a "quintessential 'shotgun' pleading of the kind [the Eleventh Circuit has] condemned repeatedly." Id. at 3 (quoting Magluta v. Samples, 256 F.3d 1282,

1284 (11th Cir. 2001)).  The Court noted that it was "virtually impossible" to know which allegations of fact were intended to support which claims of relief since each cause of action incorporated more than 190 paragraphs.  Id.  Instead of dismissing Plaintiff's Complaint, this Court identified the pleading deficiencies and ordered Plaintiff to file an amended complaint in accordance with the following instructions:

    (1)  Inform may not include conclusory, vague and immaterial facts that do not clearly connect to a particular cause of action.

    (2)  Inform may not incorporate every factual paragraph into each count.

    (3)  Inform must indicate which of the factual paragraphs support each individual count alleged.

    (4)  Inform must identify what precise conduct is attributable to each individual defendant separately in each count when asserting a single count against multiple defendants.

    (5)  Each individual count may only be based on a single legal claim (i.e., Inform may not assert a violation of § 2 of the Sherman Act and a violation of § 3 of the Clayton Act together in the same count).

Id. at 5-6.

      Plaintiff filed an eighty-nine page First Amended Complaint ("Amended Complaint") on October 9, 2020, and asserted the following causes of action:  (1) Violation of § 1 of the Sherman Act (Unreasonable Restraints on Trade); (2)

Violation of § 2 of the Sherman Act (Monopoly Maintenance); (3) Violation of § 2 of the Sherman Act (Monopoly Leveraging); (4) Violation of § 2 of the Sherman Act (Attempted Monopolization); (5) Violation of § 2 of the Sherman Act (Exclusive Dealing); (6) Violation of § 3 of the Clayton Act (Exclusive Dealing and Tying); and (7) Tortious Interference.  [Doc. 35].  Plaintiff primarily relies on the same set of facts for each cause of action.[1]  Those facts are discussed immediately below.

This case primarily involves online advertising.  Online advertising consists of marketing advertisements, which are delivered through the Internet on both desktop and mobile devices.  Id. at 12.  Like other advertising media, online

---

[1] In the original Complaint, as already explained herein, Plaintiff incorporated all 194 allegations into each of the enumerated causes of action.  The Court explained in its previous order that this pleading style required the reader to parse through numerous allegations to identify those that have some relevance to a particular defendant or cause of action.  [Doc. 33, p. 4].  Plaintiff was ordered to replead and specifically directed not to incorporate each and every factual allegation into the causes of action.  In the Amended Complaint, Plaintiff does not incorporate over 190 paragraphs.  Plaintiff continues, however, to incorporate a vast number of irrelevant facts into each count.  Consider this chart:

| Count | Paragraphs Incorporated |
| --- | --- |
| I (Unreasonable Restraints on Trade) | 6-7, 9, 69-78, 102-157 |
| II (Monopoly Maintenance) | 6-7, 9, 69-78, 102-157 |
| III (Monopoly Leveraging) | 6-7, 9, 69-78, 102-157, 159-165 |
| IV (Attempted Monopolization) | 9, 102-157 |
| V (Exclusive Dealing) | 6-7, 69-78, 126, 132-157 |
| VI (Exclusive Dealing and Tying) | 6-7, 69-78, 126, 131-157 |
| VII (Tortious Interference) | 127-130 |

advertising often includes: (1) a publisher, who integrates advertisements into its online content; (2) an advertiser, who provides the advertisements to be displayed; and (3) advertising agencies that help create and place the ads. Id.

Plaintiff is a digital media company that provides a platform of services to online publishers, content creators and online advertisers. Id. at 38. Specifically, Plaintiff manages the distribution and delivery of video advertisements from content creators into articles on newspaper, magazine, radio and television websites. Id. at 38-39. In so doing, Plaintiff works with both publishers (i.e., website operators for newspaper, magazine, radio and television sites) and advertisers. Id. at 39. As to the publishers, Plaintiff's platform enables them to pair corresponding video with their original text content to enhance the user's experience and understanding of the publisher's story. Id. As to the advertisers, Plaintiff's platform provides brands with an opportunity to deliver video advertisements to the audience that is most likely to consume their products. Id. At its peak, Plaintiff had an inventory of ad space from a network of approximately 5,000 publishers. Id. at 42. According to Plaintiff, this "aggregated digital audience allowed [it] to work with a brand (or the advertising agency representing a brand) to optimize the placement of its ads to reach that brand's specific target

demographic." Id.  Plaintiff contends that between 2010 to 2017, it garnered revenue of more than $180 million.  Id. at 43.

Plaintiff asserts that Defendants have engaged in anticompetitive conduct that has destroyed its business.  Id. at 54-55.  Very generally, Plaintiff alleges that because a company's advertising services must be compatible with Google's ad products and Google's Chrome Browser, Defendants are able to influence industry standards in its own favor by setting arbitrary and anti-competitive rules by which video content and video advertisements are enabled, viewable and audible, which ultimately preference Defendants' products and services.  Id. at 48-49.

According to Plaintiff, one such example of these "arbitrary and anti-competitive rules" was Google's decision to transition from Flash to HTML5.  Flash is a proprietary digital software developed by Adobe.  Id. at 49.  Plaintiff asserts that Flash was the standard for playing video on websites for more than a decade, and, as a result, most advertising content was developed in Flash.  Id.  Plaintiff contends that in 2014, Google began offering Flash-to-HTML5 conversion tools for the Google Display Network that would create a backup HTML5 video advertisement to run when Flash was disabled or otherwise not supported.  Id. at 50.  On January 27, 2015, YouTube announced that it would no longer be using Flash by default and would instead be using the HTML5 video

player in Google's Chrome and other browsers.  Id. at 50-51.  In February 2015, Google started to automatically convert both existing and new advertisements that were supported by Flash to HTML5 but only when the advertiser uploaded their ads through Google's AdWords, AdWords Editor or third-party tools that worked with Google's ad platform.  Id. at 51.  Plaintiff asserts that in June 2015, Google Chrome began to "intelligently pause" ads that were supported by Flash.  Id. at 52.  Ultimately, Plaintiff alleges that by 2017, Google disabled Flash entirely in favor of HTML5.[2]  Id. at 53.  Although HTML5 is not owned by Defendants, as it is an open-source technology, Plaintiff contends that Google has more control over how, when and what videos are played with HTML5 than it had with Flash.  Id. at 56.

Plaintiff asserts that because of Google's transition to HTML5, advertisers that had ads supported by Flash either had to convert their content to HTML5 or migrate to the Google network to reach target users.  Id. at 51.  When Flash was disabled in 2017, Plaintiff contends that it had the "immediate effect" of foreclosing a very significant portion of online advertisers from reaching users and target audiences.  Id. at 54.  As a result of this conduct, Plaintiff asserts that Google

---

[2] By disabling Flash, if an advertisement supported by Flash was presented to a consumer, a pop-up would appear to the consumer asking if that consumer "wanted to allow Adobe Flash to run on this site?" [Doc. 35, p. 53].  By clicking allow, a consumer could still see the advertisement.  Id.  It is Plaintiff's contention that most consumers would not authorize Flash to run, and thus the advertisement would never be seen.  Id. at 54.

"syphoned off customers from [Plaintiff] and other competitors and hundreds of online advertisers and publishers withered and died, while Google and YouTube plundered valuable video advertisements that had supported publisher's websites." Id. at 51-52.  Ultimately, Plaintiff argues that it was "severely impacted overnight," and its business was sent "plummeting."  Id. at 55.

Plaintiff additionally asserts that Google engaged in the following anticompetitive conduct:  (1) exclusive dealing and anticompetitive contracts; (2) illegal tying and bundling of services; (3) unilateral setting and altering of technological standards; (4) manipulative and technological blocking, exclusion, downgrading and denial of interoperability; (5) preferential treatment of its own products and services; (6) denial of interoperability and purposeful incompatibility; (7) opacity as to function, pricing and data; and (8) predatory pricing.  Id. at 60-68.

## LEGAL STANDARD

On November 13, 2020, Defendants filed the instant Motion to Dismiss the Complaint.  [Doc. 38].  In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] the allegations in the complaint as true and constru[es] them in the light most favorable to the plaintiff."  Traylor v. P'ship Title Co., LLC, 491 F. App'x 988, 989 (11th Cir. 2012).  Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain

statement of the claim showing that the pleader is entitled to relief." Although detailed factual allegations are not necessarily required, the pleading must contain more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Importantly, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (citation omitted). At bottom, the complaint must contain more than "an unadorned, the-defendant-unlawfully-harmed-me accusation," id., and must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Traylor, 491 F. App'x at 990 (quoting Iqbal, 556 U.S. at 678).

## ANALYSIS

In their Motion to Dismiss, Defendants argue that Plaintiff's Amended Complaint is still a shotgun pleading. [Doc. 38-1, p. 8]. Defendants also argue that Plaintiff lacks antitrust standing and that the claims suffer from myriad pleading and legal deficiencies. Id. at 16.

1. **Shotgun Pleading**

As already explained at length in this Court's September 25, 2020 Order, "[c]ourts in the Eleventh Circuit have little tolerance for shotgun pleadings." Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1295 (11th Cir. 2018). Typically,

shotgun pleadings are characterized by: (1) multiple counts that each adopt the allegations of the preceding counts; (2) conclusory, vague and immaterial facts that do not clearly connect to a particular cause of action; (3) failing to separate each cause of action into distinct counts; or (4) combining multiple claims against multiple defendants without specifying which defendant is responsible for which act. McDonough v. City of Homestead, 771 F. App'x 952, 955 (11th Cir. 2019).

Shotgun pleadings "waste scarce judicial resources, inexorably broaden the scope of discovery, wreak havoc on appellate court dockets, and undermine the public's respect for the courts." Arrington v. Green, 757 F. App'x 796, 797 (11th Cir. 2018). Shotgun pleadings,

> whether filed by plaintiffs or defendants, exact an intolerable toll on the trial court's docket, lead to unnecessary and unchannelled discovery, and impose unwarranted expense on the litigants, the court and the court's parajudicial personnel and resources. Moreover, justice is delayed for the litigants who are "standing in line," waiting for their cases to be heard. The courts of appeals and the litigants appearing before them suffer as well.

Jackson v. Bank of Am., N.A., 898 F.3d 1348, 1356-57 (11th Cir. 2018). The Eleventh Circuit Court of Appeals has even stated that tolerating shotgun pleadings "constitutes toleration of obstruction of justice." Id. at 1357.

To be sure, Plaintiff's Amended Complaint is cumbersome and suffers from some of the same deficiencies as the first. While the Amended Complaint no longer has multiple counts that adopt the allegations of the preceding counts and does not fail to separate each cause of action into distinct counts, at eighty-nine pages, the Amended Complaint is in no sense a "short and plain statement of the claim" required by the Federal Rules of Civil Procedure. Particularly concerning to this Court is Plaintiff's inclusion of numerous conclusory, vague and immaterial facts not obviously connected to any particular cause of action. In fact, Plaintiff still incorporates more than sixty paragraphs into each cause of action. Plaintiff also never specifies which defendant is responsible for which act or omissions; instead, Plaintiff simply lumps the conduct of Defendants together. For the reasons explained below, Plaintiff's Amended Complaint is an impermissible shotgun pleading subject to dismissal.

- A. <u>Plaintiff's Amended Complaint is replete with conclusory, vague and immaterial facts that do not clearly connect to a particular cause of action.</u>

In the Court's first instruction to Plaintiff, Plaintiff was directed not to include conclusory, vague and immaterial facts that are not clearly connected to a particular cause of action. [Doc. 33, p. 5]. Although Plaintiff made some changes to its Complaint, it failed to adequately comply with this instruction. As an initial

matter, in the Amended Complaint, Plaintiff describes at length the growth of Google's search engine, which plays no role in any cause of action. [Doc. 35, pp. 17-19].  Plaintiff also describes various acquisitions but does not base any claim on them. Id. at 26-29.  Moreover, Plaintiff asserts that Google improperly influences the government yet does not state a claim based on this purported influence. Id. at 74-75.  These factual assertions, which are not connected to any of the causes of action, are almost ten pages in length.

As to the causes of actions specifically, this Court recognizes that Plaintiff no longer incorporates every paragraph into the causes of action.  Nevertheless, the pleading is still improper.  By way of example, Count 1 targets unreasonable restraints on trade.  The elements of a § 1 claim are:  (1) an agreement between two or more parties (2) that unreasonably restrains trade.  Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1545 (11th Cir. 1996).

In Count 1, Plaintiff's Amended Complaint asserts several conclusory paragraphs, which include allegations that "[i]ndividually and in combination, [Defendants'] Anticompetitive Restraints constitute illegal restrictions, agreements, and barriers that are intended to and do in fact prevent, restrict or interfere with competition in Defendants' Leveraged Monopolies in violation of the Sherman Act," "[t]he Google Defendants are combinations within the meaning

of [§ 1 of the Sherman Act]" and "Plaintiff has suffered, continues to suffer, and will suffer until the Court enters the relief requested below, an antitrust injury resulting from [Defendants'] Anticompetitive Restraints as described herein." [Doc. 35, p. 76]. In addition to these conclusory paragraphs, Plaintiff then incorporates by reference more than sixty paragraphs—the same sixty plus paragraphs incorporated into all the other causes of action.

In violation of this Court's previous order, most of these paragraphs have nothing to do with a violation of § 1 of the Sherman Act. For instance, spanning almost ten pages, Plaintiff discusses Google's transition from Flash to HTML5. In these paragraphs, Plaintiff never identifies a conspiracy or an agreement with another entity which would amount to an antitrust violation. While these paragraphs are comprehensible and this Court understands that Flash is now disabled in the Google Chrome Browser, Plaintiff never explains why this transition violated various antitrust laws or was otherwise illegal. It seems to the Court that many facts alleged by Plaintiff are simply aimed at creating the impression that Google is a bad actor.

At bottom, Plaintiff should have specifically directed this Court to an agreement between two or more parties. In the allegations to support Count 1, Plaintiff does not identify any specific agreement and instead refers the Court to

paragraphs 9 and 102-157. [Doc. 35, p. 76]. Certainly, most of these allegations have nothing to do with an agreement between two or more parties. To determine whether Plaintiff has stated a claim here, Plaintiff expects this Court to comb through more than sixty paragraphs (and over twenty-five pages) to identify which agreement between two or more persons or entities unreasonably restrains trade. The Court is not willing to undergo this type of analysis. "The federal judiciary is a system of scarce resources," and "district courts have neither the manpower nor the time to sift through a morass of irrelevant facts in order to piece together claims for plaintiff's counsel." Barmapov v. Amuial, 986 F.3d 1321, 1327-28 (11th Cir. 2021) (Tjoflat, J., concurring). Importantly, "district courts are flatly forbidden from scouring shotgun complaints to craft a potentially viable claim for a plaintiff. By digging through a complaint in search of a valid claim, the courts 'would give the appearance of lawyering for one side of the controversy.'" Id. at 1328. Ultimately, because Plaintiff again chose to incorporate numerous immaterial facts to support the causes of action, Plaintiff's Amended Complaint remains a shotgun pleading.

> B. Plaintiff failed to adequately identify the precise conduct that is attributable to each defendant.

Plaintiff was also specifically instructed by this Court that when a single count is brought against multiple defendants, Plaintiff must identify what precise

13

conduct is attributable to each individual defendant. [Doc. 33, p. 5]. Plaintiff contends that it complied with this directive because Defendants operate as a single entity. Plaintiff thus added the following allegation to its Amended Complaint:

> Collectively, the Google Defendants are operated and controlled as a single entity, with Sundar Pichai acting as the CEO of both companies. Not only did Google essentially create Alphabet as a holding company in 2015, but virtually all of Alphabet's revenues comes from Google. YouTube, in turn, is a wholly owned subsidiary of Google and is controlled and operated as such. Alphabet filed its 10-K and 10-Q statements with the Securities and Exchange Commission, reporting consolidated revenues for all of the Google Defendants. In fact, these statements expressly define Alphabet as "Alphabet Inc. and its subsidiaries."

[Doc. 35, p. 10]. This allegation is not sufficient to comply with the Court's directive. Simply put, the allegation does not plausibly show that all the defendants participated in all the alleged anticompetitive conduct. It is important to attribute the specific conduct to the specific defendant because liability for both a subsidiary and parent is not automatic where "there is no evidence that both were involved in the challenged conduct." In re Fla. Cement & Concrete Antitrust Litig., 746 F. Supp. 2d 1291, 1324 (S.D. Fla. 2010) (quoting Mitchael v. Intracorp., Inc., 179 F.3d 847, 857 (10th Cir. 1999)). At bottom, even though this Court ordered Plaintiff to specify which conduct was attributable to which defendant, Plaintiff did not do so.

Although Plaintiff's Amended Complaint corrects some of the pleading deficiencies and does not demonstrate all the previously identified characteristics of shotgun pleadings, this Court cannot ignore that Plaintiff's Amended Complaint undoubtedly continues to exhibit key characteristics of shotgun pleadings. As explained earlier, Plaintiff's Amended Complaint is rife with immaterial factual and conclusory allegations. Plaintiff's Amended Complaint also does not specify which defendants are responsible for which acts or omissions. For these reasons, Plaintiff's Amended Complaint remains a "quintessential 'shotgun' pleading of the kind [the Eleventh Circuit has] condemned repeatedly." Magluta, 256 F.3d at 1284. Accordingly, dismissal is appropriate in this case.

2. **Antitrust Standing**

Even though dismissal is appropriate on shotgun pleading grounds, dismissal is also required because Plaintiff has not shown antitrust standing. "A private plaintiff seeking damages under the antitrust laws must establish standing to sue." Fla. Seed Co. v. Monsanto Co., 105 F.3d 1372, 1374 (11th Cir. 1997). To have antitrust standing, a plaintiff must do more than satisfy the basic "injury in fact" and "case or controversy" requirements that would satisfy constitutional standing. Id. In addition to these constitutional requirements, "the court must find a close

relationship between the plaintiff's injury and the alleged antitrust violation." Amey, Inc. v. Gulf Abstract & Title, Inc., 758 F.2d 1486, 1493 (11th Cir. 1985).

The Eleventh Circuit has established a "two-pronged approach" in deciding whether a plaintiff has antitrust standing. Id. First, a plaintiff must establish that it has suffered "antitrust injury." Fla. Seed, 105 F.3d at 1374. Second, a plaintiff must establish that it is an "efficient enforcer of the antitrust laws." Id.

A. Antitrust Injury

Antitrust injury is defined as:

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1449 (11th Cir. 1991) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). Generally, a plaintiff must prove that there is a public harm that coincides with the antitrust plaintiff's private harm. Id. at 1449-50. In fact, "[w]here an antitrust plaintiff merely alleges harm to an individual competitor not harm to competition generally, antitrust injury has not been established and dismissal is warranted." QSGI, Inc. v. IBM Glob. Fin., No. 11-CV-80880, 2012 WL 13019046, at *3 (S.D. Fla. July 31, 2012).

As to the alleged antitrust injury, Plaintiff asserts in its Amended Complaint that "Defendants' Anticompetitive Restraints have resulted in significant monetary injury to Plaintiff, as well as higher prices paid by consumers for retail products, higher prices for advertising and the forcing of Plaintiff and others to use Google products and services." [Doc. 35, p. 76]. Plaintiff also alleges that Google has "effectively put [it] out of business." Id. at 2. After review, this Court finds that these allegations are too conclusory to establish an antitrust injury. Here, Plaintiff provides no factual support to show that Defendants weakened competition beyond Plaintiff's claim that Plaintiff was put out of business. Moreover, Plaintiff provides no factual support to show that prices are higher for retail products or that prices are higher for advertising. Ultimately, these "naked assertions" devoid of further factual enhancement are insufficient to survive a motion to dismiss.

B. Efficient Enforcer

A plaintiff must also show that it is an efficient enforcer of antitrust laws. Courts generally consider the following factors when determining whether a plaintiff is an efficient enforcer of the antitrust laws:

> (1) whether the plaintiff has suffered a direct injury; (2) whether its injury is remote; (3) whether other plaintiffs are better suited to bring the suit; (4) whether the plaintiff's injuries are speculative; (5) whether the calculation of damages would be complex and run the risk of duplicative recoveries; and (6) whether the plaintiff could enforce the court's judgment.

17

Duty Free Ams., Inc, v. Estee Lauder Cos., 797 F.3d 1248, 1273 n.5 (11th Cir. 2015).

As to the first factor, Plaintiff has not suffered a direct injury.  Based on the allegations in the Amended Complaint, Plaintiff would have been injured only if: (1) a publisher provided video advertising space on its website to Plaintiff; (2) Plaintiff selected advertisements for the space that were not compatible with HTML5; (3) a consumer viewed the publisher's website using Chrome; and (4) the consumer would have clicked on or viewed the ad but did not do so because of Chrome's limitations.  Only then, because the publisher and advertiser were injured, would Plaintiff suffer an injury.  Given this chain of events needed to occur before injury, not only is Plaintiff's injury not direct, but it is also remote and speculative.  Importantly, given that advertisers, publishers and Adobe suffered a direct injury, they are better suited to bring this action.  After considering the factors, this Court finds that Plaintiff is not an efficient enforcer of the antitrust laws.

Ultimately, Plaintiff must do more than satisfy the constitutional minimums to have standing, and Plaintiff has not done so in this case.  First, Plaintiff has not alleged antitrust injury because the allegations are too conclusory.  Second,

Plaintiff has not shown it is an efficient enforcer of the antitrust laws. Accordingly, dismissal is appropriate on this alternative ground.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss [Doc. 38] is **GRANTED** on shotgun pleading grounds, and alternatively on standing grounds. The state law tortious interference claim is **DISMISSED** without prejudice.[3] The remaining claims are **DISMISSED** with prejudice.[4] The Clerk is **DIRECTED** to close this case.

**SO ORDERED** this 20th day of September, 2021.

J. P. BOULEE
United States District Judge

---

[3] Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1296-97 (11th Cir. 2018) (holding that where the dismissal occurs without any analysis of the merits of the state law claims, the dismissal of the state law claims should be without prejudice as to refiling in state court).

[4] Jackson v. Bank of Am., N.A., 898 F.3d 1348, 1358 (11th Cir. 2018) (determining that a court does not abuse its discretion in dismissing the case with prejudice on shotgun pleading grounds where the plaintiff had fair notice of the defects and a meaningful chance to fix them).